UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                                              :
                                                    :     Chapter 11
CALPINE CORPORATION, et al.,                        :     Case No. 05-60200 (BRL)
                                                    :
                  Debtors.                          :
------------------------------------------------------------ x
BRENCOURT CREDIT OPPORTUNITIES                      :
MASTER, LTD., BRENCOURT MULTI-                      :
STRATEGY ENHANCED DEDICATED                         :
FUND, LP, DILLON READ U.S. FINANCE                  :
L.P., DILLON READ FINANCIAL PRODUCTS                :
TRADING LTD., LINDEN CAPITAL L.P.                   :
AND ORE HILL HUB FUND, LTD.,                        :     Civil Case No.07-CV-7831 (JGK)
                                                    :
                  Appellants,                       :
                                                    :
             -against-                              :
                                                    :
CALPINE CORPORATION AND ITS                         :
AFFILIATED DEBTORS AND DEBTORS IN                   :
POSSESSION, OFFICIAL COMMITTEE OF                   :
UNSECURED CREDITORS OF CALPINE                      :
CORPORATION, OFFICIAL COMMITTEE OF                  :
EQUITY SECURITY HOLDERS,                            :
                                                    :
                  Appellees.                        :
------------------------------------------------------------ x

**OPENING BRIEF OF APPELLANT HOLDERS**
**OF THE 7.75% CONVERTIBLE NOTES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

INTRODUCTION ................................................................................................... 1

STATEMENT OF BASIS OF APPELLATE JURISDICTION ...................................... 1

STATEMENT OF ISSUES PRESENTED ..................................................................... 2

APPLICABLE STANDARD OF APPELLATE REVIEW ............................................. 3

STATEMENT OF THE CASE ..................................................................................... 3

I.       Nature of the Case ...................................................................................... 3

II.      Course of Proceedings ................................................................................ 6

         A.       Chapter 11 Cases                                                    6

         B.       Makewhole Objection                                                 8

         C.       Limited Objection                                                   8

         D.       Bankruptcy Court Opinion and Order                                  9

STATEMENT OF FACTS ........................................................................................ 10

I.       Brief Description of the 7.75% Convertible Notes ...................................... 10

ARGUMENT ......................................................................................................... 13

I.       THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DETERMINING
         THAT THE INDENTURE TRUSTEE'S PROOF OF CLAIM DID NOT INCLUDE A
         CLAIM FOR THE BREACH OF THE CONVERSION RIGHT ................................... 13

II.      THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DETERMINING
         THAT THE SUPPLEMENTAL PROOF OF CLAIM DID NOT RELATE BACK TO
         THE PROOF OF CLAIM AND ABUSED ITS DISCRETION IN EXPUNGING THE
         CLAIM ...................................................................................................... 15

         A.       The Bankruptcy Court Erred In Determining That The
                  Supplemental Proof Of Claim Did Not Describe The Original
                  Claim With More Particularity                                        17

         B.       The Bankruptcy Court Abused Its Discretion In Determining
                  That The 7.75% Convertible Noteholders' Claim For Damages
                  Arising From The Debtors' Abrogation Of The Conversion
                  Right Contained In The Indenture Should Be Expunged                  20

i

III.   THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN HOLDING
       THAT THE DEBTORS ARE NOT LIABLE TO THE 7.75% CONVERTIBLE
       NOTEHOLDERS FOR ELIMINATING THE CONVERSION RIGHT IN BREACH OF
       THE INDENTURE AND DISALLOWING THE CONVERSION RIGHT CLAIM.......24

       A.   The Debtors Are Solvent And Therefore The 7.75%
            Convertible Noteholders Are Entitled To The Full Benefit Of
            Their Bargain And Should Be Made Whole For The Loss Of
            The Conversion Right                                          24

       B.   The Indenture Provides For The Survival Of The Conversion
            Right During A Bankruptcy, And The Debtors' Proposed
            Repayment Of The 7.75% Convertible Notes Is A Breach Of
            The Conversion Right                                          25

       C.   Damages Are Due Despite The Automatic Acceleration Of The
            Debt                                                          31

       D.   Law Of The Case And The CalGen Decision Supports The
            Allowance Of The 7.75% Convertible Noteholders' Claims        33

       E.   The Conversion Right Claim Does Not Involve A "Double
            Recovery"                                                     35

       F.   The Fact That The Conversion Right Claim Was Contingent Or
            Unmatured As Of The Petition Date Does Not Mean That The
            Claim Should Be Expunged                                      37

IV.    THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DETERMINING
       THAT THE CLAIM FOR DAMAGES ARISING FROM THE DEBTORS'
       ABROGATION OF THE CONVERSION RIGHT WOULD BE SUBJECT TO
       SUBORDINATION PURSUANT TO SECTION 510(B) OF THE BANKRUPTCY
       CODE.................................................................39

       A.   The 7.75% Convertible Noteholders' Conversion Right Claim
            For Damages Arising From The Breach Of The Indenture
            Claim Bears No Causal Nexus To The "Purchase Or Sale Of A
            Security"                                                     40

       B.   Section 510(b) Requires Only That Such Claim Be
            Subordinated To The Claims Of Principal And Interest Under
            The 7.75% Convertible Notes, And Does Not Mandate That
            Such Claim Be Deemed *Pari Passu* With, Or Subordinated To,
            Common Stock                                                  44

V.     THE PROPOSED FORM OF ORDER SUBMITTED BY THE DEBTORS AND
       ENTERED BY THE BANKRUPTCY COURT DID NOT ACCURATELY REFLECT

THE RULING OF THE BANKRUPTCY COURT SUSTAINING THE LIMITED
OBJECTION ............................................................................................................. 46

CONCLUSION ................................................................................................................. 47

# TABLE OF AUTHORITIES

## CASES

In re 139-141 Owners Corp.,
    306 B.R. 763 (Bankr. S.D.N.Y. 2004).................................................................25

In re 433 South Beverly Drive,
    117 B.R. 563 (Bankr. C.D. Cal. 1990)...............................................................32

In re Alexander's, Inc.,
    176 B.R. 715 (Bankr. S.D.N.Y. 1995)...............................................................20

In re America West Airlines, Inc.,
    179 B.R. 893 (Bankr. D. Ariz. 1995).................................................................44

Ameritrust Co. v. Integrated Resources,
    157 B.R. 66 (S.D.N.Y. 1993)........................................................................3, 19

In re AroChem Corp.,
    176 F.3d 610 (2d Cir. 1999)..............................................................................3

Arthur v. Burkich,
    520 N.Y.S.2d 638 (3d Dep't 1987)...................................................................30

Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 North LaSalle Street P'ship,
    526 U.S. 434 (1999)........................................................................................25

In re Bennett Funding Group, Inc.,
    146 F.3d 136 (2d Cir. 1998)..............................................................................3

In re Best Prods. Co., Inc.,
    140 B.R. 353 (Bankr. S.D.N.Y. 1992) .............................................................13

Broad v. Rockwell International Corp.,
    642 F.2d 929 (5th Cir. 1981) cert denied 454 U.S. 965 (1981) .............................26, 35, 43

Butner v. United States,
    440 U.S. 48 (1979)..........................................................................................25

In re Calpine Corp.,
    365 B.R. 392 (Bankr. S.D.N.Y. 2007)...................................................31, 33, 34

In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.,
    791 F.2d 524 (7th Cir. 1986) ............................................................................24

i

Chock Full O'Nuts Corp. v. United States,
    453 F.2d 300 (2d Cir. 1971)............................................................35, 36

Consol. Rock Prods. Co. v. Du Bois,
    312 U.S. 510 (1941).........................................................................24

In re Dow Corning,
    456 F.3d 668 (6th Cir. 2006) ............................................................25

In re Einstein/Noah Bagel Corp.,
    257 B.R. 499 (Bankr. D. Ariz. 2000)................................................38, 39

In re Enron Corp.,
    364 B.R. 482 (S.D.N.Y. 2007)............................................................3

In re Enron Creditors Recovery Corp.,
    370 B.R. 90 (Bankr. S.D.N.Y. 2007)..................................................18

First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.),
    937 F.2d 833 (2d Cir. 1991) ............................................................13

Friends Realty Associates, LLC v. Wells Fargo Bank, N.A.P.,
    2007 WL 1322344 (1st Dep't May 8, 2007)........................................30

Gens v. Resolution Trust Corp.,
    112 F.3d 569 (1st Cir. 1997)............................................................14

Harff v. Kerkorian,
    324 A.2d 215 (Del. Ch. 1974), rev'd in part on other grounds........................43

Harsco Corp. v. Sequi,
    91 F.3d 337 (2d Cir. 1996)............................................................26, 34

Hauser v. Western Group Nurseries, Inc.,
    767 F. Supp. 475 (S.D.N.Y. 1991)....................................................28

Hilton Hotels Corp. v. Dunnet,
    275 F. Supp. 2d 954 (W.D. Tenn. 2003)............................................37

In re Imperial Coronado Partners, Ltd.,
    96 B.R. 997 (B.A.P. 9th Cir. 1989)....................................................32

Indu Craft, Inc. v. Bank of Baroda,
    47 F.3d 490 (2d. Cir. 1995)............................................................36

Jezarian v. Raichle,
     439 U.S. 1074 (1979)...................................................................................45

In re Keene Corp.,
     188 B.R. 903 (Bankr. S.D.N.Y. 1995).............................................................20

Lillis v. AT&T Corp.,
     No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007)......................37

Liona Corp., Inc. v. PCH Associates (In re PCH Associates),
     949 F.2d 585 (2d Cir. 1992)............................................................................34

In re Med. Diversified, Inc.,
     461 F.3d 251 (2d Cir. 2006)............................................................................40

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),
     419 F.3d 115 (2d Cir. 2005)..............................................................16, 17, 18

In re Migel's Will,
     336 N.Y.S.2d 376 (N.Y. Sur. 1972)................................................................43

In re Miss Glamour Coat Co.,
     80-2 U.S. Tax Case p. 9737, 1980 WL 1668 (S.D.N.Y. 1980) ........................19

In re Montgomery Ward Holding Corp.,
     272 B.R. 836 (Bankr. D. Del. 2001) ...............................................................41

Northwest Bank Worthington v. Ahlers,
     485 U.S. 197 (1988).......................................................................................37

Official Comm. of Unsecured Creditors. v. Am. Capital Fin. Servs., Inc. (In re Mobile
     Tool Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004) ......................................41

Perrin v. United States,
     444 U.S. 37 (1979).........................................................................................45

Pioneer Inv. Serv. Co. v. Brunswick Associates Ltd. P'ship,
     507 U.S. 380 (1993).......................................................................................44

Praedium II Broadstone, LLC v. Wall Street Strategies, Inc.,
     No. 04-3880, 2004 WL 2624678 (S.D.N.Y. Nov. 18,  2004)...........................20

R.A. Mackie & Co. v. Wien Securities Corp.,
     329 F. Supp. 2d 477 (S.D.N.Y. 2004).............................................................37

Racusin v. American Wagering, Inc. (In re American Wagering, Inc.),
    No. 05-15969, 2007 WL 1839681 (9th Cir. June 28, 2007).......................................42, 45

Raven Media Investments LLC v. DirecTV Latin American, LLC (In re DirecTV Latin
    America, LLC), No. 03-981, 2004 WL 302303 (D. Del. Feb. 4, 2004). ..........................40

Russo Enters., Inc. v. Citibank, N.A.,
    699 N.Y.S.2d 437 (2nd Dep't 1999)..............................................................................30

In re Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,
    691 F.2d 1039 (2d Cir. 1982).........................................................................................32

In re Skyler Ridge,
    80 B.R. 500 (Bankr. C.D. Cal. 1987)..............................................................................32

In re Stirling Homex Corp.,
    579 F.2d 206 (2d Cir. 1978), cert. denied sub nom.
    Jezarian v. Raichle, 439 U.S. 1074 (1979) ....................................................................45

Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal,
    791 F. Supp. 401 (S.D.N.Y. 1991)..................................................................................36

In re Tricycle Enters., Inc.,
    No. 06-30096, 2007 WL 1246593 (Bankr. N.D.N.Y. April 27, 2007)............................17

Trump-Equitable Fifth Avenue Co. v. H.R.H. Construction Corp.,
    106 A.D.2d 242 (1st Dep't 1985), aff'd 66 N.Y.2d 779 (1985) .....................................28

United States v. Winstar,
    518 U.S. 839 (1996)........................................................................................................33

Wabash Valley Power Association v. United States (In re Wabash Valley Power
    Association),
    72 F.3d 1305 (7th Cir. 1995) ........................................................................................37

In re Wyeth Co.,
    134 B.R. 920 (Bankr. W.D. Mo. 1991)..........................................................................41

## STATUTES

11 U.S.C. § 101(5)(A)..................................................................................38

11 U.S.C. § 101(16)....................................................................................43

11 U.S.C. § 502(b)(1) .................................................................................38

11 U.S.C. § 510(b) ................................................................................39, 44

11 U.S.C. § 1129(b) ...................................................................................25

Fed. R. Bankr. P. 7015...............................................................................16

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-595, at 311, 95th Cong. (1st Sess. 1978), reprinted in 1978
    U.S.C.C.A.N. 5963, 6268 ....................................................................44

S. Rep. No. 989, 95th Cong. (2d Sess. 1978), reprinted in 1978 U.S.C.C.A.N. 5787,
    5810.......................................................................................................44

## MISCELLANEOUS

6A Fletcher Cyc. Corp. § 2649.10 (2006) ...................................................35

3 Moore, Moore's Federal Practice 15.15[3] at 15-148 (1992)...................19

John Creed & Noah Beck, The Demise of CoCos and the Tax Consequences of
    Exchanging Convertible Debt, 734 PLI/Tax 263 (June 27, 2005) ....................11

v

## INTRODUCTION

Appellants, the holders and/or investment advisors to certain holders of the 7.75%

Contingent Convertible Notes due 2015 (the "7.75% Convertible Notes" or the "7.75%

Convertible Noteholders")[1] issued by Calpine Corporation ("Calpine," and together with the

above-captioned debtors and debtors-in-possession, the "Debtors") pursuant to that certain

Indenture, dated as of August 10, 2000 (the "Base Indenture"), between Calpine and Wilmington

Trust Company as predecessor indenture trustee (together with Manufacturer's Traders Trust, as

successor indenture trustee, the "Indenture Trustee"), as supplemented by the Third

Supplemental Indenture, dated as of June 23, 2005 (the "Supplemental Indenture", and together

with the Base Indenture, the "Indenture"), by and through their undersigned counsel, hereby

submit this opening brief in support of their appeal taken from the Order Granting Debtors'

Limited Objection to Convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280,

6299 and 6300 (the "Order") entered by the United States Bankruptcy Court for the Southern

District of New York (the "Bankruptcy Court") on August 10, 2007  [Docket 5595].

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

Pursuant to 28 U.S.C. § 158(a)(1) and Rule 8001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), this Court has jurisdiction to hear this appeal.

The Order constitutes a final appealable order pursuant to 28 U.S.C. § 158(a)(1).

---

[1]    The Appellant-7.75% Convertible Noteholders include: Brencourt Credit Opportunities Master, Ltd., Brencourt Multi-Strategy Enhanced Dedicated Fund, LP, Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., Linden Capital L.P. and Ore Hill Hub Fund, Ltd., as holders and/or investment advisors to certain holders of certain of the 7.75% Convertibles Notes.

## STATEMENT OF ISSUES PRESENTED

1.      Whether the Bankruptcy Court erred as a matter of law in determining that the Indenture Trustee's timely-filed proof of claim (the "Proof of Claim") on account of the 7.75% Convertible Notes, which included a liquidated claim for principal and interest and a claim for unliquidated amounts that may be due or become due under the 7.75% Convertible Notes and the Indenture, and which attached a copy of the Indenture, did not include a claim (the "Conversion Right Claim") for breach of the conversion right contained in the Indenture (the "Conversion Right").

2.      Whether the Bankruptcy Court erred as a matter of law in determining that the supplement to the proof of claim filed by the Indenture Trustee (the "Supplemental Proof of Claim"), which merely clarified that the original Proof of Claim for unliquidated amounts included a claim for breach of the Conversion Right, is not an amendment to the Proof of Claim and did not relate back to the Proof of Claim and therefore should be time barred.

3.      Whether the Bankruptcy Court abused its discretion in determining that allowance of the 7.75% Convertible Noteholders' claim for damages arising from the Debtors' abrogation of the Conversion Right contained in the Indenture should be expunged on equitable grounds.

4.      Whether the Bankruptcy Court erred as a matter of law in holding that the Debtors are not liable to the 7.75% Convertible Noteholders for eliminating the Conversion Right in breach of the Indenture and disallowing the Conversion Right Claim.

5.      Whether the Bankruptcy Court erred as a matter of law in determining that the claim for damages arising from the Debtors' abrogation of the Conversion Right contained in

the Indenture would be subject to subordination pursuant to Section 510(b) of the Bankruptcy

Code.

        6.      Whether the Bankruptcy Court erred as a matter of law by improperly

adjudicating issues not before it and valuing the claims of the 7.75% Convertible Noteholders as

the amount of outstanding principal, plus accrued interest at a rate to be determined by the

Bankruptcy Court at the end of the chapter 11 cases and reasonable prepetition indenture trustee

fees as provided under the Indenture, and ordering that the 7.75% Convertible Noteholders were

not entitled to claims on account of any breaches of their Indenture (other than breach of the

Conversion Right), "makewhole" or other damages, which claims were neither disputed in the

Debtors' Limited Objection nor briefed or argued by the parties.

## APPLICABLE STANDARD OF APPELLATE REVIEW

        On appeal, a federal district court reviewing an order of the bankruptcy court

accepts its factual findings unless they are clearly erroneous, pursuant to Bankruptcy Rule 8013,

and reviews its conclusions of law de novo.  In re Enron Corp., 364 B.R. 482, 485 (S.D.N.Y.

2007) (citing In re AroChem Corp., 176 F.3d 610, 620 (2d Cir. 1999);  In re Bennett Funding

Group, Inc., 146 F.3d 136, 138 (2d Cir. 1998).  The decision to grant or deny an amendment to a

timely-filed proof of claim rests within the sound discretion of the bankruptcy judge, and upon

appellate review, is subject to an abuse of discretion standard. See Ameritrust Co. v. Integrated

Resources, 157 B.R. 66, 72 (S.D.N.Y. 1993).

## STATEMENT OF THE CASE

### I.      Nature of the Case

        Through the Limited Objection, the Debtors requested that the Bankruptcy Court

deny the 7.75% Convertible Noteholders any claim based upon a breach of the express

provisions of the Indenture.  Specifically, the Debtors requested that the Bankruptcy Court

(a) disallow the Supplemental Proof of Claim on the basis that it was not timely-filed by the Bar

Date (defined below) and did not relate back to the original Proof of Claim, (b) disallow any

claims contained in the Supplemental Proof of Claim for damages arising as a result of the

Debtors' failure to provide any recovery to the 7.75% Convertible Noteholders on account of the

abrogation of the Conversion Right because (i) the maturity date of the 7.75% Convertible Notes

was accelerated upon the Debtors' filing for bankruptcy and thus the Conversion Right, which

was exercisable until one day prior to the scheduled maturity date, was extinguished under

section 502 of the Bankruptcy Code, (ii) the 7.75% Convertible Notes are traditional convertible

securities entitling the 7.75% Convertible Noteholders to either a right to receive principal and

interest or the right to convert and receive equity, but not both, (iii) even if the 7.75%

Convertible Noteholders had a valid claim for breach of the Conversion Right, it must be

subordinated under section 510(b) of the Bankruptcy Code to all debt securities.  The Debtors

also requested the Bankruptcy Court find that the original Proof of Claim did not contain a valid

claim for breach of the Conversion Right in its assertion of unliquidated claims arising under the

Indenture.

The Bankruptcy Court adopted the Debtors' arguments in toto, finding that (a) the

Supplemental Proof of Claim was not timely filed and did not relate back to the original Proof of

Claim, primarily because accepting the Supplemental Proof of Claim at this stage in the Debtors'

bankruptcy cases would be unduly prejudicial, and (b) even if the Supplemental Proof of Claim

was timely filed, the 7.75% Convertible Noteholders were not entitled to a claim for breach of

the Conversion Right because (i) the maturity date of the 7.75% Convertible Notes was

accelerated and the Conversion Right was thus eliminated, (ii) the 7.75% Convertible Notes were

nothing more than ordinary convertible notes entitling their holders to only one recovery, either principal plus accrued interest or stock upon conversion, but not both, and (iii) even if there was a cognizable claim for breach of the Conversion Right, it would be subordinated pursuant to section 510(b) of the Bankruptcy Code.  The Bankruptcy Court also found that the original Proof of Claim did not include a claim for breach of the Conversion Right in its general language asserting unliquidated claims and attaching a copy of the Indenture as an exhibit.

The 7.75% Convertible Noteholders respectfully submit that the Bankruptcy Court erred in its conclusions because (a) it did not accurately assess the factors necessary to determine if the Supplemental Proof of Claim related back to the original Proof of Claim, (b) it failed to understand and address the clear language of the Indenture providing for the continuing right to convert the 7.75% Convertible Notes after the Debtors' filing for bankruptcy protection, (c) it failed to understand the unique nature of these contingent 7.75% Convertible Notes that specifically provide for the recovery of both par plus accrued interest and shares of stock upon conversion of the 7.75% Convertible Notes, (d) ignored the nature of damages resulting from the breach of the 7.75% Convertible Notes such that they are valid claims, not interests pari passu to the equity interests in the Debtors, and (e) ignored the fact that the original Proof of Claim specifically identified all contingent claims based upon the provisions of the Indenture that the Debtors themselves negotiated less than three years ago.

In addition to overturning the findings of the Bankruptcy Court, this Court must vacate the specific order approving the Debtors' Limited Objection as it goes far beyond the relief sought in the Limited Objection by limiting the 7.75% Convertible Noteholders' claims only to those for principal and accrued interest thereon and disallowing all other claims connected to the 7.75% Convertible Notes — relief that the Debtors' themselves never sought.

In the end, the Bankruptcy Court has denied the 7.75% Convertible Noteholders the benefit of their bargain to their detriment and has created a windfall for other creditors and, particularly, for holders of equity interests that are junior to the 7.75% Convertible Noteholders' claims.

**II.      Course of Proceedings**

**A.      Chapter 11 Cases**

On December 20, 2005 (the "Petition Date") and thereafter, Calpine and various of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.

By order dated April 26, 2006 [Docket 1348], the Court established August 1, 2006 as the bar date for filing proofs of claim (the "Bar Date").

On July 19, 2006, Wilmington Trust Company, as original Indenture Trustee for the 7.75% Convertible Notes, filed the Proof of Claim [Claim Number 2404] asserting claims for (a) principal and interest and (b) other unliquidated amounts arising under the Indenture.   On or about April 23, 2007, Manufacturers and Traders Trust Company (as successor Indenture Trustee for the 7.75% Convertible Notes) filed the Supplemental Proof of Claim [Claim Number 6280].

Between March and July of 2007, the Convertible Noteholders engaged in a number of meetings and negotiations with the Debtors regarding the treatment of the 7.75% Convertible Notes, specifically including the Conversion Right.

On June 20, 2007, the Debtors filed their Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket 5016] (the "Original Disclosure Statement") and the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket 5015] ("Original Plan"). The Plan represents a classic "waterfall plan," purportedly allocating value to stakeholders in

6

accordance with the priorities set forth in the Bankruptcy Code. Allowed unsecured claims will receive a pro rata distribution of reorganized Calpine common stock until paid in full, and shareholders will receive any remaining residual value in the form of new common stock.

On July 26, 2007, the Debtors filed a Form 8-K containing a press release indicating that certain parties had recently contacted the Debtors about "potentially sponsoring an alternative plan of reorganization premised upon a structure that will provide guaranteed distributions to the Debtors' stakeholders," and that the Debtors initiated a process to gauge potential investors' interest and distributed requests for proposals in connection with a guaranteed distribution plan to potential investors. To allow time for the process to unfold, the Debtors adjourned the hearing to consider the Original Disclosure Statement. Id.

On August 27, 2007, the Debtors filed their First Amended Joint Plan of Reorganization [Docket 5702] (the "Amended Plan") and their First Amended Disclosure Statement [Docket 5698] (the "Amended Disclosure Statement"). The Amended Plan maintains the key terms of the Original Plan, though it projects enhanced recoveries for stakeholders including existing equity holders under the Debtors' most likely claim scenario. Specifically, Calpine estimates that recoveries to shareholders would be approximately $2.05 per existing share of Calpine common stock, compared with $1.80 per share in the Original Plan. Amended Disclosure Statement at 3.

On August 29, 2007, the Debtors filed a Form 8-K containing a press release announcing that the Debtors had further adjourned the date for the hearing to consider the Amended Disclosure Statement until September 25, 2007 to allow additional time to consider the possibility of adding a rights offering to the Amended Plan under which current Calpine

shareholders would have rights to purchase new Calpine common stock issued under the Amended Plan to fund a full or partial cash payout of the Company's unsecured creditors.

**B.      Makewhole Objection**

On June 8, 2007, the Debtors filed their motion [Docket 4880] (the "Makewhole Objection") seeking the entry of an order allowing the Debtors' limited objection to certain claims relating to Calpine's second lien debt and unsecured bonds, and determining the value of such claims pursuant to Bankruptcy Rule 3012.  In footnote 3 to the Makewhole Objection, the Debtors expressly stated that the proofs of claim filed in connection with the different series of convertible notes issued by Calpine were not the subject of the Makewhole Objection, though the Debtors reserved their rights to object to such claims at a later date. See id. at 5, n.3.

**C.      Limited Objection**

Approximately one month later, on July 6, 2007, the Debtors' filed their Limited Objection to convertible Noteholder Claim Nos. 2404, 2821, 2823, 6247, 6249, 6280, 6299 and 6300 [Docket 5206] (the "Limited Objection"), pursuant to which the Debtors sought to expunge only the Conversion Right Claim of the 7.75% Convertible Noteholders.

On July 27, 2007, the 7.75% Convertible Noteholders filed a response to the Limited Objection [Docket 5428].  Certain holders of the 6% Contingent Convertible Notes Due 2014 (the "6% Convertible Noteholders" or "6% Convertible Notes") and the Indenture Trustees for each of the 7.75% Convertible Notes and the 6% Convertible Notes also filed a response to the Debtors' Limited Objection [Docket Nos. 5427, 5429, 5449].  The Debtors, the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders each filed responsive pleadings in support of the Limited Objection [Docket Nos. 5538, 5540, 5541].

**D. Bankruptcy Court Opinion and Order**

On August 8, 2007, the Bankruptcy Court conducted a non-evidentiary hearing (the "Hearing") to consider the Limited Objection. At the conclusion of oral argument, the Bankruptcy Court issued an oral opinion (the "Opinion") granting the Debtors' Limited Objection, in which it held, in substance, as follows:

1. The "new claims" — expressly defined by the Bankruptcy Court as limited to the Conversion Right Claim — were not amendments that relate back to the Proof of Claim. (Hr'g Tr. Aug. 8, 2007 at 97: 5-6). Specifically, the Bankruptcy Court held that the "new claims" do not correct a form defect in the original claims, do not describe the original claims with more particularity and do not plead a new theory of recovery on the facts set forth in the original claims. Instead, the Bankruptcy Court held that the "initial claims" did not make any meaningful reference to the Conversion Right Claim, which the Bankruptcy Court misconstrued as asserting a "double recovery." (Id. at 98: 1-7).

2. The delay in filing the Supplement was not excusable, and disruption of the judicial administration of the case could occur because the 7.75% Convertible Noteholders filed the "new claims" during the plan formulation process, and the "timing of the 'new claims' forces the Debtors to deal with them when they should be focusing on the approval of the disclosure statement and confirmation of the plan." (Id. at 99: 7-13). In addition, to extent the "new claims" remain unresolved and unliquidated as of confirmation, the reorganized Debtors "may have to maintain large reserves thereby delaying distributions to other stakeholders" who have timely filed proofs of claim and interests. (Id. at 99: 23-25; 100: 1).

3. The 7.75% Convertible Noteholders are not entitled to the Conversion Right Claim. The 7.75% Convertible Notes represent "an indivisible unit" such that the "issuer has but one obligation to meet either redemption or conversion, it can never be required to do both" and "[b]y repaying the noteholders principal accrued interest in full the debtors are rendering the alternative performance as provided in the indenture." (Id. at 100: 3-5; 19-21). Upon Calpine's bankruptcy filing, the 7.75% Convertible Notes were automatically accelerated and became "immediately due and payable" and the right to convert no longer existed. (Id. at 95: 4-7). Since the "conversion rights were not exercisable as of the petition date when the notes were accelerated and matured . . . the put right itself had not yet become exercisable." (Id. at 100: 19-25; 101: 1-9).

4. Even if the "new claims" were cognizable, "they would be susceptible to subordination pursuant to Section 510(b) of the bankruptcy code as claims arising from the purchase or sale of a security of the debtors." (Id. at 101: 10-13).

9

At the conclusion of its Opinion, the Bankruptcy Court stated: "Accordingly, the debtors' limited objection to the *new claims* is granted.  Settle an order consistent with this decision."  (Id. at 102: 7-9) (emphasis added).  After the Debtors circulated a form of proposed order, attorneys for each of the 7.75% Convertible Noteholders and the 6% Convertible Noteholders submitted a joint letter, dated August 10, 2007, to chambers alerting the Bankruptcy Court that the form of order submitted by the Debtors granted relief well beyond the scope of the matters addressed at the Hearing and determined in the Bankruptcy Court's Opinion.  (Ltr. from M. Barr & K. Hansen to the Hon. Burton R. Lifland, Aug. 10, 2007, at 1-3.).

Nevertheless, on August 10, 2007, the Bankruptcy Court entered the form of order proposed by the Debtors [Docket 5595], which provides that:

> the value of the New Claims is determined as the amount of outstanding principal, plus accrued interest at a rate to be determined by the Court at the end of the Chapter 11 Cases and reasonable prepetition indenture trustee fees as provided under the Indentures (collectively, the "Repayment Amounts"); *provided, however,* that nothing herein shall conflict with any treatment of indenture trustee fees under a plan of reorganization for the Debtors.  For the purposes of clarity, the Repayment Amounts shall not include any actual or potential claims, premiums or penalties related to any contract defaults or damages.

Order ¶ 3 (emphasis added).

On August 14, 2007, the 7.75% Convertible Noteholders filed a timely notice of appeal [Docket 5616].

## STATEMENT OF FACTS

### I.    Brief Description of the 7.75% Convertible Notes

On June 23, 2005, Calpine issued $650 million in principal amount of the 7.75% Convertible Notes pursuant to the Indenture.  The scheduled maturity date for the Notes is June 1, 2015.  The Indenture provides that the Notes are convertible, at the option of the holders, into

cash and shares of common stock at any time following May 31, 2014, or prior to such time upon the satisfaction of certain conditions precedent.  <u>See</u> Supplemental Indenture § 10.01(a).  The initial conversion price under the Indenture is $4.00, subject to a variety of adjustments in the event of certain corporate transactions, distributions or occurrences.  <u>See</u> Supplemental Indenture §§ 1.01, 10.05, 10.06.

Upon conversion, Calpine is required to satisfy its obligation <u>in cash</u> up to the principal amount of the debt (the "<u>Net Share Settlement</u>").  <u>See</u> Supplemental Indenture § 10.15(a), (b).  If the aggregate consideration to be delivered at conversion (the "<u>Conversion Value</u>") is greater than the principal amount of the debt, then the excess of the Conversion Value over the principal amount is paid in shares.[2]  <u>Id</u>.  Upon an Event of Default that specifically includes an Event of Default caused by Calpine's filing for bankruptcy, Calpine may elect to tender the Conversion Value in the form of shares.  <u>See</u> Supplemental Indenture § 10.15(d).  In plain English, whenever the Noteholders convert, if the ratios in the Indenture would result in a conversion amount that is greater than the principal amount, the principal is paid in cash and the remainder is paid in stock (with interest accrued on the principal to the last interest accrual date paid in cash).

The primary benefit to Calpine for structuring the loan as contingent, convertible debt is to prevent dilution of its earnings-per-share for financial reporting purposes.[3]  Calpine

---

[2]     By way of illustration, if Calpine shares trade at $5.00 per share for the prescribed period of time, upon conversion of $1,000 in principal amount of the Notes, the noteholder will receive $1,250 in total Conversion Value (the conversion rate of 250 shares [*i.e.*, $1000 divided by the conversion price] multiplied by the average trading price [*i.e.*, $5.00]).  Pursuant to the Net Share Settlement provisions, the noteholder will receive $1,000 in cash and the remaining $250 in Calpine shares.

[3]     <u>See</u> <u>generally</u> John Creed & Noah Beck, <u>The Demise of CoCos and the Tax Consequences of Exchanging Convertible Debt</u>, 734 PLI/Tax 263 (June 27, 2005).  Issuers are generally required to include the shares underlying their outstanding convertible debt in the calculation of earnings-per-share immediately upon issuance of the debt.  <u>Id</u>.  To avoid the dilutive effect of these accounting rules (and in response to a change

*(cont.)*

necessarily received additional benefits as well, including: (1) cheaper financing in the form of a

lower coupon rate, (2) the prospect that holders will convert (thereby eliminating liabilities from

Calpine's balance sheet but, of course, requiring a large cash payment), and (3) less restrictive

covenants as compared with senior, non-convertible bonds.

    In exchange, the Indenture contains enhanced protections designed to prevent

elimination of the value of the Conversion Right, including a prohibition against defeasance

(Supplemental Indenture § 8.01); protections against a merger, consolidation or sale (Base

Indenture § 4.1); adjustments to the conversion price in the event of certain dividends or

distributions (Supplemental Indenture § 10.05); adjustments to the conversion price in the event

of a Change of Control (Supplemental Indenture § 10.06); protections in the event of a

reclassification, merger, consolidation or sale of substantially all of Calpine's assets

(Supplemental Indenture § 10.12); and protections in the event of a bankruptcy filing

(Supplemental Indenture § 10.06).

    Also, in order to prevent the issuer from eliminating the Conversion Right prior to

stated maturity, as it is attempting to now do, the 7.75% Convertible Noteholders bargained for

no-call protection.  Specifically, Section 9.1 of the Base Indenture provides that "Securities of

any Series which are redeemable before their Stated Maturity shall be redeemable <u>in accordance

with their terms</u> and (except as otherwise specified as contemplated by Section 2.1) in

accordance with this Article."  Base Indenture § 9.1.  In other words, each subsequent series of

---

adopted by the Financial Accounting Standard Board in late 2004), contingent convertible bonds typically limit
a holder's ability to convert until the issuer's stock trades at a value significantly in excess of the conversion
price, and provide that the principal return must be paid in cash.  <u>Id</u>.  Only those shares actually issued upon
conversion would be added to the number of shares outstanding for purposes of calculating earnings-per-share.
<u>Id</u>.

securities are redeemable solely to the extent expressly permitted therein.  The Supplemental

Indenture provides for only one limited scenario in which the Company may redeem the 7.75%

Convertible Notes, i.e., if the Company's senior loan documents would preclude the Company

from delivering cash to 7.75% Convertible Noteholders that tender their Notes for conversion,

and so long as there is no Event of Default, then, and only then, may the Company "redeem" the

7.75% Convertible Notes and deliver the same consideration otherwise deliverable.  See

Supplemental Indenture § 3.02.

## ARGUMENT

## I.

### THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THE INDENTURE TRUSTEE'S PROOF OF CLAIM DID NOT INCLUDE A CLAIM FOR THE BREACH OF THE CONVERSION RIGHT

To properly assess whether the Original Proof of Claim put the Debtors on notice

of a claim based upon the Conversion Right, the Court must examine the intent of claims bar

dates, the terms of the original Proof of Claim and the Indenture, and understand that the Debtors

negotiated the specific terms of the Indentures two years ago.  The purpose of a claims bar date

is to put a debtor on notice as to the universe of claims – be they liquidated, unliquidated,

contingent, matured, unmatured, etc. – against the debtor.  See In re Best Prods. Co., Inc., 140

B.R. 353, 357 (Bankr. S.D.N.Y. 1992) (citing First Fid. Bank, N.A. v. Hooker Invs., Inc. ( In re

Hooker Invs., Inc.), 937 F.2d 833, 840 (2d Cir. 1991) (stating that "[t]he bar order in a chapter 11

case serves the important purpose of enabling the parties in interest to ascertain with reasonable

promptness the identity of those making claims against the estate and the general amount of the

claims.").  Here, the original Proof of Claim was timely-filed and contained claims for principal

and interest and made a general contingent claim for all other amounts that might be payable

13

under the Indenture, and clearly put the Debtors on notice of the Conversion Right Claim.  See

Gens v. Resolution Trust Corp., 112 F.3d 569, 575 (1st Cir. 1997) (affirming bankruptcy court

decision permitting post-bar date amendment to original, timely-filed proof of claim).  In Gens v.

Resolution Trust Corp., the First Circuit held that the original proof of claim accompanied by a

copy of the promissory note at issue provided adequate notice to the debtor of the claim arising

therefrom.  Moreover, because the promissory note was attached to the original proof of claim,

defects in the original proof of claim were deemed insufficient to preclude the challenged

amendment.  Id.

The Indenture itself is crystal clear — just as the Debtors negotiated them to be —

– that the 7.75% Convertible Notes provide for two forms of recovery upon conversion: (i) cash

in exchange for the principal amount, and (ii) stock in exchange for the equity conversion

premium.  As a result, the Debtors' statements and the Bankruptcy Court's finding that the

original Proof of Claim did not contain a claim related to the Conversion Right was inaccurate.

Indeed, it is simply without merit nor supported by any evidence in the record that the Debtors

were unaware and taken completely by surprise by the 7.75% Convertible Noteholders

submitting a claim based upon the Conversion Right, especially given the fact that 7.75%

Convertible Notes represented one of the last financings that the deeply-levered Debtors were

able to obtain prior to their bankruptcy filing, and that the Indenture was thus negotiated recently

and carefully.

The addendum to the Proof of Claim was broadly worded, deliberately so, in

order to capture as wide a range of claims arising under the Indentures as possible.  The Proof of

Claim was timely-filed, asserted both liquidated and unliquidated claims, and attached the actual

Indenture.  The Proof of Claim asserted, on the cover page and in the addendum thereto, amounts

representing outstanding principal and accrued but unpaid interest as well as "other unliquidated amounts" including "[a]ll other interest, charges, penalties, premiums, and advances which may be due or become due under the [7.75% Convertible] Notes and the Indenture, including, without limitation, reasonable compensation, expenses, disbursements and advances (including, without limitation, reasonable fees and disbursement of counsel) of the Indenture Trustee and (if applicable) of the [7.75% Convertible Noteholders]."  Addendum to Proof of Claim at 2.

In addition, under the heading "Supporting Documents," the Proof of Claim stated: "[t]he claims hereby made are all founded on the terms of the [7.75% Convertible] Notes (the originals of which are in the possession of the [7.75% Convertible Noteholders] and the terms of the Indenture.  A true and correct copy of the Indenture (which includes the form of Notes) has been attached as **<u>Exhibit A</u>** to the original of this Addendum to this Proof of Claim." Id. at 2-3 (emphasis in the original).  As discussed below, the terms of the Indenture plainly provide for the Conversion Right and related protections, and the Debtors are charged with being familiar with its contents, particularly since they themselves drafted the document.  Accordingly, the Proof of Claim includes all claims related to the breach of the Indenture.  The Bankruptcy Court's ruling that the claims related to the breach of the Indenture were time-barred was incorrect as a matter of law.

## II.

### THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THE SUPPLEMENTAL PROOF OF CLAIM DID NOT RELATE BACK TO THE PROOF OF CLAIM AND ABUSED ITS DISCRETION IN EXPUNGING THE CLAIM

The Bankruptcy Court determined that the Supplemental Proof of Claim did not relate back to the original Proof of Claim, primarily because it found that allowing the Conversion Right Claim would unduly prejudice the Debtors' estates as the Debtors' cases had

moved to the plan phase, and permitting potentially large claims could disrupt the Debtors' entire

plan process. The Bankruptcy Court also ostensibly found that the Supplemental Proof of Claim

did not state a claim based upon the same facts giving rise to the Proof of Claim, but did not

make a specific finding on such a point. The Bankruptcy Court erred on both points. There

simply can be no question that the claims described in the Supplemental Proof of Claim arise

from the same operative facts giving rise to the Proof of Claim. All claims asserted by the 7.75%

Convertible Noteholders were based on the terms of the Indenture and arise solely from that

contract. As a result, under no circumstances could the Bankruptcy Court reasonably conclude

that the Supplemental Proof of Claim did not arise from the same facts as the Proof of Claim.

Similarly, the Bankruptcy Court's finding of prejudice to the Debtors' estates

arising from allowance of the Supplemental Proof of Claim is wholly without merit. The

Convertible Noteholders were in negotiations with the Debtors and the Official Committee of

Unsecured Creditors months before the Debtors' Original Plan was formulated. Moreover, the

Debtors' Plan, as amended, represents a "waterfall" plan that distributes value to each senior

class of claims until paid in full, which value then flows to each successive junior class of claims

and interests in the same fashion. In such a case, allowance of the Conversion Right Claim does

not reduce the distributable assets or prejudice any party in interest other than holders of the

Debtors' equity, who assumed the risks associated with equity when they purchased such

interests.

The Bankruptcy Rules permit courts to accept late-filed amendments to timely-

filed proofs of claim. See Fed. R. Bankr. P. 7015; Midland Cogeneration Venture Ltd. P'ship v.

Enron Corp., 419 F.3d 115, 133 (2d Cir. 2005). As explained in the Enron decision, courts

typically engage in a two-step inquiry to determine whether an amendment will be allowed:

16

First, they examine "'whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.'" Id. (quoting In re Black & Geddes, Inc., 58 B.R. 547, 553 (S.D.N.Y. 1983)). An amendment will meet this threshold if it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." [Citations omitted]. Second, if an amendment does, in fact, "relate back" to the timely filed claim, courts will "examine each fact within the case and determine whether it would be equitable to allow the amendment." In re Integrated Res., Inc., 157 B.R. at 70. Multiple factors play a role in this analysis, including whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would "receive a windfall" from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified. See id.; see also In re McLean Indus., Inc., 121 B.R. at 708. Of these, however, "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment." In re Integrated Res., Inc., 157 B.R. at 70.

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp., 419 F.3d at 133.

**A.    The Bankruptcy Court Erred In Determining That The Supplemental Proof Of Claim Did Not Describe The Original Claim With More Particularity**

Generally, amendments to proof of claims are "freely allowed" where the purpose is to describe the original claim with greater particularity. Midland Cogeneration Venture Ltd. P'ship v. Enron Corp., 419 F.3d at 134. "The Court must first consider whether the amendment reasonably relates to a timely filed proof of claim and is supported by the same operative facts giving rise to the original proof of claim or whether it is merely a disguised attempt to file a new claim after the bar date has passed." In re Tricycle Enters., Inc., No. 06-30096, 2007 WL 1246593 (Bankr. N.D.N.Y. April 27, 2007) (citations omitted).

With respect to the Supplemental Proof of Claim, the Indenture Trustee took extra measures to make clear that the Supplemental Proof of Claim was intended to simply clarify the nature of the unliquidated amounts previously asserted in the original Proof of Claim. On the

17

form cover page for the Supplemental Proof of Claim, the Indenture Trustee indicated that it

supplements a previously filed claim dated 7/18/06 (Claim No. 2404).  Also, the notice of the

filing of the Supplemental Proof of Claim states: "Please note that this Supplement to Proof of

Claim <u>merely supplements</u> proof of claim number 2404, and <u>is not intended to, and does not,</u>

<u>replace</u> proof of claim number 2404."  Supp. to Claim No. 2404 (emphasis in original).  In

addition, a footnote to the attachment to the Supplemental Proof of Claim states:

> The purpose of the Supplement is to <u>provide more detail regarding</u>
> <u>the claims asserted in Paragraph II with respect to the 7.75%</u>
> <u>Notes</u>.  All of the claims described herein arise from and relate to
> the 7.75% Notes, and arise under the Indenture or from a breach
> thereof, <u>and were subsumed and included within the Original Proof</u>
> <u>of Claim</u>.

(emphasis added).

The Supplemental Proof of Claim makes no reference to new documents, facts or

indentures.  Rather, the Supplemental Proof of Claim refers to exactly the same facts and

documents as in the original claim, and amplifies the nature of the claims asserted in the original

claim.  <u>See</u> <u>In re Enron Creditors Recovery Corp.</u>, 370 B.R. 90 (Bankr. S.D.N.Y. 2007)

(applying Rule 15(c)(2) of the Federal Rules of Civil Procedure to determine whether an

amendment relates back to a proof of claim).

Unlike the cases cited by the Debtors and the Bankruptcy Court, the Supplemental

Proof of Claim does not change the parties or assert a new claim against a separate debtor-entity.

<u>Cf.</u> <u>Midland Cogeneration Venture Ltd. P'ship v. Enron Corp.</u>, 419 F.3d 115 (2d Cir. 2005)

(court rejected late-filed claim to add Enron under the guaranty six months after the court-

determined bar date).  Rather, the Supplemental Proof of Claim relates to liability under the same

document.

Ironically, though cited by the Bankruptcy Court in support of its Opinion, the decision in Ameritrust Co. v. Integrated Resources, 157 B.R. 66, 72 (S.D.N.Y. 1993), actually supports the Appellants' contention that the Supplemental Proof of Claim merely clarifies the claim with more particularity.  In that case, this Court affirmed the bankruptcy court's ruling that counter-claims by a creditor would not be dismissed as time-barred and would be deemed to amend the creditors' timely-filed proofs of claim under loan guaranty agreements.  This Court found that the counter-claim did not change any fact set forth in the original claim and concluded it arose from the same transaction.  In Ameritrust, the debtors contended, as Calpine asserts here, that none of the creditor's original claims on account of contractual loan guarantees were based on fraud and because such claims alleged no wrongdoing on the part of the debtor, the amendment does not relate back to the original claim and should be time-barred.  Id. at 71.  This Court rejected the argument and reasoned:

> The appellant's contention that the amendment is permissible only if the "underlying causes of action were asserted" in the original proof of claim is contrary to prevailing legal theory.  See, e.g., 3 Moore, Moore's Federal Practice 15.15[3] at 15-148 (1992) (an amendment that changes only the legal theory of the action or adds another claim arising out of the same transaction or occurrence will relate back); In re Miss Glamour Coat Co., 80-2 U.S.Tax Case. p 9737, 1980 WL 1668 (S.D.N.Y. 1980) (concluding that courts have moved away from the cause-of-action test in allowing an amendment under Fed. R. Civ. P. 15; amendments are now permitted if they arise out of the same transaction or occurrence as the first claim).

Id.

The Supplemental Proof of Claim relates to the same indenture and transaction as the Proof of Claim, and does nothing more than clarify the nature of unliquidated amounts asserted in the Proof of Claim.  Accordingly, this Court should find that the Supplemental Proof of Claim meets the "relation back" test.

19

**B.     The Bankruptcy Court Abused Its Discretion In Determining
         That The 7.75% Convertible Noteholders' Claim For Damages
         Arising From The Debtors' Abrogation Of The Conversion
         Right Contained In The Indenture Should Be Expunged**

The record is devoid of any meaningful explanation to support the Bankruptcy

Court's finding that prejudice will occur if the Supplemental Proof of Claim is allowed.  As

noted above, the Supplemental Proof of Claim was filed in good faith, merely clarifies the

unliquidated claims originally asserted in the Proof of Claim and addresses certain legal

arguments being proffered by other parties-in-interest both prior and subsequent to the issuance

of the CalGen Decision[4], nothing more.  The Supplemental Proof of Claim does not change the

parties involved or offer any surprises.[5]

Courts have considered several factors in determining whether a debtor will be

prejudiced by an amendment of a proof of claim including (i) whether the plan of reorganization

and disclosure statement has been approved; (ii) whether the debtor had reason to anticipate the

claim; and (iii) the amount of the claim relative to the debtor's estate.  Praedium II Broadstone,

LLC v. Wall Street Strategies, Inc., No. 04-3880, 2004 WL 2624678, at *6 (S.D.N.Y. Nov. 18,

2004); In re Keene Corp., 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995); In re Alexander's, Inc.,

176 B.R. 715, 722 (Bankr. S.D.N.Y. 1995).

The Bankruptcy Court cited the distraction to the Debtors with respect to the plan

formulation process and the need to provide certainty.  Hr'g Tr. Aug. 8, 2007 at 99-101).  The

---

[4]    See Memorandum Decision and Order Granting, in Part, Debtors' Motion for Order (I) Authorizing Debtors to
       Obtain Replacement Postpetition Financing to (A) Refinance Existing Postpetition Financing and (B) Repay
       Prepetition Debt; (II) Allowing Debtors' Limited Objection to Claims; and (III) Determining Value of Secured
       Claims, entered on March 5, 2007 [Docket 3875] (hereinafter referred to as the "CalGen Decision").

[5]    In essence, the Bankruptcy Court seems to have penalized the 7.75% Convertible Noteholders for having filed
       the Supplemental Proof of Claim.

7.75% Convertible Noteholders engaged in good faith negotiations with the Debtors regarding the claim <u>well before</u> the Debtors even filed the first draft of the reorganization plan. In fact, the Debtors acknowledged their discussions with the 7.75% Convertible Noteholders in a status conference before the Bankruptcy Court as early as May 30, 2007. The Debtors later stated in open court that the first draft of the plan of reorganization had not even been disseminated to the official committees until mid-June 2007, which was over a month after the Supplemental Proof of Claim was filed and several weeks after a meeting was had among counsel to the Debtors and the 7.75% Convertible Noteholders. Thus, the Debtors were aware of the 7.75% Convertible Noteholders' claim for damages while plan formulation was still in process and had every reason to anticipate the Conversion Right Claim, and any assertion by the Debtors of prejudice is disingenuous.

Nevertheless, the Debtors claim to have been "frantically attempting to put together a guaranteed distribution plan, hit our January 31, 2008 exit date all with the shadow of the expiration of exclusivity looming over us," (Hr'g. Tr. Aug. 8, 2007 at 53: 19-22), and assert that the Conversion Right Claim could destroy the Debtors' efforts to achieve their confirmation goals. This is simply hyperbole. After disallowance of the Supplemental Proof of Claim, the Debtors failed to propose any fixed recovery plan and have continued with their "waterfall" plan on file. Neither the Debtors nor the official committees can identify why allowance of the Conversion Right Claim would prejudice them in this context and can only say that they will. As noted above, with a "waterfall" plan, there is no prejudice to the Debtors from the crystallization of the claims pool as it would not change how they propose to pay creditors in any fashion. Indeed, as it stands now, the Debtors have billions of dollars of contingent claims asserted against them and have not asserted that any of those contingent claims prejudice any party under

21

the "waterfall" plan nor their formulation of the same.  Unlike plans with fixed recoveries for each class of creditors, the Debtors' plan simply lets value flow from top to bottom in priority of claims and interests.

Thus, allowance of the claims asserted by the Proof of Claim and Supplemental Proof of Claim would not disrupt the judicial administration of the Debtors' case.  The Amended Plan represents a classic waterfall plan, which contemplates a distribution to equity to the extent all creditors are paid in full.  The Debtors are currently engaged in the claims reconciliation process, as is customary in chapter 11 cases.  The Debtors have not demonstrated how the allowance of the Supplemental Proof of Claim or the 7.75% Convertible Noteholders' claims would disrupt the waterfall Plan or disrupt judicial administration of the case.  If anything, the record suggests that the Debtors, as part of the claims reconciliation process are currently in the process of objecting to various claims asserted by various noteholders that include claims beyond just principal and interest.  The fact that the Debtors carved out the 7.75% Convertible Notes from the Makewhole Objection belies their assertion of prejudice.  Tellingly, the Makewhole Objection is still pending and remains unresolved as of the date hereof.  Yet, nowhere in the Makewhole Objection, where the Debtors objected to proofs of claim substantially similar in form to the Proof of Claim, do the Debtors assert that such claims were untimely.

Recent events underscore the total absence of any prejudice to the Debtors, or the estate, from either a timing or plan perspective.  The Debtors have now adjourned the hearing to consider approval of their disclosure statement twice.  In fact, contrary to the frantic picture they painted to the Bankruptcy Court, the Debtors acknowledged in a recent Form 8-K that no alternative firm plan proposals were received by the Debtors, and ultimately reverted back to the waterfall plan.  See Form 8-K dated August 29, 2007.  Indeed, the Debtors' statements on the

22

record before this Court and in their pleadings filed with the Bankruptcy Court deflate their arguments based on prejudice. At an August 22nd hearing before this Court, Debtors' counsel stated "[w]e are, I don't know, five, six – no one can say with any certainty. *We could be years away from confirmation*. No one knows." (Hr'g Tr. Aug. 22, 2007 at 37: 19-21) (emphasis added). The Debtors' sense of haste and urgency was greatly exaggerated.

Moreover, it strains credulity to suggest that the Debtors' counsel and teams of professional advisors could not manage the claims reconciliation process while simultaneously proceeding on a plan formulation track.

Ultimately, creditors are not prejudiced if a claimant asserts its lawful rights (particularly here where creditors are slated to be paid in full and the Bankruptcy Court understands the Conversion Right Claim as subordinate to the level of equity). The fact that the Debtors dispute the claim is not a basis for determining the sufficiency or timeliness of a proof of claim. Moreover, though the 7.75% Convertible Noteholders' claim for breach of the Conversion Right may be in the hundreds of millions of dollars, the Debtors estimate that the New Calpine Total Enterprise Value (as defined in the Amended Plan) is approximately $20.3 billion. While the allowance of the Conversion Right Claim would impact recovery levels, the Debtors are hard pressed to argue that such a claim would be material in light of a $20.3 billion company. In addition, as noted above, there are myriad contingent claims that may become fixed and allowed in this case, including hundreds of millions of dollars of makewhole claims, which raise the identical issue presented by allowance of the Supplemental Proof of Claim with respect to prejudice to the plan process, yet all creditors and equity holders will suffer dilution from the potential allowance of those claims. Yet, such allowance does not rise to the level of prejudice and cannot defeat the claims.

It is therefore apparent that the Bankruptcy Court made a number of unwarranted assumptions in determining that the Supplemental Proof of Claim should not be allowed as an amendment to the Proof of Claim, and therefore abused its discretion.

## III.

### THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN HOLDING THAT THE DEBTORS ARE NOT LIABLE TO THE 7.75% CONVERTIBLE NOTEHOLDERS FOR ELIMINATING THE CONVERSION RIGHT IN BREACH OF THE INDENTURE AND DISALLOWING THE CONVERSION RIGHT CLAIM

In addition to disallowing the Supplemental Proof of Claim on relation-back and timeliness grounds, the Bankruptcy Court also determined that claims for the Conversion Right were without legal merit. In doing so, the Bankruptcy Court ignored a fundamental legal rubric and clear provisions of the Indenture and its decision must be overturned.

**A.    The Debtors Are Solvent And Therefore The 7.75% Convertible Noteholders Are Entitled To The Full Benefit Of Their Bargain And Should Be Made Whole For The Loss Of The Conversion Right**

The Debtors, by their own admission, are likely solvent. A solvent debtor may not produce a windfall for its equityholders by exploiting the provisions of the Bankruptcy Code to eliminate the lawful rights and claims of its creditors. Consol. Rock Prods. Co. v. Du Bois, 312 U.S. 510, 527 (1941); In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co., 791 F.2d 524, 528 (7th Cir. 1986). As the Sixth Circuit stated in Dow Corning:

> When a debtor is solvent . . . the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interests is significantly reduced…
>
> [A]bsent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce creditors' contractual rights. See Chicago, 791 F.2d at 528 ("[I]f the bankrupt is solvent the task for the bankruptcy court is simply to

enforce creditor rights according to the tenor of the contracts that created those rights").

In re Dow Corning, 456 F.3d 668, 679-80 (6th Cir. 2006).

Thus, when a debtor is solvent, the debtor must afford the creditor the full benefit of his bargain. See In re 139-141 Owners Corp., 306 B.R. 763, 771 (Bankr. S.D.N.Y. 2004) (stating that in bankruptcy cases involving a solvent debtor, "it is the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act") (citing Ruskin v. Griffiths, 269 F.2d 827, 832 (2d Cir. 1959)); In re Dow Corning Corp., 456 F.3d at 679 (stating that when a debtor is solvent, the bankruptcy court's role is to enforce the contractual rights of the parties).

Furthermore, under the absolute priority rule, creditors are to receive the full benefit of their bargain prior to equityholders receiving any recovery. See 11 U.S.C. § 1129(b); see also In re Dow Corning Corp. at 678 (citing Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 North LaSalle Street P'ship, 526 U.S. 434, 441-42 (1999) (describing the absolute priority rule).

Consequently, the Convertible Noteholders, as creditors of a solvent debtor, are entitled to the full benefit of their bargain, and should recover all amounts to which they would be entitled under applicable law, including damages arising from breach of the Indenture and the loss of the value of the Conversion Right.

**B.      The Indenture Provides For The Survival Of The Conversion Right During A Bankruptcy, And The Debtors' Proposed Repayment Of The 7.75% Convertible Notes Is A Breach Of The Conversion Right**

In order to determine whether a "claim" exists, as defined in section 101 of the Bankruptcy Code, bankruptcy courts look to state law. See Butner v. United States, 440 U.S. 48, 55 (1979) ("stating that [p]roperty interests are created and defined by state law"). Here, the Indenture is governed by New York Law. See Supplemental Indenture § 12.07. Accordingly,

25

New York law must be applied in determining the 7.75% Convertible Noteholders' claims. "[T]he construction of [an indenture] is basically a question of contract law," Broad v. Rockwell Int'l Corp., 642 F.2d 929, 940-41 (5th Cir. 1981), cert denied 454 U.S. 965 (1981), and any determination as to liability must succeed or fail not upon treatises or case law discussing traditional convertible notes, but rather based upon the proper interpretation of the unique Indenture at issue here.

The Indenture is an enforceable agreement, and the Indenture Trustee has properly fulfilled its duties and responsibilities pursuant thereto. The Debtors' proposed repayment of the 7.75% Convertible Notes, whether under a plan of reorganization or otherwise, does in fact breach a host of protections designed to prevent Calpine from eliminating the value of the Conversion Right, resulting in damages. All of the elements to establish a breach of contract claim under New York law are met. See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). The ruling of the Bankruptcy Court to the contrary was incorrect as a matter of law.

One of the fundamental premises of the arguments of the Appellees, and the Bankruptcy Court's Opinion, is their mistaken belief that the Conversion Right terminates upon the automatic acceleration of the 7.75% Convertible Notes as a result of Calpine's bankruptcy filing since, in their view, the default advances the maturity date of the 7.75% Convertible Notes to the Petition Date, and therefore a breach of the Indenture cannot occur if that right is eliminated. The Bankruptcy Court, the Debtors and the official committees noted, in particular, that the acceleration provision only accelerates principal on the 7.75% Convertible Notes as part of their argument that the Conversion Right would have been contained in the acceleration clause in the event that the Indenture intended to preserve it after an acceleration event. Debtors' Limited Objection at 3. What the Debtors, the official committees and the Bankruptcy Court

26

flatly ignored, however, is that there is an express provision in the Indenture that provides for the survival of the Conversion Right after a bankruptcy filing.

All doubt on this point is put to rest by the clear language of Section 10.15(d) of the Supplemental Indenture, which provides as follows:

> If an Event of Default as set forth in Section 5.1(e) or (f) of the Original Indenture [i.e., a bankruptcy filing] has occurred and is continuing, the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock, provided that Holders shall receive an amount in cash in lieu of any fractional shares.

Supplemental Indenture § 10.15(d) (emphasis added).[6]

The extent to which the Debtors (and the official committees) stretch the plain meaning of Section 10.15 of the Indenture is made clear when, during the Hearing, counsel to the Debtors practically admitted that the Conversion Right survived a bankruptcy filing, and otherwise offered a strained reading of that provision. The Debtors have unabashedly taken the position that the Conversion Right is literally vaporized as of the Petition Date (Hr'g Tr. Aug. 8, 2007 at 58: 4) and that the express terms of Section 10.15(d) of the Supplemental Indenture were designed to apply in the single situation where conversion was initiated pre-bankruptcy and

---

[6]    The post-bankruptcy survival of the Conversion Right expressed in the Indenture for the 7.75% Convertible Notes is underscored when juxtaposed against the language contained in the analogous section 10.15(d) contained in the indenture for the 6% Convertible Notes. Unlike Section 10.15(d) of the 7.75% Convertible Notes Indenture, which expressly relates to a bankruptcy event of default and affords the company the election of issuing stock or cash upon a bankruptcy, section 10.15(d) of the indenture for the 6% Convertible Notes relates to events of default generally. Specifically, that section provides: "[i]f an Event of Default has occurred and is continuing (other than a Default in a cash payment upon conversion of the Notes), the Company may not pay cash upon conversion of any Notes . . . and instead will make payment only through the delivery of shares of Common Stock." The deliberate insertion of the bankruptcy event of default in the Indenture for the 7.75% Convertible Notes clearly demonstrates the intent of the drafters to allow for the survival of the Conversion Right specifically after a bankruptcy filing.

27

consummated post-bankruptcy – even though there is not a shred of language in the Indenture

supporting this view.  At the Hearing, Debtors' counsel stated:

> First, if[,] but only if[,] the pre-conditions to conversion had
> occurred pre-bankruptcy, one could read 10.15(d) to say that the
> conversion privilege survived, albeit modified to provide for
> conversion only to stock and not to cash and stock.  Similarly, one
> can read 1015(d) to say that if the conversion privilege was in the
> process of being exercised and there was an intervening
> bankruptcy, then the conversion privilege again would be honored
> albeit by converting to stock not to cash and stock.

(Hr'g Tr. Aug. 8, 2007 at 58: 17-21).

This is certainly a novel, if not radical position – namely, to remove words from a

page simply because the issuer commenced a voluntary bankruptcy proceeding.  Section

10.15(d) clearly permits conversion during a bankruptcy and expressly provides for the right of

7.75% Convertible Noteholders to convert after a bankruptcy Event of Default.  Indeed, Section

10.15(d) can be read in no other fashion.  The Debtors' interpretation, if correct, would render

Section 10.15(d) meaningless and violate a fundamental canon of contract interpretation under

New York law that requires that force and effect be given to all provisions of a contract.  See

Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp., 106 A.D.2d 242, 244 (1st Dep't 1985),

aff'd, 66 N.Y.2d 779 (1985) (stating that a contract must be interpreted "so as to give force and

effect to all of its provisions.") (citations omitted);  Hauser v. Western Group Nurseries, Inc., 767

F. Supp. 475, 488 (S.D.N.Y. 1991) ("It is a cardinal rule of contractual interpretation that a court

shall not interpret an agreement in a way which leaves a part meaningless or ineffectual.")

(citations omitted).  This Indenture provision completely refutes the Debtors' "loss of conversion

upon automatic acceleration in bankruptcy" argument.

The Indenture also provides that the 7.75% Convertible Notes are convertible, at the option of the holders, upon the satisfaction of the conditions precedent listed in Section 10.01(a).  See Supplemental Indenture § 10.01(a).  Significantly, the absence of an Event of Default of any kind, including a bankruptcy filing, is not included in any of the conditions precedent in either Section 10.01(a) of the Supplemental Indenture or elsewhere.  If the parties to the Indenture intended for a voluntary bankruptcy filing or other Event of Default to terminate the Conversion Right, they would have drafted such a limitation, much as they did in numerous other occasions throughout the Indenture.[7]

Ultimately, the Bankruptcy Court's Opinion rises and falls with its misplaced reliance on the form of note and the Indenture's use of the word "maturity."  The form of note attached to the Supplemental Indenture expressly states: "[s]uch conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity, subject, in the case of conversion of any Global Note, to any Applicable Procedures."  Supplemental Indenture at A-5.  The form of note specifically uses the capitalized term "Maturity" but no such defined term appears in the form of note, the Supplemental Indenture or the Base Indenture.  Given that the form of note uses a capitalized term, and given the manifest intent of the parties that the conversion right survive during a bankruptcy pursuant to Section 10.15(d) of the Supplemental Indenture, it must be presumed that the drafter intended to utilize the defined term "Stated Maturity" as found in the Base Indenture, which is defined as the scheduled maturity date of June 1, 2015.  The Debtors offered no evidence to the contrary.  In any event, the Debtors make no attempt to find

---

[7]     See, e.g., Base Indenture §§ 4.1(ii) (Merger and Consolidation), 7.2 (Termination of Company's Obligation) and 7.3(iii) (Defeasance and Discharge of Indenture); Supplemental Indenture §§ 1.1 (definition of "Unrestricted Subsidiary") and 7.3(3) (Purchase Upon Change of Control).

support in the Indenture for their argument that "maturity" for purposes of the Conversion Right is advanced to the Petition Date as a result of the bankruptcy filing.

The Debtors' interpretation, as adopted by the Bankruptcy Court, simply cuts against many other provisions contained in the Indenture that would otherwise be rendered meaningless if a bankruptcy filing eliminated the Conversion Right. For example, the Indenture clearly provides for the right to convert any time after May 30, 2014. Moreover, the Bankruptcy Court completely failed to address the question of what were to happen should the conditions to conversion be met after a bankruptcy. There is no merit to the position that, by the terms of the Indenture, the 7.75% Convertible Noteholders could not convert if Calpine stock currently trades above the strike price and the other contractual conditions are met. Once again, the Indenture makes clear that the Conversion Right lasts until the scheduled maturity date, with no qualification as to the occurrence of any Event of Default or automatic acceleration and Section 10.15(d) categorically permits the post-bankruptcy exercise of the Conversion Right.

Moreover, in order to prevent the issuer from eliminating the Conversion Right prior to scheduled maturity, as the Debtors attempt to now do, the 7.75% Convertible Noteholders bargained for no-call protection. The Indenture provides that, with limited exception not applicable here, the 7.75% Convertible Notes cannot be redeemed. See Base Indenture § 9.1; Supplemental Indenture § 3.02. It is therefore presumed that the 7.75% Convertible Notes are non-callable. See Arthur v. Burkich, 520 N.Y.S.2d 638, 639 (3d Dep't 1987); Friends Realty Assocs., LLC v. Wells Fargo Bank, N.A.P., 2007 WL 1322344, *1 (1st Dep't May 8, 2007); Russo Enters., Inc. v. Citibank, N.A., 699 N.Y.S.2d 437, 438 (2nd Dep't 1999). Repayment of the 7.75% Convertible Notes under the Plan or otherwise clearly breaches the no-call protection contained within the Indenture, entitling the 7.75% Convertible

Noteholders to damages.  Indeed, this is precisely what this Bankruptcy Court found when it arrived at its conclusion that the CalGen third lien debt holders were entitled to damages for the repayment of the third lien debt which was non-callable for the life of that debt.  See In re Calpine Corp.,  365 B.R. 392 (Bankr. S.D.N.Y. 2007).

**C.     Damages Are Due Despite The Automatic Acceleration Of The Debt**

Consistent with applicable law, the automatic acceleration of the 7.75% Convertible Notes does not foreclose the assertion of additional damages.  Section 5.2 of the Base Indenture provides that if a bankruptcy event of default with respect to Calpine occurs, then "the principal of and interest on all the [7.75% Convertible Notes] of each Series shall ipso facto become and be immediately due and payable without any declaration or other act by the [Indenture] Trustee or any [7.75% Convertible Noteholder]."  Base Indenture § 5.2.  However, as noted above, the Conversion Right explicitly survives automatic acceleration of the debt as a result of the bankruptcy filing.  See Supplemental Indenture §§ 10.01(a), 10.15; A-5.

In addition, acceleration does not foreclose the Indenture Trustee or the 7.75% Convertible Noteholders from pursuing additional remedies, and cannot be used to prematurely terminate the Noteholders right to convert, which right does not expire until June 1, 2015. Section 5.3 of the Base Indenture states that:

> If an Event of Default occurs and is continuing, the [Indenture] Trustee may pursue any available remedy to collect the payment of principal or interest on the relevant Securities or to enforce the performance of any provision of such Securities or this Indenture. …A delay or omission by the [Indenture] Trustee or any [7.75% Convertible Noteholder] in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Base Indenture § 3.5 (emphasis added).

As numerous courts have held, in the prepayment premium context, the automatic acceleration of debt as a result of a bankruptcy filing does not foreclose the possibility that additional amounts beyond principal and interest may be due, since acceleration is not preclusive of other remedies available to the lender and since the debt may be decelerated.  See In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987) (rejecting debtor's argument that automatic acceleration eliminated any prepayment right, since acceleration is subject to deceleration in a Chapter 11 plan; otherwise a debtor could always avoid the effect of a prepayment clause by filing a bankruptcy case);  see also In re Imperial Coronado Partners, Ltd., 96 B.R. 997 (B.A.P. 9th Cir. 1989) (reasoning that since the debtor "had the right" to reinstate the loan, regardless of whether it could practically do so, the lender was still entitled to prepayment even though the lender had itself accelerated the debt prior to the bankruptcy);  In re 433 South Beverly Drive, 117 B.R. 563 (Bankr. C.D. Cal. 1990) (same);  see also In re Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1053 (2d Cir. 1982) (holding that there is "no bar…to the Indenture Trustee seeking specific performance of the redemption provisions where the debtor cause[d] the debentures to become due and payable by its voluntary actions").  Applying the Debtors' argument that the maturity date advances to the Petition Date upon automatic acceleration of the debt as a result of the bankruptcy filing, post-petition interest, for example, would never be payable.  Clearly, in the case of a solvent debtor, this is not the correct result, nor the law, and this Court should not permit the Bankruptcy Court to make new law in this area that is contrary to express contractual provisions and well established legal precedent.

**D.     Law Of The Case And The CalGen Decision Supports The Allowance Of The 7.75% Convertible Noteholders' Claims**

The Appellees and the Bankruptcy Court remain of the view that the maturity date of the 7.75% Convertible Notes has metaphysically occurred and no amounts beyond principal and interest may be due, despite conceding that, under the current plan, post-petition interest would be allowable. This position is inconsistent with the notion that the maturity date has occurred and represents a full 180 degree turn by the Bankruptcy Court with respect to its earlier CalGen Decision. The Bankruptcy Court previously recognized the incongruous nature of this argument as reflected in its CalGen Decision, wherein it ruled, correctly, that lenders were entitled to damages arising from the breach of no-call provisions contained in their indenture – despite the automatic acceleration of the date upon the bankruptcy filing.

In its CalGen Decision, the Bankruptcy Court clearly viewed the Petition Date as a forward looking date, and held that the CalGen Lenders would be entitled to a prepetition general unsecured claim for damages resulting from the Debtors' breach of the loan agreements. See In re Calpine Corp., 365 B.R. 392, 399 (Bankr. S.D.N.Y. 2007). The court noted that "damages are always the default remedy for breach of contract." Id. (citing United States v. Winstar, 518 U.S. 839 (1996)). In CalGen, the Debtors raised the same argument presented by the Debtors' Limited Objection, i.e., that the automatic acceleration of the debt advanced the date of maturity to the petition date and the CalGen Lenders were not entitled to anything more than principal and interest.[8] The court expressly rejected this argument and held that the CalGen Lenders were indeed entitled to the benefit of their bargain:

---

[8] It should be noted that the CalGen creditors did not file proofs of claim specifically identifying the prepayment premium as part of their claims, yet the Bankruptcy Court permitted their claims in any event — yet another startling inconsistency between the CalGen Decision and the current decision.

33

> The Debtors' and Creditors' Committee assert that in the absence
> of any form of liquidated damage in the indentures for the period
> in question (pre April 1, 2007), the CalGen Secured Lenders' quest
> for damages is based on an "amorphous" breach of contract theory
> which leaves them without any remedy especially since they will
> be paid the full amount of their loans plus accrued interest: "the
> benefit of their bargain." *This preclusive argument for a total
> foreclosure of any damage recovery is incorrect.* The CalGen
> Secured Lenders' expectation of an uninterrupted payment stream
> has been dashed giving rise to damages, albeit not measurable as
> the Lenders would wish. See Harsco Corp v. Segui, 91 F.3d 337,
> 348 (2d Cir. 1996).

In re Calpine Corp., 365 B.R. at 399 (emphasis added).

The CalGen Decision has become the law of this case and mandates a similar outcome here. See Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 592 (2d Cir. 1992) ("[u]nder the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."). Like the CalGen Lenders, the 7.75% Convertible Noteholders are entitled to damages for breach of the Indenture despite the absence of any provision in the Indenture for the payment of a premium or liquidated damages. See In re Calpine Corp. 365 B.R. at 399. ("Accordingly, while the agreements do not provide a premium or liquidated damages for repayment during the period the Debtors propose, the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements.").

In light of the foregoing, the 7.75% Convertible Noteholders are entitled to allowed claims for damages arising from the Debtors' breach of the Indenture and the loss of the Conversion Right. The Bankruptcy Court's finding that the 7.75% Convertible Noteholders claim for breach of the Conversion Right lacked merit was incorrect as a matter of law.

**E.**    **The Conversion Right Claim Does Not Involve A "Double Recovery"**

The Appellees and the Bankruptcy Court incorrectly characterized the Conversion Right Claim as involving a "double recovery" because their unanimous position was that the 7.75% Convertible Notes were simply garden variety convertible debt that could either be redeemed as debt claims or converted into equity claims, but under no circumstances could the 7.75% Convertible Notes yield both recoveries. (Hr'g Tr. Aug. 8, 2007 at 98: 1-7). Once again, the Bankruptcy Court missed the mark by a wide margin. A simple review of the Indenture demonstrates clearly that both cash and stock are payable to the 7.75% Convertible Noteholders and that the 7.75% Convertible Notes are not common convertible debentures, but unique instruments that served a specific purpose.

In addition, the Bankruptcy Court is simply wrong on the law even under ordinary, convertible debentures. As articulated in the "well-recognized" treatise cited by Debtors in their own papers, the Conversion Right represents a distinct right under the Indenture and possesses its own market value:

> The conversion right, although set forth in the debenture and in the indenture, is <u>separate and distinct from the debt</u> evidenced by the debenture <u>and as a separate right, it has its own ascertainable value</u>.

Debtors' Limited Objection, p. 19 (<u>citing</u> 6A <u>Fletcher Cyc. Corp.</u> § 2649.10 (2006)) (emphasis added); <u>see</u> <u>also</u> <u>Broad v. Rockwell Int'l Corp.</u>, 642 F.2d 929, 943 (5th Cir. 1981) (<u>citing</u> American Bar Foundation, Commentaries on Indentures, 522-23 (1971)).

The Bankruptcy Court, in determining the 7.75% Convertible Noteholders' claim for breach of the Conversion Right was without merit, relied extensively on the 1971 tax case of <u>Chock Full O'Nuts Corp. v. United States</u>, 453 F.2d 300 (2d Cir. 1971), despite the fact that that

35

case involved a traditional convertible bond, unlike the bonds at issue here.  Moreover, the court in that case made clear that the guiding principle behind the court's decision was the specific terms of the indenture.  "By the terms of the [specific] debenture, no conversion may take place until the bond is surrendered, and the option to convert expires as the bond becomes due."  Id.  As noted above, the 7.75% Convertible Notes provide the 7.75% Convertible Noteholders with two separate and distinct forms of consideration that are not mutually exclusive:  (1) the right to receive payments of interest and principal through maturity, and (2) upon conversion, the right to receive the principal amount in cash and the excess value in stock, and thereby benefit from potential upside through maturity.  Contrary to the Debtors' assertions, the Conversion Right retains value because the right is exercisable until June 1, 2015 and during that time there is the potential for future increases in the stock price.  Nothing in the Chock Full O'Nuts case compels a different result.

Accordingly, the 7.75% Convertible Noteholders are entitled to a separate claim for damages arising from the elimination of their Conversion Right, in addition to their claims for principal and interest.  It is well established that under New York law, "a party injured by breach of contract should be placed in the same economic position as it would have been in had the contract been performed."  Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal, 791 F.Supp 401, 415 (S.D.N.Y. 1991) (finding that lender was entitled to "damages equal to the discounted present value of the incremental interest income expected to be lost as a result of the breach");  see also Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490 (2d Cir. 1995) (finding that proper measure of damages is the amount necessary to put the non-breaching party in the same economic position).  The Bankruptcy Court's finding that the 7.75% Convertible Noteholders claim for breach of the Conversion Right lacked merit was incorrect as a matter of law.

F.      **The Fact That The Conversion Right Claim Was Contingent
Or Unmatured As Of The Petition Date Does Not Mean That
The Claim Should Be Expunged**

The Bankruptcy Court apparently adopted, in wholesale fashion, the Debtors'
suggestion that the Conversion Right lacks present value simply because the trading price of
Calpine shares was lower than the conversion price as of the Petition Date (as opposed to the
effective date of the Plan, the actual date of breach).  The Bankruptcy Court held that the
"conversion rights were not exercisable as of the petition date when the notes were accelerated
and matured . . . the put right itself had not yet become exercisable."  (Hr'g. Tr. August 8, 2007
at 101: 1-9).  This approach ignores several cases that have afforded damages to holders of "out
of the money" options after taking into account several critical factors such as duration,
volatility, future gains (or losses) in value, and strike price.  See R.A. Mackie & Co. v. Wien
Securities Corp., 329 F. Supp. 2d 477, 512-14 (S.D.N.Y. 2004);  Lillis v. AT&T Corp., No. 717-
N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007) (awarding damages to employees who
sought damages for premature termination of their out-of-the-money options based on expert
testimony using the Black-Scholes model);  Hilton Hotels Corp. v. Dunnet, 275 F. Supp. 2d 954,
963, n.4 (W.D. Tenn. 2003) ("[U]nder water options have measurable value based on the
likelihood that they may move into the money at some point prior to their expiration. . . .  [T]he
under water options themselves had inherent value because they could be exercised in the
future.").  Indeed, courts have long accepted the fundamental principle that "the equity interest of
an insolvent corporation may have some value because the equityholders are entitled to share in
the corporation's profits if it becomes profitable in the future."  Wabash Valley Power Ass'n v.
United States (In re Wabash Valley Power Ass'n), 72 F.3d 1305, 1318 (7th Cir. 1995) (citing
Northwest Bank Worthington v. Ahlers, 485 U.S. 197, 208 (1988)).  "[B]ecause the value of a
call option is derivative of the value of the underlying stock, the value of a call option on the

stock of an insolvent corporation is not worthless as a matter of law." Id. Therefore it is clear, as a matter of law, that the Conversion Right currently retains independent and significant value.

Rather, the Bankruptcy Court held that the Conversion Right Claim was not allowable under section 502(b) of the Bankruptcy Code because as of the Petition Date, "the option to receive cash would not have yet matured because the put right itself had not yet become exercisable." (Hr'g. Tr. August 8, 2007 at 100: 25-101:9) (citations omitted). The Bankruptcy Court committed clear error in disregarding section 502(b)'s clear directive that a claim cannot be expunged simply because "such claim is contingent or unmatured" as of the petition date. 11 U.S.C. § 502(b)(1). The Bankruptcy Court's understanding runs counter to not only the plain language of section 502(b) but violates the well-accepted and broad definition of the word "claim" which includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. " 11 U.S.C. § 101(5)(A) (emphasis added).

In support of its Opinion, the Bankruptcy Court cites to the case of In re Einstein/Noah Bagel Corp., 257 B.R. 499 (Bankr. D. Ariz. 2000) ("ENBC"), which is easily distinguishable. As a threshold matter, unlike Calpine, the ENBC debtors were insolvent and, under the plan, offered pre-petition equity holders out-of-the-money warrants. In addition, ENBC addresses the terms of a "put right" under a partnership agreement that requires the partnership or its parent to repurchase the limited partner's existing equity interests, whereas the 7.75% Convertible Noteholders are not existing equityholders and have asserted claims arising under a debt security governed by an indenture. Also, the ENBC court reached the conclusion that the put right is basically illusory, since the Court held that the partnership agreement contained a provision that absolved the partnership from liability in the event it was unable to

satisfy the put obligations, i.e., if it was unable to pay cash or stock for the put right, or unable to

obtain shareholder approval to register the equity interests, then the claimant's existing equity

interests would remain in place, as would ENBC's remaining obligations, though no damages

would result.  Id. at 504-06.  Calpine, on the other hand, is under a contractual obligation to

honor the Conversion Right through the year 2015, and that contractual right is being

prematurely terminated — which, under federal law, state law and the law of the case (via the

CalGen Decision), gives rise to a claim for damages.  In any event, the language cited by the

Debtors is dicta (see id. at 509), and the ENBC court ultimately refused to value the put interests.

Id. at 510.

## IV.

### THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THE CLAIM FOR DAMAGES ARISING FROM THE DEBTORS' ABROGATION OF THE CONVERSION RIGHT WOULD BE SUBJECT TO SUBORDINATION PURSUANT TO SECTION 510(B) OF THE BANKRUPTCY CODE

                    In summary fashion, the Bankruptcy Court held that, even if allowable, the

Conversion Right Claim should be subordinated pursuant to section 510(b) of the Bankruptcy

Code as "claims arising from the purchase or sale of a security."[9]  (Hr'g. Tr. August 8, 2007 at

100:11-13.)  As demonstrated below, the Bankruptcy Court misapplied Section 510(b) of the

Bankruptcy Code.  The Bankruptcy Code, together with the legislative history to Section 510(b),

clearly demonstrates that Congress did not intend for the claims asserted by the 7.75%

---

[9]    Section 510(b) of the Bankruptcy Code provides that:

   For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security
   of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security . . .
   shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by
   such security, except that if such security is common stock, such claim has the same priority as common stock.

   11 U.S.C. § 510(b) (emphasis added).

Convertible Noteholders arising under the 7.75% Convertible Notes to fall under the ambit of Section 510(b) of the Bankruptcy Code.

**A.     The 7.75% Convertible Noteholders' Conversion Right Claim For Damages Arising From The Breach Of The Indenture Claim Bears No Causal Nexus To The "Purchase Or Sale Of A Security"**

The Bankruptcy Court clearly misconstrued the nature of the Conversion Right Claim.  Unlike other "equity-like" claims that have been the subject of Section 510(b) subordination, the Conversion Right Claim represents a valid debt claim arising under a commercial loan agreement.  The conversion feature contained in the Indenture, which allows a holder to convert into cash and stock, does not transform the Conversion Right Claim for damages arising from breach of the Indenture into an equity-like claim.

In analyzing whether a claim is subject to statutory subordination, the Second Circuit has analyzed whether the claimant "(1) took on the _risk and _return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor."  In re Med Diversified, Inc., 461 F.3d 251, 256 (2d Cir. 2006) (emphasis added).  Critical to a section 510(b) analysis is whether the claimant bore the downside risks associated with the issuer's stock.  See Raven Media Investments LLC v. DirecTV Latin American, LLC (In re DirecTV Latin America, LLC), No. 03-981, 2004 WL 302303, at *12-13 (D. Del. Feb. 4, 2004) (reversing bankruptcy decision that claim for breach of a put agreement should be statutorily subordination, reasoning that "[w]hile participation in profits is a critical aspect of an equity interest, participation in the risk of loss is similarly crucial.").

40

Here, despite the hybrid nature of the 7.75% Convertible Notes, the 7.75% Convertible Noteholders did not incur the risks associated with equity. As described above, in the event the trading price of Calpine's stock price dropped, the 7.75% Convertible Noteholders retained the right to enforce Calpine's absolute obligation to pay interest and repay principal. Simply stated, the policies of Section 510(b) would not be served by subordinating any of the 7.75% Convertible Noteholders' claims arising under the Indenture, and Section 510(b) is simply inapplicable to the current situation.

Moreover, the damages asserted by the 7.75% Convertible Noteholders are not a result of the failure of the Debtors to deliver shares of stock upon conversion of the 7.75% Convertible Notes; the 7.75% Convertible Noteholders have made no election to convert the notes. Rather, the claim represents damages arising from the Debtors' breach of a debt instrument resulting from the premature termination of the Conversion Right, and therefore is not within the contours of Section 510(b) of the Bankruptcy Code.[10] See e.g., Official Comm. of Unsecured Creditors. v. Am. Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004); In re Montgomery Ward Holding Corp., 272 B.R. 836, 843 (Bankr. D. Del. 2001) (absent an allegation of fraud in the purchase, sale, or issuance of a debt instrument, Section 510(b) does not apply to a claim seeking simple recovery of an unpaid debt due upon a promissory note, even if the note was given in exchange for stock); In re Wyeth Co., 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991) (claims based on notes issued by debtor to redeem stock neither fall under the plain language of Section 510(b) nor 'bear any relationship whatever' to its underlying policy concerns).

---

[10]    Indeed, if the Bankruptcy Court's Opinion were correct and extended to its logical conclusion, the "dashed-expectation" damages that were awarded by the Bankruptcy Court as part of its CalGen Decision should also have been subordinated pursuant to Section 510(b) of the Bankruptcy Code.

The sole cause of the 7.75% Convertible Noteholders' damages is the breach of the Indenture, not the non-delivery of stock. There is no transactional nexus between the 7.75% Convertible Noteholders' damages claim for breach of the Indenture with a purchase or sale of stock. See e.g., Racusin v. American Wagering, Inc. (In re American Wagering, Inc.), No. 05-15969, 2007 WL 1839681 (9th Cir. June 28, 2007). In the American Wagering case, Racusin was hired as a financial advisor in connection with the initial public offering of the debtor's stock, and the parties entered into an agreement pursuant to which he was to be compensated in cash and stock. Id. at *1. Racusin later obtained a money judgment against the debtor arising from his claims for breach of contract. Id. After the debtor filed for bankruptcy, the debtor sought to subordinate his claim. Id. at *2. Though the court acknowledged that section 510(b) does encompass certain breach of contract claims, it only encompasses those claims that bear "some nexus or casual relationship between the claim and the purchase of the securities." Id. at *3. Specifically, the Ninth Circuit held as follows:

> We agree that his claim is not one that is properly subordinated because it is not one "for damages arising from the purchase or sale of a security." The original…contract, which promised him "4% of the final evaluation" of the IPO, only gave him the monetary value of the shares of stock, not the stock itself. [The debtor] never upheld its end of the contract, resulting in a lawsuit for breach seeking damages based on the value of the stock. Racusin received that money judgment and initiated legal action to receive it long before the bankruptcy proceeding at issue here commenced. Racusin thus sought all along what was promised by the contract-the monetary value of the stock, rather than the stock itself-and the district court, after some direction from this Court, effectuated the contractual remedy as well.

In re American Wagering, Inc., 2007 WL 1839681, at *2 (emphasis added).

The conclusion that the Conversion Right Claim represents a valid debt claim is reinforced by the well-accepted principle that convertible bonds have long been characterized as

creatures of debt, and not equity.  As the Court stated in <u>In re Migel's Will</u>, 336 N.Y.S.2d 376, 379 (N.Y. Sur. 1972):

> That a bond is convertible at the sole option of its holder into stock should no more affect its essential quality of being a bond than should the fact that cash is convertible into stock affect the nature of cash.  Any bond, or any property, for that matter, is convertible into stock through the intermediate step of converting it to cash…. [C]ase law indicates that a convertible debenture is a bond and not an equity security until conversion occurs.

<u>Id.</u> at 374;  <u>see also</u> <u>Harff v. Kerkorian</u>, 324 A.2d 215 (Del. Ch. 1974), <u>rev'd</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u>, 347 A.2d 133 (Del. 1974) (same).

In fact, <u>Broad v. Rockwell</u>, stands for the very proposition that conversion rights are incidents of debt that represent wholly contractual interests in the issuer, as opposed to equity interests.  <u>See</u> <u>Broad v. Rockwell Int'l Corp.</u>, 642 F.2d 929, 940, n. 10 (5th Cir. 1981) ("[T]he rights of the holders of the debt securities are largely a matter of contract.").  Accordingly, the Debtors' argument that the 7.75% Convertible Noteholders "bear the same risks and are entitled to the same remedies as equityholders (<u>i.e.</u>, none)" is mistaken since the 7.75% Convertible Noteholders possess valuable and enforceable rights and remedies under the Indenture.[11] Debtors' Limited Objection at 4.

Indeed, Congress recognized the fact that convertible bonds, though a hybrid security, should be treated as debt.  Specifically, Section 101(16) of the Bankruptcy Code, in pertinent part, defines the term "equity security" as including shares of stock of a corporation, warrants or other rights to purchase stock, but expressly excludes "a right to convert."  11 U.S.C. § 101(16).  The legislative history reveals that Congress did not intend the definition of "equity

---

[11]    The Debtors appear to ignore the economic realities underlying the Convertible Notes, and treat the Convertible Notes as holding stand-alone warrants to purchase stock of Calpine.  This is not the case.

43

security" to include "a security, such as a convertible debenture, that is convertible into an equity security, but has not been converted." S. Rep. No. 989, 95th Cong. (2d Sess. 1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810; H.R. Rep. No. 95-595, at 311, 95th Cong. (1st Sess. 1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6268; In re America West Airlines, Inc., 179 B.R. 893 (Bankr. D. Ariz. 1995) ("The legislative history reveals that only a right to convert is not included in the definition of 'equity security'…[a] right to purchase however, is within the definition provided in the Bankruptcy Code."). Unless and until the 7.75% Convertible Noteholders tender their Notes for conversion, all claims arising under the Indenture represent debt claims akin to claims for principal and interest.

Accordingly, the claim for damages arising from the breach of the Indenture for the 7.75% Convertible Notes does not arise as a result of the sale or purchase of a security, and, therefore, should not be subject to mandatory subordination.

**B.    Section 510(b) Requires Only That Such Claim Be Subordinated To The Claims of Principal And Interest Under The 7.75% Convertible Notes, And Does Not Mandate That Such Claim Be Deemed *Pari Passu* With, Or Subordinated To, Common Stock**

Section 510(b) subordinates a claim "to all claims or interests represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. § 510(b) (emphasis added). The statute, on its face, only requires that the 7.75% Convertible Noteholders' claims arising from the loss of the Conversion Right be subordinated (if at all) to the class of allowed claims relating to such security, i.e., the 7.75% Convertible Notes. It is well-settled that statutory provisions should be interpreted in accordance with their plain meaning. Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993) ("[c]ourts properly assume, absent sufficient indication to the contrary, that Congress

44

intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'")
(construing Fed. R. Bankr. P. 9006) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).
As such, to the extent subject to subordination, the Conversion Right Claim should rank junior to
general unsecured creditors but senior to equity.

Moreover, subordination of the Conversion Right Claim to the level of equity
runs counter to the policies underlying section 510(b) of the Bankruptcy Code. The primary
purpose of Section 510(b), as articulated by this Circuit, is to prevent the claims of equity
investors who assumed shareholder risk from diluting distributions to creditors that hold valid
debt claims and who relied upon an "equity cushion" in extending credit to the Debtors. See In
re Stirling Homex Corp., 579 F.2d 206, 213-14 (2d Cir. 1978), cert. denied sub nom. Jezarian v.
Raichle, 439 U.S. 1074 (1979). As the American Wagering court stated:

> Section 510(b) serves to effectuate one of the general principles of
> corporate and bankruptcy law: that creditors are entitled to be paid
> ahead of shareholders in the distribution of corporate assets. The
> principles behind corporate and bankruptcy laws generally do not
> favor shifting the risk of loss from shareholders to creditors, even
> if the shareholders are blameless. One of the primary purposes of
> section 510(b), therefore, is to prevent disappointed shareholders,
> sometimes the victims of corporate fraud, from recouping their
> investment in parity with unsecured creditors.

In re American Wagering, Inc., 2007 WL 1839681, at *3.

By subordinating the valid debt claims of the 7.75% Convertible Noteholders, the
Bankruptcy Court has essentially penalized valid debt holders, and conferred a substantial
windfall upon equity. In exchange for the lower coupon rate and favorable covenants associated
with the 7.75% Convertible Notes, which inured to the indirect benefit of Calpine's equity
holders, the 7.75% Convertible Noteholders obtained incremental consideration in the form of a
conversion right, which the Debtors now seek to "vaporize." The result is a windfall to equity.

45

The 7.75% Convertible Noteholders have not sued the Debtors as equity investors seeking monetary damages for fraud or breach of contract related to their mishandling of shareholders' economic investment in the company. Rather, they have asserted a claim for breach of their debt instrument. The 7.75% Convertible Noteholders are creditors of the Debtors and the total amount of their claims should be treated accordingly.

**V.**

**THE PROPOSED FORM OF ORDER SUBMITTED BY THE DEBTORS AND
ENTERED BY THE BANKRUPTCY COURT DID NOT ACCURATELY REFLECT
THE RULING OF THE BANKRUPTCY COURT SUSTAINING THE
LIMITED OBJECTION**

At the Hearing, the Bankruptcy Court disallowed claims asserted for breach of the Conversion Right under the Indenture. The order submitted by the Debtors and entered by the Bankruptcy Court, however, provides for relief well beyond the Bankruptcy Court's ruling and improperly attempts to extinguish claims not briefed or argued by parties in their papers or at the Hearing, and no basis in law or in fact is provided to support this summary disposition.

Specifically, the Order extinguished any and all claims in excess of outstanding principal, accrued interest and reasonable prepetition indenture trustee fees, and expressly expunges any other claims, such as "makewhole" or "dashed-expectation" damages. (Order ¶¶ 2-3). The language of the Order, however, is inconsistent with the Bankruptcy Court's Opinion, which was directed strictly at "new claims," defined by the Bankruptcy Court as the Conversion Right Claim. Specifically, the Bankruptcy Court stated in its Opinion that "on March, April and May of 2007 the indenture[] trustees for the convertible notes filed 'supplemental' proofs of claims seeking in addition to repayment of outstanding principal and accrued interest damages for 'any breach' of the conversion rights, collectively the new claims." (Hr'g Tr. Aug. 8, 2007 at 96: 4-9) (emphasis added). In ruling, the Bankruptcy Court held: "even were the new claims

46

allowed as timely amendments the claims for damages on account of the [C]onversion [R]ight under the [I]ndenture would be disallowed or at best subordinated."  (Hr'g Tr. Aug. 8, 2007 at 101: 25; 102: 1-5) (emphasis added).

The record does not support the broad disallowance of claims under the Order. The Bankruptcy Court's Opinion was properly focused on the only claims briefed and properly at issue – the claims asserted on account of the Conversion Right.  Throughout the ruling, the Bankruptcy Court focused and referenced the new claims as pertaining only to the Conversion Right.  The 7.75% Convertible Noteholders submit that these claims were indeed the focus and scope of the issue before the Bankruptcy Court for adjudication at the hearing.

## CONCLUSION

In light of the foregoing, the 7.75% Convertible Noteholders respectfully submit that the Proof of Claim filed on behalf of the 7.75% Convertible Noteholders was timely.  The Conversion Right contained in the Indenture represents a separate and distinct form of consideration under the 7.75% Convertible Notes.  That right, in accordance with the plain terms of the Indenture, survives through bankruptcy and remains contractually valid through June 1, 2015.  To the extent the Debtors seek to prematurely terminate that Conversion Right, whether pursuant to a confirmed plan of reorganization or otherwise, the 7.75% Convertible Noteholders are entitled to damages for the loss of that value.  Accordingly, the 7.75% Convertible Noteholders respectfully request that this Court reverse the Bankruptcy Court's Order.

*[Remainder of page intentionally left blank]*

Dated: New York, New York
      September 7, 2007

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By: /s/ Kristopher M. Hansen
      Kristopher M. Hansen (KH-4679)
      Erez E. Gilad (EG-7601)

180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for each of Brencourt Credit Opportunities Master, Ltd., Brencourt Multi-Strategy Enhanced Dedicated Fund, LP, Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., Linden Capital L.P., and Ore Hill Hub Fund, Ltd.*