**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| CALPINE CORPORATION, <u>et</u> <u>al.</u>, | : Case No. 05-60200 (BRL) |
| | : |
| Debtors. | : |

-------------------------------------------------------------x

| | |
|---|---|
| ARISTEIA CAPITAL, L.L.C., | : |
| AURELIUS CAPITAL MANAGEMENT, LP, | : |
| DRAWBRIDGE SPECIAL OPPORTUNITIES | : |
| ADVISORS LLC, ORE HILL HUB FUND LTD., | : |
| NISSWA MASTER FUND LTD., PINES EDGE | : |
| VALUE INVESTORS LTD., PINES EDGE | : |
| VALUE INVESTORS L.P., SILVER SANDS | : Civil Case No. 07-07830 (JGK) |
| FUND LLC, STARK MASTER FUND LTD. | : |
| AND 3V CAPITAL MANAGEMENT, LLC | : |
| | : |
| Appellants, | : |
| | : |
| -against- | : |
| | : |
| CALPINE CORPORATION AND ITS | : |
| AFFILIATED DEBTORS AND DEBTORS | : |
| IN POSSESSION, OFFICIAL COMMITTEE | : |
| OF UNSECURED CREDITORS OF | : |
| CALPINE CORPORATION, OFFICIAL | : |
| COMMITTEE OF EQUITY SECURITY | : |
| HOLDERS, | : |
| | : |
| Appellees. | : |

-------------------------------------------------------------x

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                             :
                                                   :  Chapter 11
CALPINE CORPORATION, <u>et al.</u>,                :  Case No. 05-60200 (BRL)
                                                   :
                                 Debtors.          :

------------------------------------------------------------x

BRENCOURT CREDIT OPPORTUNITIES             :
MASTER, LTD., BRENCOURT MULTI-             :
STRATEGY ENHANCED DEDICATED                :
FUND, LP, DILLON READ U.S. FINANCE         :
L.P., DILLON READ FINANCIAL PRODUCTS       :
TRADING LTD., LINDEN CAPITAL L.P.          :
AND ORE HILL HUB FUND, LTD.                :  Civil Case No. 07-07831 (JGK)
                                           :
                      Appellants,          :
                                           :
                 -against-                 :
                                           :
CALPINE CORPORATION AND ITS                :
AFFILIATED DEBTORS AND DEBTORS IN          :
POSSESSION, OFFICIAL COMMITTEE OF          :
UNSECURED CREDITORS OF CALPINE             :
CORPORATION, OFFICIAL COMMITTEE            :
OF EQUITY SECURITY HOLDERS,                :
                                           :
                      Appellees.           :

------------------------------------------------------------x

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:                                                :

                                                      : Chapter 11

CALPINE CORPORATION, <u>et</u> <u>al.</u>,           : Case No. 05-60200 (BRL)

                                                      :

                        Debtors.                      :

---------------------------------------------------------------x

HSBC BANK USA, N.A., AS INDENTURE       :

TRUSTEE FOR THE 6% CONVERTIBLE          :

NOTES DUE 2014                          :

AND THE 4.75% CONTINGENT                : Civil Case No. 07-07832 (JGK)

CONVERTIBLE NOTES DUE 2023              :

                                        :

                        Appellants,     :

                                        :

                        -against-       :

                                        :

CALPINE CORPORATION AND ITS             :

AFFILIATED DEBTORS AND DEBTORS          :

IN POSSESSION, OFFICIAL COMMITTEE       :

OF UNSECURED CREDITORS OF               :

CALPINE CORPORATION, OFFICIAL           :

COMMITTEE OF EQUITY SECURITY            :

HOLDERS,                                :

                                        :

                        Appellees.      :

---------------------------------------------------------------x

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| CALPINE CORPORATION, et al., | : Case No. 05-60200 (BRL) |
| | : |
| Debtors. | : |

-------------------------------------------------------------x

| | |
|---|---|
| MANUFACTURERS & TRADERS TRUST | : |
| AS TRUSTEE FOR THE 7.75% CONVERTIBLE | : |
| NOTES DUE 2015 | : Civil Case No. 07-07867 (JGK) |
| | : |
| Appellants, | : |
| | : |
| -against- | : |
| | : |
| CALPINE CORPORATION AND ITS | : |
| AFFILIATED DEBTORS AND DEBTORS | : |
| IN POSSESSION, OFFICIAL COMMITTEE | : |
| OF UNSECURED CREDITORS OF | : |
| CALPINE CORPORATION, OFFICIAL | : |
| COMMITTEE OF EQUITY SECURITY | : |
| HOLDERS, | : |
| | : |
| Appellees. | : |

-------------------------------------------------------------x

## BRIEF OF DEBTORS-APPELLEES

KIRKLAND & ELLIS LLP
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)
Stephen E. Hessler
M. Catherine Peshkin (MP 5400)
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

KIRKLAND & ELLIS LLP
Marc Kieselstein, P.C.
Aon Building
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:   (312) 861-2200

KIRKLAND & ELLIS LLP
Jeffrey S. Powell
655 15th Street, N.W.
Washington, D.C. 20005-5793
Telephone:  (202) 879-5000
Facsimile:   (202) 879-5200

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ...................................................................................... 1

JURISDICTION ............................................................................................................... 2

COUNTER-STATEMENT OF ISSUES ON APPEAL ................................................... 2

STATEMENT OF CASE .................................................................................................. 2

STATEMENT OF RELEVANT FACTS ......................................................................... 5

STANDARD OF REVIEW ............................................................................................ 15

ARGUMENT .................................................................................................................. 16

I.    THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE NEW CLAIMS
      AS UNTIMELY ................................................................................................... 16

   A.   The Bankruptcy Court Properly Found the Original Claims Did Not State Claims for
        Breach of Conversion Rights ........................................................................ 16

   B.   The Bankruptcy Court Properly Found the New Claims Do Not Relate Back to the
        Original Claims ............................................................................................. 18

   C.   The Bankruptcy Court Properly Found that Equity Does Not Warrant Consideration of
        the New Claims .............................................................................................. 20

II.   THE BANKRUPTCY COURT PROPERLY DENIED THE NEW CLAIMS ON THE MERITS ........... 28

   A.   The Debtors' Potential Solvency Does Not Warrant Allowance of the New Claims .. 29

   B.   The Indentures Do Not Support the New Claims ......................................... 30

   C.   Applicable State Law Does Not Support the New Claims ........................... 35

   D.   The CalGen Refinancing Opinion Does Not Support Allowance of the New Claims . 36

   E.   The New Claims Were Not Contingent or Unmatured as of the Petition Date ........... 37

   F.   If the Conversion Right Has Value, It Must Be Disallowed as Unmatured Interest .... 38

III.  THE BANKRUPTCY COURT PROPERLY RULED THAT THE NEW CLAIMS, IF ALLOWED, WOULD BE SUBJECT TO SUBORDINATION UNDER SECTION 510(B) OF THE BANKRUPTCY CODE ............................................................................................ 39

    A.  The New Claims Are Not Breach of Contract Claims and Thus Are Not Immune from Subordination ...................................................................................... 40

    B.  The New Claims Are Subject to Subordination Because the Noteholders Took on Shareholder Risk and Return Expectations .................................................. 40

    C.  Section 101(16)(C) of the Bankruptcy Code Does Not Defeat Subordination ............. 43

    D.  The New Claims Should Be Subordinated to Equity .................................................... 44

IV.  THE BANKRUPTCY COURT PROPERLY ENTERED THE ORDER ............................................. 45

    A.  The Noteholders Received Ample Notice of the Relief Requested ............................. 46

    B.  The Noteholders Cannot Use Their Own Failure to Raise Additional Claims at Oral Argument to Argue the Bankruptcy Court Improperly Failed to Consider Them ....... 48

# TABLE OF AUTHORITIES

**Cases**

Argonaut Ins. Co. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.), No. 93 Civ. 4014, 1995 WL 311764 (S.D.N.Y. May 18, 1995) ......................................................... 35

Carrieri v. Jobs.com Inc., 393 F.3d 508 (5th Cir. 2004)............................................................... 38

Castle Creek Tech. Partners, LLC v. CellPoint Inc., No. 02-6662, 2002 WL 31958696 (S.D.N.Y. Dec. 9, 2002)......................................................... 36

Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149 (5th Cir. 1982), vacated on other grounds, 460 U.S. 1007 (1983)......................................................... 19

Chock Full O' Nuts Corp. v. United States, 453 F.2d 300 (2d Cir. 1971) ................................... 28

Citadel Equity Fund Ltd. v. Aquila, Inc., 371 F.Supp.2d 510 (S.D.N.Y. 2005), aff'd, 168 Fed Appx. 474 (2d Cir. 2006) ......................................................... 30

Deutsch v. Health Ins. Plan of Greater New York, 751 F.2d 59 (2d Cir. 1984).......................... 36

Digital Americas, Inc. v. Int'l Wireless Comm'ns Holdings, Inc. (In re Int'l Wireless Comm'ns Holdings, Inc.), Case No. 02-2733, 2003 WL 21466898 (3d Cir. Apr. 16, 2003) ......................................................... 43

Duel Glass v. Search Fin. Servs. Inc. (In re Search Fin. Servs. Acceptance Corp.), No. 39832129RCM11, 2000 WL 256889 (N.D. Tex. Mar. 7, 2000) ...................................... 37

Gens v. Resolution Trust Corp., 112 F.3d 569 (1st Cir. 1997)..................................................... 17

Hilton Hotels Corp. v. Dunnet, 275 F. Supp. 2d 954 (W.D. Tenn. 2003) ................................... 36

Husky Oil Co. v. Comm'r, 83 T.C. 717 (T.C. 1984)..................................................................... 28

In re Adelphia Comm'ns Corp., 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................... 23

In re Aetna Cas. & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772 (2d Cir. 1996)......................................................... 16

In re Baldwin-United Corp., 52 B.R. 549 (Bankr. S.D. Ohio 1985) ............................................ 37

In re Bloomingdale Partners, 160 B.R. 101 (Bankr. N.D. Ill. 1993) ........................................... 16

In re Calpine Corp., 365 B.R. 392 (Bankr. S.D.N.Y. 2007)............................................. 11, 34, 36

In re Casse, 198 F.3d 327 (2d Cir. 1999)............................................................................... 37, 49

In re Dynamic Tours & Transp., Inc., 349 B.R. 307 (Bankr. M.D. Fla. 2006) ........................... 17

In re Einstein/Noah Bagel Corp., 257 B.R. 499 (Bankr. D. Ariz. 2000) ...................................... 38

In re Enron Corp., 341 B.R. 141 (Bankr. S.D.N.Y. 2006)........................................................... 42

In re Enron Creditors Recovery Corp., No. 01-16034, 2007 WL 1705653 (Bankr. S.D.N.Y. Jun. 13, 2007).......................................................................................... 20, 24

In re Johns-Manville Corp., 340 B.R. 49 (S.D.N.Y. 2006), aff'd, 476 F.3d 118 (2d Cir. 2007) ................................................................................................................. 15, 47

In re Miss Glamour Coat Co., 1980 WL 1668 (S.D.N.Y. Oct. 8, 1980) ...................................... 19

In re Oxford Health Investors, LLC, No. 00-80676, 2004 WL 2830694 (Bankr. M.D.N.C. June 15, 2004)................................................................................................................ 19

In re Plunkett, 82 F.3d 738 (7th Cir. 1996).................................................................................. 20

In re PPI Enters. (U.S.), Inc., 228 B.R. 339 (Bankr. D. Del. 1998), aff'd, 324 F.3d 197 (3d Cir. 2003)....................................................................................................... 29

In re R.H. Macy & Co.,166 B.R. 799 (S.D.N.Y. 1994)................................................................ 22

In re Slater, No. 095-70848-511, 1996 WL 699719 (Bankr. E.D.N.Y. Aug. 1, 1996)................. 46

In re Stavriotis, 977 F.2d 1202 (7th Cir. 1992)............................................................................ 17

In re Stoecker, 5 F.3d 1022 (7th Cir. 1993) ................................................................................. 22

In re WorldCom, Inc., Case No. 02-13533, 2006 WL 3782712 (Bankr. S.D.N.Y. Dec. 21, 2006) ............................................................................................................... 42

In re Wyeth Co., 134 B.R. 920 (Bankr. W.D. Mo. 1991)............................................................. 43

Integrated Resources, Inc. v. Ameritrust Co. (In re Integrated Resources, Inc.), 157 B.R. 66 (S.D.N.Y. 1993)............................................................................................ 17, 23

Kaiser Group Int'l, Inc. v. Pippin (In re Kaiser Group Int'l, Inc.), 326 B.R. 265 (D. Del. 2005) ............................................................................................................... 40

Kenyon County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.), No. 07-3968, 2007 WL 2435169 (S.D.N.Y. Aug. 27, 2007)............................................ 39

Lancaster Factoring Co. Ltd. v. Mangone, 90 F.3d 38 (2d Cir. 1996) ........................................ 16

Lillis v. AT&T Corp., C.A. No. 717-N, 2007 WL 2110587 (Del. Ch. Jul. 20, 2007)................. 36

Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585 (2d Cir. 1991)......................... 37

LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.), 961 F.2d 378 (2d Cir. 1992) ................................................................................................................ 39

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115 (2d Cir. 2005) .......................................................................................... passim

Montgomery Ward v. Schoeberl (In re Montgomery Ward Holding Corp.), 272 B.R. 836 (Bankr. D. Del. 2001) ............................................................................................... 43

National Can Corp. v. United States, 520 F.Supp. 567 (N.D. Ill. 1981) ...................... 28

Official Comm. of Unsecured Creditors v. American Capital Fin. Servs., Inc. (In re Mobile Tool, Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004) ........................................... 43

Peltz v. Welsh, Carson, Anderson & Stowe, LP (In re Bridge Info. Sys., Inc.), 311 B.R. 781 (Bankr. E.D. Mo. 2004) ................................................................................... 38

R.A. Mackie & Co. v. PetroCorp Inc., 329 F. Supp. 2d 477 (S.D.N.Y. 2004) .............. 35

Racusin v. American Wagering, Inc. (In re American Wagering, Inc.), 493 F.3d 1067 (9th Cir. 2007) ................................................................................................................ 41

Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251 (2d Cir. 2006) ........... 40, 41, 42

Skulnik v. Skulnik (In re United Steel Enters., Inc.), No. 05-5783, 2006 WL 3544583 (D.N.J. Dec. 8, 2006) ...................................................................................................... 47

Spencer Cent. Developers, LLC v. Sterling Rubber Prods. Co. (In re Sterling Rubber Prods. Co.), No. 04-8090, 2006 WL 348143 (6th Cir. Feb. 15, 2006) ............................ 47

SportsChannel Assocs. v. Sterling Mets, L.P., 807 N.Y.S.2d 61 (N.Y. App. Div. 2006) ............ 34

Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.), 962 F.2d 543 (5th Cir. 1992) .............................................................................................................................. 39

United States v. Kolstad (In re Kolstad), 928 F.2d 171 (5th Cir. 1991) ................................. 22, 27

Wastemasters, Inc. v. Diversified Investors Servs. of N. America, Inc., 159 F.3d 76 (2d Cir. 1998) ...................................................................................................................... 35

## Statutes

11 U.S.C. § 1129(b)(1)(B) ...................................................................................... 45

11 U.S.C. § 1141(d) .............................................................................................. 29, 33

11 U.S.C. § 502(b)(2) ............................................................................................... 39

11 U.S.C. § 502(b)(6) ............................................................................................... 29

11 U.S.C. § 502(b)(7) ........................................................................................................ 29

11 U.S.C. § 510(b) ..................................................................................................... 39, 44

FED R. BANKR. P. 7015 ...................................................................................................... 12

FED. R. BANKR. P. 8013 ..................................................................................................... 15

FED. R. CIV. P. 15(a) ......................................................................................................... 12

**Other Authorities**

Dictionary of Finance and Investment Terms 413-14 (2003) ......................................... 30

Calpine Corporation ("Calpine") and its affiliated debtors and debtors in possession (collectively with Calpine, the "Debtors"), as appellees, file this brief in opposition to the four opening briefs submitted by the appellants in these appeals from an order (the "Order") of the United States Bankruptcy Court for the Southern District Court of New York (the "Bankruptcy Court") granting the Debtors' limited objection to appellants' claims (the "Objection"). Appellants include certain holders of 6% Convertible Notes (collectively, the "6% Noteholders"), certain holders of 7.75% Convertible Notes (collectively, the "7.75% Noteholders"), HSBC Bank USA, N.A. ("HSBC"), as indenture trustee, and Manufacturers & Traders Trust Company, as successor indenture trustee ("M&T" and, together with the 6% Noteholders, the 7.75% Noteholders, and HSBC, the "Noteholders").

## PRELIMINARY STATEMENT

This appeal is about the Noteholders' attempts to cash in on the Debtors' potential solvency and the Bankruptcy Court's award of approximately $76 million in "dashed expectations" damages to a different group of creditors on account of completely different claims. Indeed, very shortly after the "dashed expectations" award—and approximately *eight months* after the bar date—the Noteholders filed potentially $1.5 billion of new claims asserting breach of contract claims against the Debtors that were unsupported by any law. But when the Bankruptcy Court—the entity most familiar with the scope of its own opinion—heard the Noteholders' claims, it ruled they were untimely and did not warrant consideration and, most significantly, were wholly without merit. The Bankruptcy Court also ruled the claims would be subordinated even if they were allowed. Now, however, in spite of the innumerable grounds for the Bankruptcy Court's denial of their new claims, the Noteholders ask this Court to reverse the Bankruptcy Court, arguing, among other things, that the Bankruptcy Court erred in interpreting *its own* opinion. For the reasons set forth in further detail herein, the Court should affirm the Bankruptcy Court in all respects.

## JURISDICTION

The Court has jurisdiction over the appeal of a final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).

## COUNTER-STATEMENT OF ISSUES ON APPEAL[1]

1.  Did the Bankruptcy Court err as a matter of law in finding that the Indenture Trustees' timely-filed proofs of claim (collectively, the "Original Claims") did not include claims for breach of a conversion right?

2.  Did the Bankruptcy Court err as a matter of law in determining that the "supplemental" Proofs of Claim (collectively, the "New Claims") were new claims that did not "relate back" to the Original Claims and were therefore time-barred?

3.  Did the Bankruptcy Court abuse its discretion by refusing to permit the Noteholders to assert the New Claims on equitable grounds?

4.  Did the Bankruptcy Court err as a matter of law in holding that the Noteholders are not entitled to damages on account of their New Claims?

5.  Did the Bankruptcy Court err as a matter of law in holding that the New Claims would be subject to mandatory subordination to the level of equity under 11 U.S.C. § 510(b)?

6.  Was the Bankruptcy Court correct in entering the Order?

## STATEMENT OF CASE

At the time of Calpine's bankruptcy filing, it had approximately $1.8 billion in principal amount outstanding under certain unsecured convertible debentures. Prior to the claims bar date established and fully noticed in Calpine's bankruptcy cases, the indenture trustees for these convertible debentures filed proofs of claim seeking repayment of principal and interest and "other unliquidated amounts" under their indentures. Eight months after the bar date had passed—and shortly after the Bankruptcy Court issued an opinion granting some measure of "dashed expectation" damages to a different group of noteholders—the indenture trustees filed "supplemental" proofs of

---

[1]    Because certain of the Noteholders included assertions in their issue statements that are subject to dispute, the Debtors have included a Counter-Statement of Issues on Appeal.

claim at the direction of certain major convertible noteholders seeking what could amount to an aggregate $1.5 billion in damages under a newly minted theory of breach of the "conversion rights" under their indentures. In response, the Debtors filed a limited objection to all of the convertible note claims, including the "conversion right" claims, beyond claims for principal and interest and trustee fees, and the official committees of unsecured creditors and equity holders joined the objection.

After conducting a non-evidentiary hearing, the Bankruptcy Court granted the objection in all respects.[2] In granting the objection, Judge Lifland ruled that the new "conversion right" claims did not relate back to the original convertible notes claims because the original proofs of claim made no meaningful reference to conversion rights and the Debtors could not reasonably have expected the Original Claims to be amended to state novel breach of "conversion right" theories.[3] Thus, Judge Lifland ruled the "conversion right" claims were new claims that had been untimely filed. Judge Lifland then declined to exercise his discretion to consider the "conversion right" claims even though they were untimely on the grounds that doing so would: (i) prejudice the Debtors and their other creditors; and (ii) the Noteholders had offered "no justification whatsoever" for their delay in filing the "conversion right" claims. In addition, Judge Lifland evaluated the merits of the "conversion right" claims and appropriately denied them on the grounds that, under the terms of the indentures, any "conversion rights" terminated upon Calpine's bankruptcy filing and, even more fundamentally, on the grounds that the Noteholders were seeking an impermissible double recovery by asserting claims for alternative remedies of repayment and conversion. At the Debtors'

---

[2]  Now that their claims have been denied the Noteholders suggest their rights were trampled because they were denied an evidentiary hearing. See 6% Brief at 13, 23; 7.75% Brief at 9. Notably, however, the Noteholders **agreed** below that an evidentiary hearing was unnecessary. August 8, 2007 Bankruptcy Court Hearing Tr. at 49. (counsel to 6% Convertible Noteholders acknowledged: "We've also agreed that we're not having that evidentiary hearing today.").

[3]  August 8, 2007 Bankruptcy Court Hearing Tr. (App. Tab 1) at 93-102. A copy of the hearing transcript, as well as copies of other documents in the record referenced herein, is included in the accompanying "Record Appendix." Citations to the Record Appendix are referred to as (App. Tab ___).

request, Judge Lifland ruled in the alternative that, even if allowed, the "conversion right" claims would be subordinated to the level of common stock under section 510(b) of the Bankruptcy Code because the "conversion rights" offer Noteholders access to the potential upside and concomitant downside of equity ownership.

Judge Lifland issued his ruling from the bench and, after considering competing orders submitted by the Debtors and the official committees, on the one hand, and the Noteholders, on the other, entered an order (substantially the same as the proposed order originally filed with the objection some 30 days before the hearing) denying the Noteholders' claims beyond Principal and Interest (as defined in the objection).  The Noteholders have appealed from the Bankruptcy Court's ruling and also seek a determination that, by entering the order, the Bankruptcy Court improperly adjudicated issues not before it, even though the Noteholders were on notice of the relief requested from the time the Objection was filed.

Because conversion and repayment are alternatives under the indentures and because the Debtors have proposed (and, in some cases, stipulated) to repay the Noteholders' outstanding principal and interest under their plan of reorganization, the Noteholders would not be entitled to recover on their conversion right claims even if the so-called "conversion rights" had not terminated as a consequence of the bankruptcy filing in accordance with the indentures.  Moreover, even if the Noteholders were entitled to claims on account of their "conversion rights," such claims must be disallowed as unmatured interest under section 502(b)(2) of the Bankruptcy Code.  Accordingly, it follows that the Noteholders are not entitled to allowable claims for damages under any theory.

## STATEMENT OF RELEVANT FACTS

### 1.    The Convertible Notes

Between 2000 and 2005, Calpine issued four series of unsecured convertible notes (the "Convertible Notes" or "Notes").[4]  As of December 20, 2005, the "Commencement Date" of these chapter 11 cases, approximately $1.8 billion of Convertible Notes were outstanding in the following principal amounts:

- $547,370,000 6.00% Contingent Convertible Senior Notes Due 2014 (the "6% Notes"), issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000 (the "Original Indenture" and, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000, the Second Supplemental Indenture, dated as of September 30, 2004, and the Third Supplemental Indenture, dated as of June 23, 2005, the "Indenture");[5] and

- $650,000,000 7.75% Contingent Convertible Senior Notes Due 2015 (the "7.75% Notes"), issued by Calpine pursuant to the Indenture; and

- $633,775,000 4.75% Contingent Convertible Senior Notes Due 2023 (the "4.75% Notes"), issued by Calpine pursuant to a certain Indenture, dated as of November 14, 2003, which was superseded by that certain Amended and Restated Indenture dated as of March 12, 2004 (the "4.75% Notes Indenture" and, together with the Indenture, the "Indentures").[6]

Although the 7.75% Noteholders assert that the Debtors bargained for the conversion rights in exchange for any number of concessions (including a lower coupon rate, the prospect that holders will convert their Notes and thereby remove liabilities from Calpine's balance sheet, less

---

[4]    One of these series was the 4.00% Convertible Senior Notes Due December 26, 2006 (the "4% Notes"). Although HSBC's New Claims also asserted "conversion rights" claims on account of the 4% Notes, the Debtors successfully objected to those claims below.  The Noteholders have not appealed from that aspect of the Bankruptcy Court's ruling.

[5]    Orig. Indenture and 1st Supp. (App. Tab 2); 2d Supp. (App. Tab 3); 3d Supp. (App. Tab 4).

[6]    4.75% Indenture (App. Tab 5).

restrictive covenants, elimination protections, and no-call protection),[7] no evidence has been adduced to support these contentions.

### 2.    The "Conversion Rights"

### a.    Overview

Described generally, prior to maturity, the Indentures allow holders to convert their Notes into cash and/or common stock upon the occurrence of one of a number of conditions precedent. Thus, any conversion right the Noteholders may have is by no means absolute. Specifically, pursuant to section 10.01(a) of the respective Indentures, the holders may convert their Notes during specified periods only under the following circumstances:

(i)     if the trading price of Calpine's common stock is at least 20% higher than the conversion price;

(ii)    if the 6% or 7.75% Notes are still outstanding after a given date, irrespective of the stock trading price;

(iii)   during a five trading-day period if the trading price of the Notes during the previous five consecutive trading days was less than 95% of an amount roughly equal to what the Noteholders would receive upon conversion;[8]

(iv)    if Calpine distributes rights, warrants, or options to all or substantially all of its common stock holders entitling them to purchase common stock for less than its trading price;

(v)     if Calpine issues debt, rights, or warrants to all or substantially all of its common stock holders with a per share value exceeding 12.5% of the common stock price;

(vi)    if Calpine is party to a consolidation, merger, share exchange, sale of all or substantially all of its assets or other similar transaction; or

(vii)   in the case of the 4.75% Notes, Calpine calls the notes for redemption.

---

[7]    7.75% Brief at 12. Moreover, as set forth below, a party that freely trades off lower fixed interest for an opportunity to buy equity at a favorable price is not entitled to compensation if that economic decision does not pay off.

[8]    This amount is the product of (i) the common stock trading price and (ii) the number of shares to which each converting Noteholder was entitled as determined using the conversion rate. See Indentures § 10.01(a).

All of the Notes feature a conversion (or "strike") price.[9]

### b.    In The Absence Of Default

As long as no event of default had occurred—*and* provided one of the conversion conditions had transpired—converting Noteholders were entitled to receive (a) repayment of principal, in cash and (b) payment of any "upside" difference between the applicable conversion price and Calpine's stock price at the time of conversion (the "Equity Kicker"), in shares of Calpine common stock.  Where, upon conversion, the stock price was lower than the strike price, the holders were not entitled to full repayment of principal and could only receive their conversion value, in cash.[10]

### c.    Post-Event Of Default

The Indentures provide that commencing a chapter 11 case constitutes an event of default.[11]  Upon an event of default, all Notes shall be "immediately due and payable" without any further action or notice by the trustee or holders.[12]  The Indentures further provide that, upon

---

[9]    The unadjusted conversion rate for the 4.75% Notes was approximately 153.8462 shares per $1,000 principal amount of Notes, reflecting a strike price of $6.50.  4.75% Notes Indenture at A-4.  The unadjusted conversion rate for the 6% Notes was approximately 259.7403 shares per $1,000 principal amount of Notes, reflecting a strike price of $3.85.  2d Supp. at 3.  The unadjusted conversion rate for the 7.75% Notes was 250 shares per $1,000 principal amount of Notes, reflecting a strike price of $4.00.  3d Supp. at A-5.

[10]    By way of example, if Calpine's common stock is trading at $5.00 per share at the time of conversion, a holder of 7.75% Notes with a strike price of $4.00 and a conversion rate of 250 shares per $1,000 in principal of Notes would receive, in return for converting $1,000 in principal amount of 7.75% Notes, $1,000 in cash and $250 worth of common stock (i.e., $250 x ($5.00-$4.00)).  Specifically, the Noteholder is entitled to receive a conversion value equal to the product of the $5.00 stock price and the conversion rate of 250 shares/$1,000 note—which is $1,250.  As set forth above, of this $1,250, the Noteholder will receive $1,000 (the principal amount) in cash and the remaining $250 in stock.  Conversely, if Calpine's common stock were trading at $3.00 per share at conversion, the same holder would only receive $750 in cash and no stock (i.e., the product of the $3.00 stock price and the conversion rate of 250 shares/$1,000 note) because the conversion value is less than the principal amount of the Note.

[11]    See Orig. Indenture § 5.1(e); 4.75% Notes Indenture § 6.01(8).

[12]    See Orig. Indenture § 5.2 ("If an Event of Default specified in clause (e) or (f) of Section 5.1 with respect to the Company occurs, the principal of and interest on all the Securities of each Series shall ipso facto become and be

(Continued…)

acceleration and the automatic maturity of the Convertible Notes, any conversion right terminates altogether.[13]

### d.      Repayment Provisions

The Indentures do not provide for (i) any "makewhole" payments of damages or penalties upon acceleration of the Convertible Notes or (ii) any payments of damages or penalties upon termination of the Conversion Rights by virtue of acceleration or otherwise.  The Indentures expressly provide for payment of postpetition interest "in any proceeding under any Bankruptcy Law[,]"[14] but do not contemplate any damages or any other type of payments in the event of a bankruptcy proceeding.[15]  Critically, the Indentures also do not contain a guaranteed conversion right or a "fill-up" provision that would expressly survive notwithstanding acceleration (although even if they did, the Debtors would dispute the effectiveness of such provisions in bankruptcy).  In sum, Convertible Noteholders who do not convert their notes prior to maturity (either by choice or because none of the conversion conditions have transpired) are entitled only to repayment of principal and accrued interest.

The Indentures also provide that the Noteholders may force Calpine to repurchase their Notes upon a change of control, but only in the amount of principal and accrued interest.[16]  The

---

immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders."); 4.75% Notes Indenture § 6.02(a) (similar).

[13]   See 4.75% Notes Indenture at A-4; 2d. Supp. at A-5; 3d Supp. at A-5 (The "conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity . . .").  "Maturity" is not defined in the Indentures, but it is clear that the term does not refer solely to maturity occurring upon expiration of the term of the Notes, because that maturity is defined as "Stated Maturity."  Orig. Indenture at 10.

[14]   See, e.g., 4.75% Notes Indenture § 4.01; 2d. Supp. at A-4.

[15]   The 4.75 Notes Indenture refers to payment of "Liquidated Damages, if any" in certain circumstances, but does not actually provide for any Liquidated Damages.  4.75% Notes Indenture at 7, A-4.

[16]   See, e.g., 2d Supp. § 3.03(a); 4.75% Notes Indenture § 3.10.

change of control provision also does not provide for enforcement of a "separate" conversion right under such circumstances.

### 3.    Commencement of the Chapter 11 Cases

On the Commencement Date, Calpine and 273 direct and indirect wholly owned subsidiaries commenced voluntary chapter 11 cases in the Bankruptcy Court.  The Debtors' filing of their chapter 11 cases constituted an event of default under each of the Indentures, thus rendering the Notes due and payable immediately.  None of the conversion conditions had been satisfied at the Commencement Date—i.e., the Notes' accelerated maturity date.

### 4.    Convertible Noteholders' Original Claims

By order, dated April 26, 2006, the Bankruptcy Court established August 1, 2006, which was approximately eight months after the Commencement Date, as the bar date for filing proofs of claim (the "Bar Date").[17]  On or about July 19, 2006, Wilmington Trust Company ("WTC"), as Indenture Trustee for the 7.75% Notes, filed a proof of claim ("Claim 2404") asserting claims for (a) principal and interest and (b) other unliquidated charges.  Claim 2404 did not state a claim for breach of contract damages.[18]  On or about July 27, 2006, HSBC, as successor Indenture Trustee for the 4.75% Notes and the 6% Notes, filed two proofs of claim asserting similar claims, including "other unliquidated amounts," in connection with the 4% Notes and the 6% Notes ("Claim

---

[17]    The 6% Noteholders assert the Debtors granted HSBC a 30-day Bar Date extension.  6% Brief at 9.  The Debtors did not discuss this below because HSBC never took advantage of such extension and none of the Noteholders raised the issue below.  In any case, the extension does not affect the outcome of this matter.

[18]    (App. Tab 6).  The other unliquidated charges listed in Claim 2404 were limited to "All other interest, charges, penalties, premiums, and advances which may be due or become due under the Notes and the Indenture, including, without limitation, reasonable compensation, expenses, disbursements and advances (including, without limitation, reasonable fees and disbursement of counsel) of the Indenture Trustee and (if applicable) of the Holders."  Claim 2404 at 2.

2821"), and the 4.75% Notes ("Claim 2823").[19]   None of the Original Claims made mention of a conversion right or any claim associated therewith.

On January 5, 2007, the Debtors and HSBC entered into a stipulation and order (the "HSBC Stipulation"), which the Bankruptcy Court approved on January 30, 2007 [Docket No. 3501], pursuant to which the parties stipulated to allowed claim amounts for the principal and prepetition accrued interest due on account of, inter alia, each of the 4.75% Notes and the 6% Notes.[20]   The parties reserved resolution of unliquidated claims for the plan of reorganization process and/or the claims reconciliation process.

### 5.    CalGen Refinancing Opinion

In January of 2007, the Debtors sought Bankruptcy Court approval of a refinancing that involved, among other things, repayment of certain secured notes issued by Debtor Calpine Generating Company, LLC ("CalGen").   Certain holders of these notes (collectively, the "CalGen Secured Lenders") objected to the terms of the proposed repayment, arguing that "no-call" clauses barred repayment of their notes until specified "lockout" periods had concluded and, assuming otherwise, repayment would entitle the CalGen Secured Lenders to secured claims for "makewhole" premiums to compensate for discontinued future interest payments.

---

[19]   (App. Tabs 7 and 8).  "Other Unliquidated Amounts" is a catchall for "any and all other amounts due or to become due under the Indenture and the Notes, whether now due or hereafter arising, which amounts may, presently, be unliquidated or contingent, but may become fixed and liquidated in the future, including, but not limited to, amounts as or for interest, liquidated damages, optional or mandatory redemptions, redemption premiums, redemption prices, expenses, indemnities, compensatory, secondary and/or punitive damages, and all compensation obligations…"   Claim 2821 § 2(f); Claim 2823 § 2(d).  The "Other Unliquidated Amounts" sections of all of the unsecured claims filed against the Debtors by HSBC are identical.  See Claims 2820, 2822, 2824, 2825 (App. Tabs 9-12).

[20]   (App. Tab 13).

On March 5, 2007, the Bankruptcy Court entered its opinion on the proposed refinancing (the "CalGen Refinancing Opinion") disagreeing with both of these arguments.[21]  First, the Bankruptcy Court held that  "[g]enerally, no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases[,]" because "[t]he 'essence of bankruptcy reorganization is to restructure debt . . . and adjust debtor-creditor relationships[,]'" and "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it."  Second, the Bankruptcy Court found "each of the CalGen Secured Debt agreements provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt," and "[a]s such, the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately.'"  The Bankruptcy Court also found the governing agreements did not expressly provide for prepayment premiums upon the repayment of accelerated debt prior to April 1, 2007.  Thus, the Bankruptcy Court held that the proposed repayment of the CalGen Secured Debt after automatic acceleration did not give rise to secured damages claims for prepayment premiums by the CalGen Secured Lenders.

Lastly, the Bankruptcy Court ruled that, as a result of the Debtors' early repayment, the CalGen Secured Lenders' "expectation of an uninterrupted payment stream has been dashed giving rise to damages," and therefore "the CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of the agreements."  The Debtors have appealed from this part of the Bankruptcy Court's ruling.

---

[21]  In re Calpine Corp., 365 B.R. 392, 397-399 (Bankr. S.D.N.Y. 2007).

### 6.      Convertible Noteholders' "Supplemental" Proofs of Claim

Very soon after the Bankruptcy Court issued the CalGen Refinancing Opinion, certain holders of the Notes engaged special counsel,[22] presumably to identify any potential additional theories of recovery under the Notes in light of the CalGen Refinancing Opinion.  At these Noteholders' direction, the Indenture Trustees for the Convertible Notes filed the New Claims approximately eight months after the Bar Date seeking *in addition* to repayment of outstanding principal and accrued interest, unprecedented damages for "breach" of the Conversion Rights.[23]  The Noteholders did not seek Bankruptcy Court approval to file the New Claims.[24]

To this day, and despite countless requests from the Debtors, the Noteholders have refused to specify any estimates of the dollar amount of damages they are seeking on account of the "conversion rights."  When pressed by the Bankruptcy Court at the hearing on the Objection (the "Hearing"), counsel to the 6% Noteholders acknowledged that the 6% Noteholders alone are seeking damages in the hundreds of millions of—and possibly half a billion—dollars.[25]  Although the

---

[22]    See August 22, 2007 District Court Expedited Appeal Hearing Tr. (App. Tab 14) at 11-12.

[23]    On or about March 23, 2007, HSBC filed a proof of claim ("Claim 6247") "supplementing" Claim 2821.  (App. Tab 15).  On or about March 29, 2007, HSBC filed a proof of claim ("Claim 6249") "supplementing" Claim 2823.  (App. Tab 16).  On or about April 23, 2007, M&T (as successor Indenture Trustee for the 7.75% Noteholders) filed a proof of claim ("Claim 6280") "supplementing" Claim 2404 on the same basis.  (App. Tab 17).  On or about May 22, 2007, HSBC filed proofs of claim amending and replacing Claim 6247 ("Claim 6299") and Claim 6249 ("Claim 6300").  (App. Tabs 18 and 19).  Each of the New Claims states claims for:

> (i) the rights provided to the holders of the [Notes] in Article 10 of the [applicable] Indenture (the "[Conversion Right]"), which [Conversion Right], upon information and belief, was an integral part of the consideration provided in return for the extension of credit to the Debtor evidenced by the [Notes], (ii) all damages, including any accrued prior to the commencement of the Case, arising from any breach of the terms of, and covenants set forth in, the Indenture, including the [Conversion Right], whenever arising, including all damages arising from the loss, whether pursuant to a plan of reorganization for the Debtor or otherwise, of the [Conversion Right]...

See Claim 6280 ¶ 4; Claim 6299 ¶ 4, Claim 6300 ¶ 4.

[24]    Bankruptcy Rule 7015; FED. R. CIV. P. 15(a).

[25]    THE COURT:  You're describing the elephant in the room?

(Continued…)

Bankruptcy Court chastised all of the Noteholders,[26] the 4.75% and 7.75% Noteholders have not made any representations about the scope of the damages they are seeking. Notably, however, if they are seeking damages similar to those of the 6% Noteholders, the aggregate damages sought on account of the so-called "conversion rights" could be near $1.5 billion.

### 7.      Debtors' Plan of Reorganization

On June 20, 2007, the Debtors filed their joint plan of reorganization (the "Initial Plan") [B.C. Docket No. 5015] and the disclosure statement thereto [B.C. Docket No. 5016]. The filing of the Initial Plan sparked interest from a number of parties in sponsoring a reorganization plan that would guarantee payment in full in cash to unsecured creditors and a minimum distribution to equity holders. Accordingly, on July 27, 2007, the Debtors put their plan process on hold to focus on determining the viability of a sponsored plan and to solicit bids for such a plan. Ultimately, the Debtors did not receive any bids that guaranteed distributions materially better than those available under a standalone plan. Thus, on August 27, 2007 the Debtors filed their First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [B.C. Docket No. 5698] and the disclosure statement thereto [B.C. Docket No. 5702]. On September 18, 2007 the

---

MR. DUNNE:  Right.
THE COURT:  Okay. We've got an elephant in the room.
MR. DUNNE:  Exactly. That --
THE COURT:  It's got a hundred million plus on its hide. Okay.
MR. DUNNE:  Exactly.
THE COURT:  That's what everybody wanted to know. How about a billion?
MR. DUNNE:  Well, for the sixes -- it's not a billion for the sixes, but hundreds of millions.
THE COURT:  Half a billion?
MR. DUNNE:  Could be.
THE COURT:  Could be? Okay.

August 8, 2007 Bankruptcy Court Hearing Tr. at 49-50.

[26]  Id. at 51 ("The gamesmanship that goes on here. To find out just the size of the elephant in the room, you should have come to that conclusion on your telephone call and not burden everybody with it now. I now know I'm dealing with a very, very large sum of money in the view of some of the claimants. Eleventh hour filed claims, as a matter of fact.").

Debtors filed their Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") [B.C. Docket No. 5993] (App. Tab 20) and the disclosure statement thereto (the "Disclosure Statement") [B.C. Docket No. 5995] (App. Tab 21).

As of September 17, 2007, approximately 18,448 proofs of claim had been filed against the Debtors seeking an aggregate amount of $111.68 billion.  As of August 15, 2007, there were 2,498 unsecured claims remaining on the claims register in the aggregate amount of $24.6 billion.[27]  The Debtors are still in the process of objecting to such claims and believe that after the claims reconciliation process is complete, allowed unsecured claims will fall somewhere between $8.1 and $9.3 billion (not including the New Claims).[28]  Under the most likely scenario, with midpoint valuation and midpoint claims, the Plan provides for satisfaction in full of the Noteholders' principal and accrued interest, as well as postpetition interest thereon at a rate to be determined by the Bankruptcy Court, together with reasonable prepetition indenture trustee fees as provided for under the Indentures (collectively, "Principal and Interest") pursuant to the Plan.

The Plan classifies the 4.75% Notes and the 6% Notes in the General Notes category and provides that the holders of General Notes will receive their pro rata share of the New Calpine Common Stock Pool for Creditors (as defined in the Plan) on account of their allowed claims for Principal and Interest in addition to unpaid postpetition interest at the contract rate determined by the Bankruptcy Court.[29]  The Plan classifies the 7.75% Notes, which are contractually subordinated to certain of the Debtors' debt issuances (the "Senior Notes"), as Subordinated Notes.[30]  The holders of

---

[27]  Disclosure Statement at 6.  This gross number does not include the conversion claims because the Noteholders have not yet ascribed a dollar amount to their claims.

[28]  Id. at 7.

[29]  Id. Ex. A at 14, 29.

[30]  Id. Ex. A at 22.

Subordinated Notes also receive their pro rata share of the New Calpine Common Stock Pool for Creditors together with unpaid postpetition interest, but their recoveries may be paid over to holders of Senior Notes by virtue of their contractual subordination provisions.[31]

According to the Disclosure Statement, the Debtors' financial advisors value New Calpine Common Stock (as defined in the Plan) at $17.99 to $19.23 per share, depending on whether the actual amount of allowed claims is closer to the Debtors' high or low estimate.[32]   Holders of General Notes are projected to recover between 95.2% and 100% of their claims.[33]   Holders of Subordinated Notes are projected to recover between 89.3% and 100% of their claims, depending on the extent to which their recoveries must first be paid over to holders of Senior Notes.   The Debtors currently project a return to equity of approximately $982 million, not including the New Claims.[34] Accordingly, should the Noteholders be awarded unsecured claims of $1.5 billion on account of their "conversion rights," the Debtors will not be solvent and the recovery to equity holders will be entirely wiped out.

## **STANDARD OF REVIEW**

A district court reviews a bankruptcy court's conclusions of law *de novo,* but accepts the bankruptcy court's findings of facts unless they are "clearly erroneous."   FED. R. BANKR. P. 8013; In re Johns-Manville Corp., 340 B.R. 49, 58 (S.D.N.Y. 2006), aff'd, 476 F.3d 118 (2d Cir. 2007).   A bankruptcy court's denial of a request to file a late claim is reviewed for abuse of discretion.   Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d

---

[31]   Id. Ex.A at 22, 29.

[32]   Id. at 160.   Because the Noteholders have not ascribed a dollar amount to their claims, their claims are not included in the Debtors' high or low claims estimates.

[33]   Id. at 5.

[34]   Id. at 3.

115, 124 (2d Cir. 2005).  A court abuses its discretion only where there is "*no reasonable basis* for [its] decision."  Lancaster Factoring Co. Ltd. v. Mangone, 90 F.3d 38, 42 (2d Cir. 1996) (emphasis added).

## ARGUMENT

**I.      The Bankruptcy Court Did Not Abuse Its
        Discretion in Denying the New Claims As Untimely**

The New Claims were completely new claims filed several months after the Bar Date with no excuse for the delay.  Nonetheless, the Noteholders argued the Bankruptcy Court should excuse the New Claims' untimeliness because the New Claims merely supplemented timely filed claims and, in any event, no prejudice would arise from late consideration of the New Claims.  The Bankruptcy Court correctly ruled that none of these grounds warranted consideration of the New Claims and did not abuse its discretion in denying the New Claims.

**A.      The Bankruptcy Court Properly Found the Original
        Claims Did Not State Claims for Breach of Conversion Rights**

The Noteholders first assign error to the Bankruptcy Court's finding that the Original Claims did not state claims for breach of the Noteholders' purported "conversion rights."  According to the Noteholders, by merely attaching the Indentures to the Original Claims and referring to the Notes by their names, e.g., "6% Convertible Notes," the Noteholders stated a discernible claim for conversion rights, and requiring more would impose an unprecedented burden of specificity upon the Noteholders.[35]  However, simply attaching an Indenture to a proof of claim is not sufficient to put a

---

[35] The cases the Noteholders cite in support of the notion that claims do not have to be specific actually involved claims that were stated much more specifically than the Original Claims and would have put a reasonable person on notice of what they were seeking.  See, e.g., In re Bloomingdale Partners, 160 B.R. 101 (Bankr. N.D. Ill. 1993) (claim indicating debtor had violated state noise pollution statutes was clear on its face that claimants were "seeking monetary damages from the Debtor on account of the Debtor's emanation of excessive nose from its building"); In re Aetna Cas. & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772 (2d Cir. 1996) (specifying claim was "subject to offset amounts due from another Federal entity...")  Given the well-developed body of law that the United States government is treated as a unitary body for setoff purposes in bankruptcy, see, e.g., Chateaugay, 94 F.3d at 779 (United States Government has a common law right of
(Continued…)

debtor on notice of novel claims like the New Claims.[36]  Indeed, if the Noteholders really believed

that simply attaching an Indenture to a proof of claim afforded sufficient notice of claims, they would

have done so rather than filing claims with multi-page attachments stating liquidated claims in detail

and including boilerplate catchall provisions and reservations of rights.[37]  Significantly, courts have

declined to read specific claims into such catchall provisions as doing so would render bar dates

meaningless.[38]

> The Original Claims did not mention the Noteholders' "conversion rights" or even

the conversion features of the Indenture and the Bankruptcy Court was under no obligation to read

them into the Original Claims.  No reasonable person could have divined that the Original Claims

---

interagency setoff), that phrase on its face is clearly specific enough to put a reasonable person on notice that it includes IRS tax refund offsets.  This is in complete contrast to the unheard of double recovery theories of the Noteholders.  Shorthand references are fine for alerting the debtor to the commonplace, but these claims are anything but—the Noteholders' Original Claims seeking "other unliquidated amounts" without more could not have put a reasonable person on notice of the "conversion right" claims.

Integrated Resources, Inc. v. Ameritrust Co. (In re Integrated Resources, Inc.), 157 B.R. 66 (S.D.N.Y. 1993) also does not support the Noteholders' position.  Key to the bankruptcy court decision and district court affirmation in Integrated Resources was the fact that the amended proofs of claim did not seek an increase in the amount of the claimant's original claims.  Id.  Moreover, Integrated Resources dealt with a counterclaim to a debtor's fraudulent transfer claim and has little applicability to this case, where the Debtors already have agreed to pay more than $1 billion to the Noteholders on account of principal and interest and are not seeking to avoid any previous payments.

[36]  Gens v. Resolution Trust Corp. does not hold otherwise.  See 112 F.3d 569 (1st Cir. 1997).  At issue in Gens was amendment of a claim to correct the identity of the claim holder (i.e., the original claimant was merely an agent of the actual claimant).  Id. at 575.  Gens does not support the notion that attaching a promissory note to a claim puts a debtor on notice of any novel claim that could possibly arise from it.

[37]  Notably, the Indenture Trustees know how to be specific when they believe they have specific claims.  WTC, for instance, explicitly sought "make whole amounts" in its claims on account of Calpine's 8.75% Second Priority Senior Secured Notes Due 2013.  See Claim 4055 (App. Tab 22) at 5.

[38]  See, e.g., In re Stavriotis, 977 F.2d 1202, 1206 (7th Cir. 1992) ("If the [creditor] had an unqualified right after the bar date to amend proofs of claim dramatically for any reason or for no reason at all, the bar date in bankruptcy proceedings would be meaningless.  Under that view, every creditor could file grossly misleading proofs of claim and later amend those claims as of right at their leisure, whenever they decided to calculate the extent of actual debt claimed to be owed."); In re Dynamic Tours & Transp., Inc., 349 B.R. 307, 312 (Bankr. M.D. Fla. 2006) ("reservation of rights language [in proof of claim] does not create a perpetual opportunity for [claimant] to revise its claims").

were asserting claims for breach of "conversion rights" (and, given the circumstances of this case, it is clear that at that time they were not intended to). Accordingly, the Bankruptcy Court properly found the Original Claims included no "meaningful reference to conversion rights."

### B.    The Bankruptcy Court Properly Found the New Claims Do Not Relate Back to the Original Claims

The Noteholders next argue that the Bankruptcy Court erred in finding the New Claims do not relate back to the Original Claims. In the first instance, the Bankruptcy Court correctly held that the Noteholders bear the burden of proving "relation back".[39] Moreover, considering the Noteholders' arguments below consisted of conclusory assertions that the New Claims were permissible supplements because the Noteholders designated them as such,[40] the Bankruptcy Court correctly ruled the Noteholders did not satisfy this burden. The Noteholders also argued below that the New Claims merely clarify the Original Claims, but by that logic, *any* claim would relate back to the Original Claims and a bar date would be pointless. The Bankruptcy Court recognized that the Noteholders were seeking to bootstrap "entirely new" claims into their catchall claims for "other unliquidated amounts" because they sought "in addition to 100 percent of the principal and interest due under the notes a double recovery based on conversion rights."[41] Accordingly, the Bankruptcy Court correctly ruled the New Claims did not "correct a form defect in

---

[39]    See August 8, 2007 Bankruptcy Court Hearing Tr. at 97 (citing In re Enron Creditors Recovery Corp., 2007 WL 1705653, at *5 (Bankr. S.D.N.Y. Jun. 13, 2007) (claimant asserting relation back bears the burden of proof)).

[40]    See 7.75% Response (6% Noteholders' Record Appendix at Tab 13) at 26-27 ("On the form cover page for the Supplement, the Indenture Trustee indicated that it supplements a previously filed claim dated 7/18/06 (Claim No. 2404). Also, the notice of the filing of the Supplement states: "Please note that this Supplement to Proof of Claim merely supplements proof of claim number 2404, and is not intended to, and does not, replace proof of claim number 2404."). See also 7.75% Brief at 17-18 (same).

[41]    August 8, 2007 Bankruptcy Court Hearing Tr. at 98.

the original claims, they do not describe the original claims with more particularity and they do not plead a new theory of recovery on the facts set forth in the original claims."[42]

The Noteholders also argued below that the New Claims relate back to the Original Claims because the New Claims are a "creature of the same contract, between the same parties, on account of the same transaction" as the Original Claims.[43]  But that argument ignores that the "arising out of the same transaction" test for relation back is a proxy for determining whether the debtor could have expected the claim to be amended in the way that it was.[44]  It is not enough for the Noteholders to argue the New Claims involve the same contract and the same parties when, as here, the Original Claims' boilerplate demand for "other unliquidated amounts" could not possibly have alerted the Debtors that the Noteholders would subsequently devise and file New Claims asserting the novel legal theories that they did.  Notably, courts typically do not impute notice of novel legal theories.[45]  Here, as in Chemetron, the Debtors would have had to have been "most prescient" to anticipate the New Claims. The Bankruptcy Court correctly found the Debtors were not—and could not have been—on notice of the New Claims and thus that they did not relate back to the Original Claims.

---

[42]  Id.

[43]  See, e.g., 6% Response (6% Noteholders' Record Appendix at Tab 12) ¶ 43.

[44]  See, e.g., In re Miss Glamour Coat Co., 1980 WL 1668, at *3 (S.D.N.Y. Oct. 8, 1980) (courts adopted "same transaction" test to take into account a debtor's reasonable expectation as to the possibility that "the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question"); In re Oxford Health Investors, LLC, No. 00-80676, 2004 WL 2830694, at *8 (Bankr. M.D.N.C. June 15, 2004) ("Application of this test involves two concerns: that the amendment arose out of the same transaction or occurrence, and that other parties could have reasonably expected or anticipated that the original claim would be altered in the manner of the later amendment.").

[45]  See Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149, 1193 (5th Cir. 1982), vacated on other grounds, 460 U.S. 1007 (1983) (section 9 "forced sale" claim was "so novel that defendants' counsel would have had to be most prescient to be on notice of it from simply the original complaint and discovery") (internal citations omitted).

C.    **The Bankruptcy Court Properly Found that Equity Does Not Warrant Consideration of the New Claims**

Having found the New Claims were new claims rather than amendments, the Bankruptcy Court analyzed whether equitable principles nonetheless warranted consideration of the New Claims. Courts consider the following five equitable factors in determining whether to consider late-filed new claims or whether to allow an amendment:

> (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.[46]

The Bankruptcy Court determined that *none* of these factors supported belated consideration of the New Claims.[47]

1.    **The New Claims Prejudice the Debtors**

Despite the Noteholders' assertions to the contrary, consideration of the New Claims would prejudice the Debtors and their constituents in multiple respects. Courts look at the following factors to determine whether late-filed claims will prejudice the debtor or other parties in interest: "(i) size of claim in relation to estate, (ii) whether the plan has been filed with knowledge of the existence of the claim, [and] (iii) the disruptive effect of the claim on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated."[48]   Critically, the

---

[46]   In re Enron Creditors Recovery Corp., No. 01-16034, 2007 WL 1705653, at *3 (Bankr. S.D.N.Y. Jun. 13, 2007) (internal citations omitted).

[47]   Even if the New Claims were amendments, equity would not warrant consideration of the New Claims. Notably, the 6% Noteholders argue it is not necessary to engage in an equitable analysis regarding the amendability of the New Claims because Rule 15(a) of the Federal Rules of Civil Procedure allows parties freely to amend claims prior to the filing of a response or objection. The 6% Noteholders are incorrect. Rule 15(a) does not apply in bankruptcy cases after the Bar Date has passed. See In re Plunkett, 82 F.3d 738, 740-41 (7th Cir. 1996).

[48]   Enron, 2007 WL 1705653 at *9.

Second Circuit has noted its reluctance "absent evident arbitrariness-to substitute [its] judgment for that of the bankruptcy judge who has presided over the proceedings, who is most familiar with the parties and the potential impact of any late-filed claim, and whose ability to oversee an efficient reorganization would be undermined by the very process of second-guessing itself."[49]  Accordingly, the Bankruptcy Court's determination of prejudice is entitled to substantial deference.

(a)    **The Size of the New Claims Is
Staggering in Relation to the Size of the Estate**

Despite numerous requests from the Debtors, the Noteholders have not provided any estimates of damages they seek other than the 6% Noteholders' representation at the Hearing that the New Claims on account of the 6% Notes *alone* "may be" half a billion dollars.  Extrapolating from that representation, the Noteholders' aggregate New Claims under the three series of Notes may be somewhere in the vicinity of $1.5 billion.  That is more than 7% of the Debtors' current projected total enterprise value of $20.3 billion and, depending on the Debtors' enterprise valuation as determined at confirmation, it may also be more than enough to render the Debtors insolvent or greatly increase the amount of such insolvency.[50]  Considering that the Second Circuit found that a $12.5 *million* claim was prejudicial in Enron's $858 *billion* bankruptcy,[51] it is hardly an abuse of discretion for the Bankruptcy Court to find that potentially $1.5 billion (or even $500 million) of claims is prejudicial in a case involving $24.6 billion of outstanding unsecured claims (of which the

---

[49]    Enron, 419 F.3d at 129.

[50]    See Disclosure Statement at 3.  Moreover, even if all three groups of Noteholders were "only" asserting claims for an aggregate $500 million, the New Claims would still be staggering in relation to the size of the estate (not to mention the Noteholders' aggregate principal claims of approximately $1.8 billion).  By contrast, the aggregate amount of all of the Unsecured Makewhole Claims is approximately $109 million.  Stipulation Regarding Certain Calculations Under the Indentures and Related Documents to the Unsecured Debt [B.C. Docket No. 5240] (App. Tab 23).

[51]    See Enron, 419 F.3d at 130 ("[W]hile a claim of $12.5 million might seem insignificant in the face of a $900 billion bankruptcy, courts have previously upheld findings of prejudice in cases in which the late-filed claim was a small fraction of the total claims.  Moreover, considered in absolute terms, $12.5 million is no small amount.") (internal quotations and citations omitted).

Debtors project less than $10 billion are allowable) and $20.3 billion of current projected enterprise value.

On appeal, the Noteholders argue the size of the New Claims is not prejudicial because: (i) denying the New Claims would merely result in a windfall to other parties in interest;[52] and (ii) the Plan is a "waterfall" plan—a common form of plan that does not quantify particular distributions to creditors or equity holders.[53] If these arguments were correct, however, no court would take into account claim size in a prejudice inquiry. Obviously, that is not the case.[54] Moreover, the "windfall" cases the Noteholders cite do not support the notion that the size of the New Claims is not prejudicial.[55] In any event, the notion that denying the New Claims would result

---

[52] See 6% Brief at 26-27.

[53] See id. at 26; 7.75% Brief at 22. The 7.75% Noteholders also argue that the New Claims are not the only claims that may prejudice the Debtors and their constituents; there are myriad contingent claims that may become fixed and allowed, including hundreds of millions of dollars of make whole claims. 7.75% Brief at 23. But those claims were not untimely and, accordingly, neither the size of the claims nor the potential prejudice to parties in interest is relevant.

[54] See Enron, 419 F.3d at 130 ("*[T]he size of the claim cannot be irrelevant to the analysis*, and some courts have taken into account whether allowance of a particular late claim would 'jeopardize the success of the reorganization,' by, for example, 'forc[ing] the return of ... amounts already paid out under the confirmed Plan, or affect[ing] the distribution to creditors and equity holders.'") (emphasis added).

[55] In re Kolstad dealt with the IRS's request to amend the amount of a tax claim originally filed *by the debtor* on the IRS's behalf pursuant to section 501(c) of the Bankruptcy Code. United States v. Kolstad (In re Kolstad), 928 F.2d 171, 175 (5th Cir. 1991) ("IRS's amended claim simply alleges a higher amount owed by Kolstad for the same type of employment tax liability stated in Kolstad's § 501(c) claim."). Of course, the case could not have been resolved any other way—otherwise debtors would file lowball 501(c) claims on behalf of all of their creditors right before the bar date and claim that allowing amendments would be prejudicial. In re Stoecker involved a creditor who failed to attach supporting documentation to its proof of *secured* claim (even though secured creditors are not required to file proofs of claim at all). 5 F.3d 1022 (7th Cir. 1993). The Seventh Circuit allowed the amendment because the creditor's harmless failure to attach appropriate documentation did not "mislead or otherwise harm anyone." Id. at 1028. And finally, the facts of In re R.H. Macy & Co. are vastly different from those in this case. 166 B.R. 799 (S.D.N.Y. 1994). In R.H. Macy, the claimant was an elderly woman who spoke little English and did not read her mail in time; she filed her personal injury claim less than two weeks after the bar date. Id. at 800. Although the bankruptcy court took a hard line regarding bar date enforcement, the district court reversed for obvious reasons that do not bear on this case. Unlike the sympathetic old lady who could not read, however, the Noteholders are sophisticated commercial lenders and must be held to a higher standard. Moreover, the Second Circuit cited R.H. Macy in holding that claim size is relevant. Enron, 419 F.3d at 130.

in a windfall to other parties in interest implies the New Claims are allowable. Considering the Debtors are not seeking disallowance of otherwise undisputed, account stated, or fixed judgment claims as late-filed on merely technical grounds, the Noteholders' windfall argument falls flat.

Furthermore, the fact that the Plan contemplates a "waterfall" structure does not weigh against a finding of prejudice. Indeed, the Noteholders vastly oversimplify "waterfall" plans and ask the Court to believe that such plans are not the subject of intense negotiations that turn, among other things, on claims amounts. That is also not the case.[56] The Debtors and their fellow appellees (as well as other key constituencies) have engaged (and shall undoubtedly continue to engage) in extensive negotiations regarding the Plan. In light of the fact that the Debtors could not have predicted the New Claims, the Bankruptcy Court did not abuse its discretion in finding the sheer magnitude of the New Claims weighs against considering the New Claims.[57]

### (b)    The New Claims Disrupt the Plan Process

In evaluating the impact of new claims on a reorganization plan, courts consider whether the plan was filed with knowledge of the claims and whether the filing of the claims disrupts

---

[56]  See generally In re Adelphia Comm'ns Corp., 368 B.R. 140, 152 (Bankr. S.D.N.Y. 2007) ("Beginning in August 2003, the Debtors convened a series of meetings with key restricted parties (bank lender agents, the Creditors Committee and the Equity Committee) to review and discuss the four primary factors in determining potential recoveries: the "Waterfall" analysis (i.e., the analysis of how distributable value would flow through the corporate structure), the Debtors' long range business plan, the intercompany transactions, and valuation/allocation. While the underlying facts were not a major subject of controversy, the accounting judgment calls and application of the law to the facts were matters of considerable debate. The Debtors brought the issues, and the uncertainties concerning their resolution, to the attention of the creditor groups involved, with the hope that they would consensually resolve them.").

[57]  The size of the New Claims would also be prejudicial if the New Claims were merely amendments rather than late-filed new claims. Courts generally find amendments are not prejudicial as long as they are reasonably close in amount to the amounts of the original claim. Ameritrust Co. v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 157 B.R. 66, 72 (S.D.N.Y. 1993) ("The record contains evidence that the appellee banks' amended proofs of claim seek no increase in the amount or priority of the bank's original claims. This factor alone goes to support three of the five factors that need to be considered when balancing the equities.") (internal citations omitted). Where, as here, the New Claims increase the amount of the Noteholders' claims to nearly 200% of principal alone, a finding of prejudice cannot constitute an abuse of discretion.

the economic model on which a plan was formulated and negotiated.[58]  Although the New Claims were filed shortly before the Debtors filed the Initial Plan, they nonetheless were filed while the Debtors were formulating and negotiating the Initial Plan.[59]  The Second Circuit noted in Enron that it did not believe the fact that "a claim is submitted before the date on which a reorganization plan is filed ought, ordinarily, to be conclusive" and ruled the bankruptcy court did not abuse its discretion by refusing to consider a late-filed claim on the grounds that it was filed during plan negotiations.[60] Considering the Plan is still the subject of extensive negotiations (as was the Initial Plan at the time the New Claims were filed) and given that the New Claims alone could drastically impact claims of creditors and obliterate potential recoveries to equity holders, it is safe to say the Debtors would have to go back to the drawing board with their various constituents if the New Claims are subject to consideration.[61]  As such, the Bankruptcy Court properly found the New Claims disrupt the Plan

---

[58]   Enron, 2007 WL 1705653 at *10.

[59]   Although the Noteholders assign error to this finding on the grounds that the Bankruptcy Court did not conduct an evidentiary hearing, the Debtors submit the Bankruptcy Court could take judicial notice of this fact given its close monitoring of these chapter 11 cases including, inter alia, reading all of the pleadings filed in the cases and receiving regular status reports and in-court updates.  By way of example, the fee application the 6% Noteholders cite in support of their contention that the Debtors are not prejudiced because they have an infinite bench of professionals (never mind the "infinite bench of professionals" available to the Noteholders to timely file their proofs of claim) indicates the Debtors were indeed formulating and negotiating a plan between January and March of 2007, i.e., before the New Claims were filed.  See Fifth Interim K&E Fee Application (App. Tab 24) at 15 ("This Subject Matter includes time expended by K&E attorneys working with the Debtors and various constituencies to develop a plan of reorganization, as well as planning and developing a strategy for the Debtors' eventual exit from chapter 11. In particular, during the Fifth Interim Fee Period, K&E worked closely with the Debtors and their advisors to evaluate all of the potential structural plan of reorganization options available to the Debtors, including the possibility of raising capital through a plan of reorganization. Due to the complexities of these cases—from Calpine's highly intricate corporate and capital structure to the number of different stakeholders involved—these efforts required substantial outlays of time from K&E professionals.").

[60]   Enron, 419 F.3d at 129 ("negotiations were at a sufficiently advanced stage that the belated introduction of a multimillion-dollar claim would have a disruptive effect").

[61]   The Noteholders make much of the fact that the Debtors' plan process has been a moving target.  See, e.g., 7.75% Brief at 23 (referring to the Debtors' adoption and subsequent abandonment of an alternative sponsored plan process and potential rights offering).  They are right; the Debtors have a fiduciary duty to develop a plan that will maximize the recoveries for all of their stakeholders.  This duty is at odds with dropping everything to cater to creditors that slept on their rights and now seek to increase their recoveries because they think the pot is
(Continued…)

process.  The Bankruptcy Court also did not abuse its discretion in finding that creditors that had

timely filed proofs of claim could be prejudiced by the delayed distributions resulting from the

Debtors having to establish significant reserves for the New Claims if the New Claims were to

"remain unresolved and unliquidated as of confirmation."[62]

**(c)     The Possibility of Subordination and/or Solvency
Does Not Weigh Against a Finding of Prejudice**

Demonstrating contortionist type skills, the Noteholders also argue on appeal that the

Bankruptcy Court's finding that other creditors may be prejudiced by belated consideration of the

New Claims is inconsistent with its alternative ruling that the New Claims would be subordinated to

equity if allowed, i.e., because of the subordination ruling, only equity, and not creditors, would be

prejudiced by the untimely assertion of the New Claims.  Of course, this argument ignores that the

Noteholders are arguing at the same time for reversal of the subordination ruling.  It also ignores that

that the Bankruptcy Court found that prejudice to the Debtors and their creditors would result not

only from the potential reduction of distributions to creditors but also from the delay and distraction

involved in litigating the New Claims to final resolution and the potential need for maintaining

attendant reserves (which would be necessary in light of the fact that the extrapolated aggregate

amount of the Noteholders' claims dwarfs any surplus the Debtors currently project).[63]

---

bigger.  If anything, this argument only supports the notion that consideration of the New Claims will distract the Debtors from their paramount duties.

[62]   August 8, 2007 Bankruptcy Court Hearing Tr. at 99.

[63]   By the same token, the Noteholders' argument that the Debtors' potential solvency weighs against a finding of prejudice fails.  Indeed, at this point, the Debtors' solvency is just that—potential.  And, in any event, the delay and distraction associated with belated consideration of the New Claims is a significant factor whether or not the Debtors turn out to be solvent.

## 2.    The Noteholders Engaged in Dilatory Behavior

There is no bright line rule regarding acceptable delay—courts generally evaluate how the delay will affect the judicial administration of a particular case.[64]  In Enron, the Second Circuit affirmed the bankruptcy court's finding that the claimant had engaged in dilatory behavior by filing its claim six months after the bar date.[65]  Accordingly, the Bankruptcy Court did not abuse its discretion by finding the Noteholders were dilatory because they "waited nearly eight and in some cases ten months after the bar date to file the new claims which to the extent they are cognizable at all existed on the petition date. The Noteholders offer no excuse for this delay which has disrupted the judicial administration of the case in multiple ways."[66]

On appeal, the Noteholders argue (for the first time) that the appropriate inquiry regards the Debtors' delay, not the Noteholders.'[67]  Specifically, the Noteholders attempt to turn the prejudice inquiry on its head by arguing *the Debtors* delayed unreasonably in objecting to certain other claims in the case and that therefore the claims reconciliation process is effectively still open such that the Debtors and their constituents are not prejudiced by the timing of the New Claims.  But the appropriate standard has *nothing* to do with the Debtors' conduct.  This argument is unsupported

---

[64]  Enron, 419 F.3d at 128 ("In determining how long is too long, courts generally consider the degree to which, in the context of a particular proceeding, the delay may disrupt the judicial administration of the case.") (internal quotations and citations omitted).

[65]  Id.

[66]  August 8, 2007 Bankruptcy Court Hearing Tr. at 98-99 (internal citations omitted).  To the extent that HSBC's New Claims were filed only 6 1/2 months after HSBC's extended Bar Date, there is no material difference between being 6 1/2 months late and nearly 8 months late—either constitutes a substantial delay.  Moreover, the fact that HSBC did not file any additional claims between the Bar Date and their extended Bar Date indicates that HSBC did not believe it had any further claims.  Indeed, considering the extension was most likely granted to afford HSBC the opportunity to further investigate its claims against the Debtors, HSBC's failure to take advantage of its extension gave the Debtors every reason to rely on the fact that HSBC's Original Claims did not involve any surprises.

[67]  6% Brief at 24-25; 7.75% Brief at 22.

by any law and cannot form the basis for a determination that the Bankruptcy Court abused its discretion in applying the correct legal standard.[68]

### 3.    The Noteholders Did Not Articulate Justifiable Grounds for their Delay

The Bankruptcy Court correctly found the Noteholders had not offered any viable reason for their delay in filing the New Claims. Although the Noteholders offered no reasons below for their delay below, they now argue the Original Claims included their New Claims and that holding them to the late-filed standard produces the absurd result of prejudicing them for *filing* the New Claims rather than simply asserting them some other way.[69] This argument is not compelling; the Debtors would have raised the same objection whether or not the Noteholders had actually *filed* their "Supplemental" New Claims.

Although the Bankruptcy Court properly ruled the New Claims were new claims rather than amendments and, accordingly, could have weighed the "excusable neglect" factor most heavily in its analysis,[70] it determined that *all* of the factors support refusing late consideration of the New Claims. Thus, the Bankruptcy Court did not abuse its discretion by refusing to consider the late-filed New Claims and the analysis would have been no different had the New Claims been deemed amendments.

---

[68] Debtors file their plans based on claims, not vice versa. Accordingly, while creditors must comply with claim-filing deadlines, debtors do not have deadlines for filing objections. See In re Kolstad, 928 F.2d at 173-174 (5th Cir. 1991) ("The deadlines have a purpose: they enable a debtor and his creditors to know, reasonably promptly, what parties are making claims against the estate and in what general amounts. . . There is no bar date or deadline for filing objections.").

[69] See August 22, 2007 District Court Expedited Appeal Hearing Tr. at 13-14.

[70] The Second Circuit has noted that the justification for delay is the factor courts should weigh most heavily in the "excusable neglect" analysis (which is essentially the same as the equitable analysis for amended claims). Enron, 419 F.3d at 122-23.

## II.    The Bankruptcy Court Properly Denied the New Claims On the Merits

Convertible notes allow their holders to elect repayment in the form of principal and interest or in the form of another security of the issuer—typically stock.  According to the Second Circuit, convertible debentures

> provide for two ***mutually exclusive*** modes of satisfaction. Under one the holder may exercise his right to convert the debenture into common stock, in which event he will surrender his debenture and it will not be redeemed or paid at maturity … The alternative to conversion is that the taxpayer will redeem the debenture or pay it at maturity, in which event the conversion privilege will be terminated and it will pay out no more than it received at the time of issuance, thus precluding the existence of any original issue discount. ***In no event will the taxpayer be required both to honor the conversion privilege and to redeem the debenture***. By the terms of the debenture, no conversion may take place until the bond is surrendered, and the option to convert expires as the bond becomes due. The holder of an obligation convertible into stock has the privilege of electing between two alternative modes of satisfaction, but he cannot resort to both.[71]

Here, the Noteholders have nothing other than traditional convertible notes that give them the right, under certain circumstances, to select the form of their repayment.[72]  When the Notes have been accelerated in bankruptcy and receive distributions under the Plan, the Noteholders will not be

---

[71]   See Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 304-305 (2d Cir. 1971) (emphasis added).  See also Husky Oil Co. v. Comm'r, 83 T.C. 717, 735 (T.C. 1984) ("The holder of a convertible debenture has alternative contractual rights - he may demand payment of the debenture, or he may demand shares of stock in accordance with the conversion privilege. ***When performance of one of the issuer's obligations to a holder of a convertible debenture is demanded and completed, the alternative obligation is discharged.***") (emphasis added); National Can Corp. v. United States, 520 F.Supp. 567, 574 (N.D. Ill. 1981) ("The convertible debenture is an indivisible unit; the issuer has but one obligation to meet, either redemption or conversion. ***It can never be required to do both.***") (emphasis added).

[72]   Even though the Notes provide for a hybrid cash and stock repayment, the Notes do not entitle the holders to any more value than traditional convertible notes.  Consider two sets of convertible notes with the same terms: one of the 7.75% Notes at issue here and a hypothetical "traditional" convertible note which allows holders to convert their principal into stock.  If Calpine's common stock were trading at $5.00 per share, the holder of the traditional note could convert its note into $1,250 of stock and the 7.75% Noteholder would receive the same return—$1,250—of which the $1,000 principal amount would be payable in cash and the additional $250 Equity Kicker in shares.  The only difference between the Notes and traditional convertible notes is the *form* of the value the holders receive upon conversion.  And even the form is irrelevant because holders of either type of notes could convert their respective payments into the form of the other holders' payments, i.e., the "traditional" noteholder could sell $1,000 worth of its shares for cash upon conversion or the 7.75% Noteholder could buy $1,000 of stock with the cash it received.

entitled to damages arising from the loss of their conversion right because they will no longer have any principal to convert to old equity because the Notes will have been discharged pursuant to the Plan (and, in any event, there will be no old equity to which to convert as it will have been cancelled).

A.    **The Debtors' Potential Solvency Does Not Warrant Allowance of the New Claims**

According to the Noteholders, the fact the Debtors may be solvent warrants allowance of the New Claims because courts have found in the postpetition interest and/or attorneys' fees contexts that when a debtor is solvent, a court should fully enforce a counterparty's contractual rights.[73]  This argument fails in two major respects.  First, the Noteholders are seeking ***more*** than they are entitled to under the Indentures and more than they could ever receive outside of bankruptcy. They do not have a contractual right to both conversion and repayment—and because they are receiving a distribution on account of their allowed Principal and Interest claims, their "conversion right" claims would not be subject to allowance under nonbankruptcy law.  Second, a debtor's solvency may obligate it to pay postpetition interest, but that has no bearing on the debtor's recourse to all of the protections of the Bankruptcy Code.  Specifically, solvent debtors are still entitled to a discharge and to cancel their securities.[74]  They are entitled to cap the claims of landlords with long-term real property leases as well as claims for damages for breach of employment contracts. [75]  They are also entitled to sell assets free and clear of liens and encumbrances under section 363 of the Bankruptcy Code and incur nonconsensual priming liens in connection with postpetition financing

---

[73]    See, e.g., 7.75% Brief at 24-25.

[74]    11 U.S.C. § 1141(d).

[75]    See, e.g., 11 U.S.C. § 502(b)(6) (capping claims of lessors for damages resulting from the termination of real property leases); In re PPI Enters. (U.S.), Inc., 228 B.R. 339, 347-48 (Bankr. D. Del. 1998), aff'd, 324 F.3d 197 (3d Cir. 2003) (section 502(b)(6) applies whether a debtor is solvent or insolvent); 11 U.S.C. § 502(b)(7) (capping claims for damages resulting from breach by the debtor of an employment contract).

under section 364 of the Bankruptcy Code.  The point is that the chapter 11 toolbox is equally available to solvent debtors.  Accordingly, the Debtors' potential solvency does not entitle the Noteholders to the windfall they are seeking.

      **B.**      **The Indentures Do Not Support the New Claims**

            **1.**      **The Indentures Provide that Any Conversion Rights Terminate Upon a Bankruptcy Filing**

Even if one ignored the lethal problem of duplicate recovery, the Noteholders would still not be entitled to a claim for breach of a conversion right because any conversion right under the Indentures terminated upon maturity and the Notes matured upon the automatic acceleration occurring upon the Debtors' bankruptcy filing.  Specifically, the Indentures provide that the conversion right expires at the close of business on the business day prior to "Maturity."[76] "Maturity" is not defined in the Indentures, but it is clear that the term does not refer solely to maturity occurring upon expiration of the stated term of the Notes, because that maturity is defined as "Stated Maturity."[77]  In financial parlance, the term "maturity" means the time when a debt instrument is "due and payable."[78]  Accordingly, when the Notes became "immediately due and payable" by virtue of automatic acceleration resulting from the Debtors' bankruptcy filing,[79] they matured for purposes of terminating the conversion right.

---

[76]  See 4.75% Notes Indenture at A-4; 2d. Supp. at A-5; 3d Supp. at A-5 (The "conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity . . .").

[77]  Orig. Indenture at 10.

[78]  Where an agreement does not expressly define certain terms, "it is appropriate, pursuant to New York contract law, to consult dictionaries and relevant treatises to ascertain the accepted meaning of these terms."  See Citadel Equity Fund Ltd. v. Aquila, Inc., 371 F.Supp.2d 510, 517 (S.D.N.Y. 2005), aff'd, 168 Fed Appx. 474 (2d Cir. 2006).  Maturity is, by definition, "reaching the date at which a debt instrument is due and payable."  Dictionary of Finance and Investment Terms 413-14 (2003).

[79]  Orig. Indenture § 5.2.

Of course, the Noteholders dispute that the conversion right terminates upon any maturity other than Stated Maturity—the 7.75% Noteholders even ask this Court to "presume" that the parties intended the conversion right to terminate upon "Stated Maturity."[80]  But it does not make sense for the conversion right to last past any maturity, stated or otherwise, considering that once the Notes have been repaid there is nothing to convert.  Moreover, there is no reason to *presume* the parties intended to use the term "Stated Maturity" when they were perfectly capable of using it themselves if they so intended.

The 6% Noteholders argue that "Maturity" cannot mean maturity because (i) "maturity" and "acceleration" are used disjunctively in one section of the Indenture; and (ii) the Debtors' interpretation would turn the definition of "Principal Amount at Maturity" into "gibberish."[81]  Neither of these arguments holds water.[82]  The 6% Noteholders point to section 6.01(4) of the Second Supplemental Indenture as evidence that the parties could not have intended for "Maturity" to occur upon acceleration because the terms are used in the disjunctive.  But Section 6.01(4) articulates a cross default under the Indenture when the Debtors default under *other* indebtedness and, accordingly, the wording "when such indebtedness becomes due and payable (whether at maturity, upon redemption or acceleration or otherwise)" clearly reflects an attempt to cover all possible scenarios under other indebtedness in order to prevent Calpine from hiding behind different defined terms under other debt instruments to argue Section 6.01(4) has not been implicated when a significant default has occurred—a rational provision given the complexities of Calpine's

---

[80]   7.75% Brief at 29.

[81]   6% Brief at 31-33.

[82]   The Noteholders argue that the fact that the Indenture allows for conversion after a certain date (e.g., September 30, 2013) gives rise to a "conversion right" that lasts through Stated Maturity.  6% Brief at 33.  But this provision does not mean that the conversion right would under no circumstances terminate prior to Stated Maturity—it merely provides that if the applicable Notes are still outstanding at that time, the Noteholders may convert them even if they are out of the money.

capital structure.  Section 6.01(4) does not subvert or alter the specific meanings ascribed to those terms in connection with *these Notes*.[83]

As for "Principal Amount at Maturity," the definition states the term "means, with respect to a Note, the principal amount at maturity set forth on the face of such Note."[84]  This does not mean, as the Noteholders urge, that "maturity" refers exclusively to the date set forth on the face of each Note, it merely specifies which "maturity" it refers to.  Moreover, the Debtors do not dispute that "maturity" includes Stated Maturity.[85]

Finally, although the Noteholders make much of Section 10.15(d) of the Indenture,[86] (a) arguing it means their purported conversion right does not terminate upon acceleration and (b) implying that conversion rights survive until Stated Maturity *even if the principal of the Notes has been repaid*, Section 10.15(d) does not warrant consideration or allowance of the New Claims.  Significantly, Section 10.15(d) does not change the fact that conversion and repayment are alternatives.  It does *not* confer a conversion right where none existed as of the petition date, nor does it extend conversion rights through Stated Maturity even if the Notes are repaid upon automatic

---

[83]  This is underscored by the fact that no provision in the Indentures referring to the time these Notes become due and payable incorporates the same or similar parenthetical.

[84]  See 2d Supp. at 4.  Notably, "Principal Amount of Maturity" is only defined and used in the 6% Notes, but the conversion right termination provisions of all of the Notes are the same.

[85]  There is also no conflict with the original issue discount under the 6% Notes—the definition of "Principal Amount" indicates that all references to "principal of the Securities in the Original Indenture shall be to the Principal Amount as defined above."  2d Supp. at 4.  Thus, the "principal of and interest on" the Notes payable in the event of default is the Principal Amount (which factors in any original issue discount) rather than the Principal Amount at Maturity.  Orig. Indenture § 5.2.

[86]  See also 4.75% Indenture § 10.14(d).

acceleration.[87]  Where, as here, the Notes were not convertible at the time of filing, Section 10.15(d) simply does not indicate an intent to preserve any so-called conversion rights.

The Noteholders also argue that the Indentures preserve their purported conversion rights because they contain certain anti-dilution and anti-elimination provisions.[88]  But, contrary to the Noteholders' assertion that the anti-elimination provisions were designed to prevent elimination of the "value" of the "conversion right" in a *bankruptcy*, the anti-elimination provisions noticeably do not apply in the event of "bankruptcy" or "reorganization" and, in any case, the Debtors would dispute the validity of such provision if it existed.[89]  Finally, the fact that the Noteholders bargained for certain non-bankruptcy anti-elimination protections provides no justifiable reason to infer that repayment pursuant to a bankruptcy-induced acceleration constitutes a breach of the Indentures.

### 2.    The Court Should Not Rewrite the Indentures

Unable to make a compelling case that the language of the Indentures supports their position, the Noteholders argue, somewhat desperately, that it is simply not possible that lenders would have bargained for terms that allowed the Debtors to cause the conversion right "to expire prematurely, without compensating the Noteholders, by defaulting and triggering an acceleration…"[90]  Thus, the Noteholders essentially ask the Court to rewrite the Indentures to avoid a

---

[87]  Moreover, as the Debtors noted at the Hearing, due to the protracted nature of the actual conversion process, Section 10.15(d) also could apply in circumstances where the conversion process had been commenced but not completed prior to a bankruptcy filing.  Reading the Indenture as the Noteholders urge would render meaningless the provision that indicates the "conversion right" terminates upon maturity.  In any event, even if the conversion right were to survive a bankruptcy filing, it would certainly not survive cancellation of stock and a bankruptcy discharge.  See 11 U.S.C. § 1141(d).

[88]  7.75% Brief at 30.

[89]  See 2d Supp., 3d Supp. § 10.12; 4.75% Notes Indenture § 10.11.

[90]  6% Brief at 30.  Significantly, in addition to bargaining for only principal and accrued interest upon acceleration, the Noteholders also bargained for certain provisions indicating that payment in full of principal and interest satisfies the Debtors' obligations in the event of a change of control.  Specifically, the Indentures contemplate that, if a change of control occurs, the Noteholders may force Calpine to repurchase their Notes,
(Continued…)

"commercially preposterous" result.[91]   But this assumes a somewhat unlikely scenario under which the Debtors *forced* the Noteholders to lend to them on terms commercially onerous to the Noteholders.[92]   Moreover, what the Noteholders are really arguing is that no indenture can ever be interpreted in a way that does not benefit commercial lenders.[93]   That cannot be right.   And, for that matter, what would truly be commercially preposterous would be rewriting the Indentures to entitle the Noteholders to a conversion right even after the Notes are repaid or terminated and thereby double their recovery under the Notes beyond what they could even receive outside of bankruptcy.[94] In any case it is well settled in the Second Circuit and in the bankruptcy context that "courts should

---

*but only in the amount of principal and accrued interest*.   See, e.g., 2d Supp. § 3.03(a); 4.75% Notes Indenture § 3.10.  Nothing in the change of control provision states or implies that the Noteholders would be entitled to enforce their "separate" conversion right under such circumstances.  Indeed, the change of control provision conclusively indicates that a distribution on account of outstanding principal and interest (as proposed under the Plan) satisfies the Noteholders in full.

[91]   6% Brief at 31.  According to the 6% Noteholders, the Indentures cannot mean what they say because it would mean the conversion right would have expired at the close of business on the business day immediately preceding the petition date.  6% Brief at 31 n.11.  But this is not troubling—choosing the close of business on the day immediately preceding the petition date is much more easily administrable than requiring parties to ascertain the exact time the petition was filed.

[92]   The 7.75% Noteholders' suggestion that the Debtors drafted the Indentures is not correct.  7.75% Brief at 14, 15.  Far from being contracts of lending adhesion, the Indentures, like all documents governing commercial loans, were the product of negotiations between the Debtors and the respective indenture trustees.

[93]   This is similar to the Noteholders' argument below that automatic acceleration provisions may not be used against lenders.  But if automatic acceleration is so important to lenders, lenders must take the burdens along with the benefits or contract around them (which they did not in these Indentures). Moreover, the Bankruptcy Court correctly held in CalGen that automatic acceleration does operate to render notes immediately due and payable.  In re Calpine Corp., 365 B.R. 392, 398 (Bankr. S.D.N.Y. 2007) ("by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately'").

[94]   See SportsChannel Assocs. v. Sterling Mets, L.P., 807 N.Y.S.2d 61, 61 (N.Y. App. Div. 2006) ("When read in the context of the entire agreement, § 13.1.1 was immediately terminated when defendant delivered the termination notice and paid plaintiff more than $54 million on May 27, 2004. Plaintiff's interpretation--that § 13.1.1 did not terminate until November 1, 2005--would 'produce a result that is absurd, commercially unreasonable [and] contrary to the reasonable expectations of the parties' (*Matter of Lipper Holdings, LLC v. Trident Holdings, LLC,* 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 [2003] [citations omitted].").

not rewrite the contracts before them to conform to their own conception of business equity."[95]

Moreover, considering, as discussed in more detail below, any conversion right claims ultimately

must be disallowed as unmatured interest, it is not surprising that the parties would have determined

not to include support for them in the Indenture.

### C.    Applicable State Law Does Not Support the New Claims

Before the Bankruptcy Court, the Noteholders argued they had claims under state law

for breach of their so-called conversion rights but failed to cite any authority that would support their

contention.  Recognizing the shortcomings of this approach, the Noteholders now cite a handful of

cases, none of which supports the notion that distribution under a reorganization plan on account of

principal and accrued interest, in full, without special compensation for the value of a "conversion

right," would constitute a breach of contract under New York law.

In the first instance, none of these cases involved convertible notes.  And none of

these cases involved a bankruptcy.  And each of these cases featured warrants or options that were

either "perpetual" or guaranteed.  Indeed, in Mackie, this Court's decision turned, among other

things, on the fact that the warrants' "perpetual duration was a unique and unusual feature for warrant

agreements" and the warrants were explicitly preserved in the event of a merger.  Significantly, the

Court's decision also turned on the fact that the warrant agreement "did not provide, implicitly or

explicitly, for an 'exit transaction' or 'value realization event' that would terminate the perpetual

duration of the Warrants."[96]  Lillis v. AT&T also does not support the Noteholders' position.  In

Lillis, the court's decision turned on the fact that the options at issue contained a provision that

---

[95]  Wastemasters, Inc. v. Diversified Investors Servs. of N. America, Inc., 159 F.3d 76, 79 (2d Cir. 1998); Argonaut Ins. Co. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.), No. 93 Civ. 4014, 1995 WL 311764, at *2 (S.D.N.Y. May 18, 1995) ("a bankruptcy court does not have the power to rewrite contracts").

[96]  R.A. Mackie & Co. v. PetroCorp Inc., 329 F. Supp. 2d 477, 486 (S.D.N.Y. 2004).

preserved the option in event of reorganization or liquidation.[97]  The Noteholders' Indentures do not.

Moreover, the Lillis options were guaranteed for a 10-year period.  Similarly, the options in <u>Hilton</u>

<u>Hotels Corp. v. Dunnet</u> were guaranteed for 3 years and the option contract at issue in that case also

explicitly provided for preservation of the options in the event of a merger.[98]  Considering the

Noteholders' conversion rights are not implicitly or explicitly preserved under the Indentures and,

indeed, are alternatives to the repayment the Noteholders are receiving, these cases do not support

claims for conversion right damages.[99]

>    **D.    The CalGen Refinancing Opinion Does
>            Not Support Allowance of the New Claims**

The Noteholders argue, rather stridently, that the Bankruptcy Court erred because it

failed to correctly interpret its CalGen Refinancing Opinion to support allowance of the New Claims.

But the CalGen Refinancing Opinion does not support the Noteholders' claims.  As an initial matter,

the CalGen Refinancing Opinion supports *the Debtors' argument* that the "conversion rights"

terminated upon the acceleration and attendant maturity of the Notes.[100]  Moreover, the CalGen

---

[97]  <u>Lillis v. AT&T Corp.</u>, C.A. No. 717-N, 2007 WL 2110587, at *14 (Del. Ch. Jul. 20, 2007).

[98]  <u>Hilton Hotels Corp. v. Dunnet</u>, 275 F. Supp. 2d 954, 962-63 (W.D. Tenn. 2003).

[99]  Moreover, the cases the Noteholders cite for the proposition that the Bankruptcy Court's opinion improperly allows the Debtors to benefit from their breach are not applicable in the bankruptcy context.  What is more, they are factually distinct.  For example, <u>Castle Creek Partners</u> involved an issuer that was trying to avoid its conversion obligations *after* it was established the issuer was unable to repay its obligations, i.e., the issuer was trying to escape without repaying *or* converting.  <u>Castle Creek Tech. Partners, LLC v. CellPoint Inc.</u>, No. 02-6662, 2002 WL 31958696 (S.D.N.Y. Dec. 9, 2002).  In <u>Deutsch</u>, the court refused to allow a party to breach a contract to prevent the counterparty from automatically renewing it.  <u>Deutsch v. Health Ins. Plan of Greater New York</u>, 751 F.2d 59, 64-65 (2d Cir. 1984).

[100]  <u>See</u> <u>In re Calpine Corp.</u>, 365 B.R. 392, 398 (Bankr. S.D.N.Y. 2007) (holding "each of the CalGen Secured Debt agreements provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt," and "[a]s such, the CalGen Secured Debt has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately'") (citing <u>In re LHD Realty Corp.</u>, 726 F.2d 327, 330-31 (7th Cir. 1984) ("acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity.")).

Refinancing Opinion is not, as the Noteholders seem to believe, a blank check that allows unsecured lenders to recover twice on account of alternative remedies.

In any event, it is simply not possible that Judge Lifland could have erred as a matter of law in ruling that *his own* CalGen Refinancing Opinion does not entitle the Noteholders to recover under their conversion right theory. In the first instance, Judge Lifland is the party that best understands the contours of the CalGen ruling and his interpretation of the CalGen Refinancing Opinion is entitled to the utmost deference.[101] Moreover, the reasoning of CalGen does not apply to this situation—whereas prepayment premiums are designed to ensure that creditors receive the same return regardless of when the notes are repaid, conversion rights are an *alternative* to principal and interest. CalGen does not support awarding simultaneous claims for two alternative remedies.[102]

### E.    The New Claims Were Not Contingent or Unmatured as of the Petition Date

The Noteholders argue the New Claims are contingent or unmatured claims and therefore that they cannot be subject to disallowance by virtue of the fact that the conversion rights were not exercisable as of the Commencement Date. In the first instance, the New Claims—if they are claims[103]—are not contingent because, as discussed supra, the conversion right terminated on the

---

[101]    See In re Casse, 198 F.3d 327, 334 (2d Cir. 1999) ("We agree with the Fourth Circuit in *Tomlin,* 105 F.3d at 941, that an appellate court reviewing bankruptcy orders should 'defer to a district court's interpretation of its own order,' and extend the same deference to Bankruptcy Judge Feller's interpretation of his order in the case at bar.").

[102]    Even if the CalGen Refinancing Opinion did support allowance of the New Claims, it is not, as the Noteholders argue, the law of the case. The law of the case doctrine is "a discretionary rule of practice" applied to "bar relitigation of issues decided in earlier proceedings of the same lawsuit" or "in different lawsuits between the same parties." Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 592 (2d Cir. 1991). Where, as here, the issues involve different parties, altogether different indentures, and altogether different "rights," the CalGen Refinancing Opinion cannot be the law of the case and it does not entitle the Convertible Noteholders to damages for breach of their supposed conversion rights.

[103]    See, e.g., In re Baldwin-United Corp., 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) (stock conversion claim of employees that held options that could be converted into cash or stock was not a claim); Duel Glass v. Search Fin. Servs. Inc. (In re Search Fin. Servs. Acceptance Corp.), No. 39832129RCM11, 2000 WL 256889, at *3 (N.D. Tex. Mar. 7, 2000) (holding that claim based on warrants which were not redeemable for cash as of the petition date should be treated as an equity interest rather than a claim).

Commencement Date.  Notably, however, even if the Noteholders' conversion rights somehow survived the bankruptcy filing, then their remedy during bankruptcy would be to convert their Notes, not to receive damages on account of their future inability to convert.  Moreover, the conversion rights would not under any circumstances survive repayment and the Debtors' emergence from bankruptcy and the Noteholders are not entitled to any future upside from increases in the stock price of reorganized Calpine.[104]  Accordingly, the New Claims are not contingent or unmatured.

### F.    If the Conversion Right Has Value, It Must Be Disallowed as Unmatured Interest

To the extent the Noteholders argue that they are entitled to conversion right damages because they accepted lower interest rates on account of the conversion feature, the Noteholders' arguments fail as a matter of bankruptcy law.  Specifically, the value of any conversion right would be equivalent to original issue discount ("OID").  See, e.g., Peltz v. Welsh, Carson, Anderson & Stowe, LP (In re Bridge Info. Sys., Inc.), 311 B.R. 781, 792 (Bankr. E.D. Mo. 2004) (to the extent "the value of the options contained in the convertible debt instrument is separate consideration apart from the debtor's unsecured obligation to repay the principal amount of the loan," such value

---

[104]  See In re Einstein/Noah Bagel Corp., 257 B.R. 499, 509 (Bankr. D. Ariz. 2000) (disallowing claim for value of put right where put right was not ripe for exercise at the petition date and was subject to cancellation under section 1141 of the Bankruptcy Code).  The court noted:

> If [the claimant] were correct, the same argument could be applied to unexercised warrants and stock options that, although under water at the time of the filing, would have substantial value if they could 'ride through' the bankruptcy and be exercisable against the reorganized debtor with a clean balance sheet.  Many cases, among them In re America West Airlines, Inc., 179 B.R. 893 (Bankr. D. Ariz. 1995), teach us that this is not the law.

Contrary to the Noteholders' assertion, Einstein/Noah Bagel was not wrongly decided.  See Carrieri v. Jobs.com Inc., 393 F.3d 508, 524 (5th Cir. 2004) ("[W]e find that, as the bankruptcy court did, the reasoning of *Einstein* is persuasive in this case, even though it is a bankruptcy-level decision from another circuit.").

constitutes OID). Therefore, any claim for such value would be treated as unmatured interest, which must be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code.[105]

### III.    The Bankruptcy Court Properly Ruled that the New Claims, If Allowed, Would Be Subject to Subordination Under Section 510(b) of the Bankruptcy Code[106]

As discussed above, the Notes are traditional convertible debentures that allow holders to select the form of recovery of monies loaned—either (i) repayment of principal in cash or (ii) conversion of principal into conversion value comprised of cash in the amount of the principal and an Equity Kicker in the form of stock. Under no circumstance are the Noteholders entitled to receive the Equity Kicker in cash.[107] Thus, the damages they are seeking on account of their conversion right are exclusively for the loss of their expected right to receive stock. Damages for loss of the right to receive stock are subject to subordination to the level of stock under section 510(b) of the Bankruptcy Code.[108]

The 7.75% Noteholders argue the Bankruptcy Court erred in ruling their conversion right claims would be subject to subordination if allowed because, they argue, their claims are for breach of contract, not non-delivery of stock, and because the Noteholders do not bear the downside

---

[105] 11 U.S.C. § 502(b)(2); Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.), 962 F.2d 543 (5th Cir. 1992) (unamortized claims for an OID are claims for unmatured interest); LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.), 961 F.2d 378 (2d Cir. 1992) (same).

[106] The 6% Noteholders (and by virtue of the HSBC Joinder, the 4.75% Noteholders) did not brief the subordination issue below because they believed, incorrectly, that the Debtors' argument was procedurally defective. 6% Response at 24-25; Debtors' Reply (App. Tab 25) at 18 n.33. Thus, they have waived their arguments on this issue on appeal. See Kenyon County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.), No. 07-3968, 2007 WL 2435169, at *9 (S.D.N.Y. Aug. 27, 2007) (Koeltl, J.) ("Arguments not raised below are waived.").

[107] Notably, however, the Noteholders suggest their New Claims are not subject to subordination because they too are merely valued by reference to stock. This reasoning is circular and, in any event, incorrect. The Noteholders are seeking to recover on account of their right to convert to stock, not to recover an amount otherwise due calculated according to the share price at a given time.

[108] 11 U.S.C. § 510(b) (requiring that claims "for damages arising from the purchase or sale of **such a security** …. be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such **security**.").

risks associated with stock ownership because they can always elect to receive repayment in the form of principal and interest instead of converting their Notes—an ironic argument since they are receiving that form of repayment and the Debtors agree there is *nothing left* to subordinate.  Neither of these arguments defeats subordination—the Bankruptcy Court was correct.

### A.    The New Claims Are Not Breach of Contract Claims and Thus Are Not Immune from Subordination

In the first instance, merely characterizing a claim on account of an equity interest as a "breach of contract" claim will not defeat subordination.  Courts look beyond the form of the claim and at the substance of the relief requested in determining whether section 510(b) supports subordination.[109]  Here, the Noteholders are seeking damages on account of their right to acquire the Debtors' existing common stock with the principal of their Notes.  The fact that the Noteholders have a contract with the Debtors does not magically transform their "conversion right" claims, which are on account of interests that are—at best—in the nature of equity, into debt claims.

### B.    The New Claims Are Subject to Subordination Because the Noteholders Took on Shareholder Risk and Return Expectations

Furthermore, although the 7.75% Noteholders acknowledge a claim is subject to subordination if the claimant took on the risk and return expectations of a shareholder, they argue the Noteholders did not take on shareholder *risk* expectations because they are not obligated to convert their Notes.[110]  But the only way the Noteholders could *possibly* be entitled to any value on account of their conversion rights would be by actually converting their Notes (otherwise they could not be

---

[109]  See Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 255 (2d Cir. 2006) (subordinating claim for breach of employment termination agreement because claimant enjoyed "potential benefit of the proceeds of the enterprise deriving from the ownership of the securities"); Kaiser Group Int'l, Inc. v. Pippin (In re Kaiser Group Int'l, Inc.), 326 B.R. 265, 268 (D. Del. 2005) (subordinating claim for breach of "fill-up" provision in merger agreement requiring debtor to provide cash and/or stock up to intended amount of merger consideration upon certain decreases in the value of shares conveyed as merger consideration).

[110]  Id.; see also 6% Brief at 41-43.

damaged under any theory)—and, in doing so, taking on the risk *and* return expectations of shareholders.[111]   In essence, the 7.75% Noteholders are arguing that they have been damaged by breach of their right to convert principal into equity while at the same time arguing their damages claim is not subject to subordination because they never have to convert principal into equity (i.e., be damaged).  That does not make sense, and it is not consistent with the Noteholders' assertion that the conversion right is a supplement, not an alternative, to the repayment of principal and interest.[112]

In any event, the Noteholders' interpretation of the shareholder risk and return requirement is incorrect.   Although the Second Circuit's <u>Med Diversified</u> opinion (which the Bankruptcy Court correctly applied) governs this situation,[113] the Noteholders ask the Court to apply a Ninth Circuit case, <u>Racusin v. American Wagering, Inc.</u>, arguing it is factually more similar to the case at hand.[114]  But <u>Med Diversified</u> and <u>Racusin</u> both set forth the same standard: subordination is appropriate where a claimant "took on the risk and return expectations of a shareholder, rather than a creditor."[115]  Moreover, <u>Racusin</u> does not support the Noteholders' contention that subordination of a

---

[111]  Moreover, the Noteholders clearly have taken on the risks of equity holders that the stock will become worthless and/or that the conversion feature would never pay off.

[112]  Indeed, if the Noteholders are entitled both to recover principal and interest ***and*** enjoy a conversion right, the fact that they can simply request repayment of principal and interest rather than conversion does ***not*** insulate them from the risks of equity holders in connection with additional conversion right.  Significantly, however, because conversion and repayment are alternatives and not concurrent rights, the fact that the Debtors are satisfying and discharging the Notes through distributions to made under a confirmed plan.  <u>See</u> 11 U.S.C. § 1141(d) (confirmation of a chapter 11 discharges the debtor from prepetition debt and terminates all rights and interests of equity security holders).  This means the Noteholders will no longer have anything to convert, and are not entitled to damages.

[113]  <u>Rombro v. Dufrayne</u> (<u>In re Med Diversified, Inc.</u>), 461 F.3d 251 (2d Cir. 2006).

[114]  <u>See</u> <u>Racusin v. American Wagering, Inc.</u> (<u>In re American Wagering, Inc.</u>), 493 F.3d 1067 (9th Cir. 2007).  Notably, the facts of <u>Racusin</u> are significantly different from this case.  In <u>Racusin</u>, the claimant was to be compensated in cash in an amount to be determined by reference to the value of the debtor's stock and the debtor sought to subordinate his judgment claim for that amount.  The Ninth Circuit ruled, inter alia, that the claimant had a debt claim rather than an equity claim because it had previously reversed an award of stock to the claimant.  <u>Id.</u> at 1072-73.

[115]  <u>Med Diversified</u>, 461 F.3d at 256.  <u>See also</u> <u>Racusin</u>, 493 F.3d at 1072.

claim for loss a conversion right is unwarranted because conversion right holders somehow enjoy the return expectations of a shareholder without taking on shareholder risk expectations.    Indeed, <u>Racusin</u> merely provides that claims for cash damages valued **by reference to** a stock price are not subject to subordination.[116]    Despite the Noteholders' contentions otherwise, however, the Conversion Right Claims are not such claims—under no circumstance is the Noteholders' Equity Kicker payable in cash.

Both <u>Racusin</u> and <u>Med Diversified</u> support subordination on the facts of this case.  In <u>Med Diversified</u>, the Second Circuit adopted the reasoning of the <u>Enron</u> bankruptcy court regarding subordination of claims arising from a loss in value of employee stock options (which would be analogous to an independent conversion right) due to the debtors' fraud.[117]    In <u>Enron</u>, the claimants argued that their claims should be treated as unsecured claims because their stock options represented cash compensation rather than equity.[118]    The bankruptcy court disagreed and subordinated the claims to the level of equity because "the cash value of the options varied with the value of the debtor's stock, and to that extent resembled a typical equity interest--and moreover, any damages claimants sought would be the type of damages flowing from changes in the debtor's share price, implicitly referred to by section 510(b)."[119]    Applying the correct test, it is clear that the New Claims,

---

[116]    <u>Racusin</u>, 493 F.3d at 1072 ("Here, although [claimant's] compensation was to be *valued* on the basis of the debtors' share price upon completion of the IPO, the contract did not provide for that compensation in the form of shares. His potential to earn greater profits as a shareholder thus did not exist") (emphasis in original).

[117]    <u>Med Diversified</u>, 461 F.3d at 257.

[118]    <u>See</u> <u>In re Enron Corp.</u>, 341 B.R. 141 (Bankr. S.D.N.Y. 2006).

[119]    <u>Med Diversified</u>, 461 F.3d at 257 (citing <u>Enron</u> at 157, 167-68, internal quotations omitted).  <u>See also</u> <u>In re WorldCom, Inc.</u>, Case No. 02-13533, 2006 WL 3782712, at *6 (Bankr. S.D.N.Y. Dec. 21, 2006) (courts presented with the issue of whether to subordinate put rights, call provisions, warrants, and stock options have done so on the basis that these types of instruments enable holders to "participate in the success of the enterprise and the distribution of profits" and that the "form in which the equity interest is held is ultimately irrelevant").

if allowed, would be subject to subordination regardless of how the 7.75% Noteholders choose to characterize them.

The 7.75% Noteholders also try to escape subordination by citing a number of inapposite "reverse conversion" cases in which courts declined to subordinate the claims of claimants that had voluntarily relinquished their equity interests in return for notes *prior to* the bankruptcy filing.[120]  In all of those cases, the claimants no longer had equity interests or even potential equity interests at the time of the bankruptcy.  When the debtors in those cases sought to subordinate claims on account of the notes arguing that the claimants' debt claims originated in equity, the courts found the claims were no longer connected in any way to equity.[121]  These "reverse conversion" cases do not support the Noteholders' arguments against subordination because the conversion rights the Noteholders are asserting in this case seek damages on account of the Noteholders' potential equity interests.

C.    **Section 101(16)(C) of the Bankruptcy Code Does Not Defeat Subordination**

The 7.75% Noteholders also argue that the New Claims are not subject to subordination because the "right to convert" was excluded from the definition of "equity security" in section 101(16)(C) of the Bankruptcy Code.[122]  In the first place, section 510(b) is not related to

---

[120]  7.75% Brief at 41.

[121]  See Official Comm. of Unsecured Creditors v. American Capital Fin. Servs., Inc. (In re Mobile Tool, Int'l, Inc.), 306 B.R. 778 (Bankr. D. Del. 2004); Montgomery Ward v. Schoeberl (In re Montgomery Ward Holding Corp.), 272 B.R. 836, 843 (Bankr. D. Del. 2001); In re Wyeth Co., 134 B.R. 920 (Bankr. W.D. Mo. 1991).  See Digital Americas, Inc. v. Int'l Wireless Comm'ns Holdings, Inc. (In re Int'l Wireless Comm'ns Holdings, Inc.), Case No. 02-2733, 2003 WL 21466898, at *3 n.2 (3d Cir. Apr. 16, 2003) ("Once a shareholder sells his or her stock, he or she has decided not to continue assuming the downside risks or upside benefits of equity ownership.").

[122]  7.75% Brief at 43-44.

section 101(16)(C) and does not incorporate the definition of "equity security,"[123] so the exclusion of the "right to convert" from that definition has no bearing on whether the New Claims are subject to subordination. Even if, however, section 510(b) were in some way dependent on section 101(16)(C), such exclusion would serve to **protect** convertible debenture holders from subordination of their *debt* claims, not to exempt their *equity* conversion claims from subordination. In any event, the 7.75% Noteholders conveniently overlook the fact that the exclusion of conversion rights from subordination provisions would only confirm that convertible debentures do not feature separate conversion rights and, therefore, that the Noteholders are not entitled to damages for breach on account of such "rights." To the extent, however, the Noteholders do have a separate "conversion right" on account of which they are owed damages, such damages **must** be subordinated to stock because any conversion rights are inextricably tied to the Debtors' stock.

### D.    The New Claims Should Be Subordinated to Equity

Recognizing that the New Claims would properly be subject to subordination, the 7.75% Noteholders argue that, even if their New Claims are subordinated, they should not be subordinated to the level of equity; rather, they should be subordinated to other claims of the same priority as the Notes. Section 510(b) requires that claims "for damages arising from the purchase or sale of **such a security** …. be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such **security**" and specifically provides if that security is "common stock, such claim has the same priority as common stock."[124] The 7.75% Noteholders ask the Court to rule that the "security" at issue here is the Convertible Notes. But, as established above, the New Claims arise solely from the right to use the principal of the Notes to acquire Calpine common

---

[123]   Section 510(b) refers to "security" but not "equity security." 11 U.S.C. § 510(b). It also explicitly refers to "common stock" but avoids the term "equity security."

[124]   11 U.S.C. § 510(b) (emphasis added).

stock—and take on the benefits and burdens of a stockholder. Thus, the New Claims should be subordinated to the level of Calpine common stock, not the Convertible Notes.

Moreover, logic dictates that any damages awards should—at best—be *pari passu* with equity. Specifically, upon conversion the Noteholders receive an Equity Kicker in the form of common stock (which is the lowest priority interest). But before the Notes are converted or the conversion feature can be exercised, the Noteholders do not even have stock. Giving preconversion Noteholders who have, in essence, "less than stock" an unsecured claim would allow them to leapfrog over the (i) existing equity holders, (ii) converted equity holders, and (iii) the Noteholders' own positions had they exercised their conversion rights. This would not make any sense—and it would violate the absolute priority rule.[125] Accordingly, any damages award to the Noteholders should be subordinated to the level of stock pursuant to section 510(b).

## IV.    The Bankruptcy Court Properly Entered the Order

The Noteholders argue that the Bankruptcy Court erred as a matter of law and deprived them of due process by entering the Order. But the Debtors' Objection and the proposed order attached thereto (the "Proposed Order") could not have been more explicit in indicating that the Debtors were asking the Bankruptcy Court to deny more than just the New Claims. Moreover, the Order as entered was nearly identical to the Proposed Order that was on file for *more than a month* before the Hearing.[126] Evidently the Noteholders believe their failure to fully process the clear terms of the Objection and the notice thereof—and, apparently, to read the attached Proposed Order *at all*—constitutes a denial of due process. That is not the case. The Noteholders also argue that the Bankruptcy Court erred in entering the Order because the Hearing did not cover any claims other

---

[125]  See 11 U.S.C. § 1129(b)(1)(B).

[126]  The changes to the Order were made at the Noteholders' request and do not expand the scope of the relief granted.

than the New Claims, apparently disregarding the fact that *they* did not raise the issue or any other claims at the Hearing and that the Debtors and the Bankruptcy Court were under no duty to assert— and then object to—additional claims on the Noteholders' behalf.  The Noteholders' assertions of error are unavailing—the Order properly grants the relief sought in the Objection and ordered at the Hearing and the Court should affirm entry of the Order.

### A.    The Noteholders Received Ample Notice of the Relief Requested

Where adequate notice of relief requested is provided, failure to oppose it is fatal.[127] Recognizing this, the Noteholders would have this Court believe they did not receive adequate notice of the relief requested, even though:

- the captions of the notice of Objection, the Objection, and the Proposed Order included the numbers of *each* claim (including the Original Claims) to which the Debtors were objecting, not just the New Claims;[128]

- the Relief Requested section of the Objection provided: "Accordingly, the Debtors respectfully request that the Court, pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3007, grant the Debtors' objection and disallow the Convertible Noteholders' claims *to the extent they seek amounts beyond Principal and Interest*;"[129] and

- the Proposed Order, which the 6% Noteholders acknowledge was materially *identical* to the Order,[130] expressly indicated the scope of the Objection.[131]

---

[127] See In re Slater, No. 095-70848-511, 1996 WL 699719, at *11 (Bankr. E.D.N.Y. Aug. 1, 1996) (claim that proposed order was overbroad failed because party was served with the motion and the proposed relief to be granted and did not appear or otherwise oppose [the] motion).

[128] Notice of Objection at 1 (App. Tab 26); Objection at 1 (App. Tab 27); Proposed Order at 1 (App. Tab 28). "Limited Objection" does not limit the scope of the Objection to claims on account of "conversion rights"—it refers solely to the fact that the Debtors were not seeking to deny claims for principal and interest, which had been allowed for most of the Notes pursuant to the Stipulation (and there was no dispute the Debtors intended to allow the principal and interest claims of the 7.75% Noteholders).  Any argument that the Noteholders were misled by the caption "Limited Objection" is undermined by the explicit notice provided elsewhere in the pleadings.

[129] Objection at 13-14.

[130] 6% Brief at 49 n. 17.  M&T's assertion that the Debtors "broadened the form of Order" (M&T Brief at 20) is not correct.

The Noteholders cannot and do not contend the scope of the Objection was not evident from the Debtors' pleadings. Instead, M&T, for example, asserts that prior to the circulation of the Order after the Hearing, "no party - not even the Debtors, who filed the Limited Objection - *focused* on the breadth of the relief requested."[132]  Failure to read—or even to "focus"—on a pleading does not constitute a lack of due process.[133]  Moreover, courts, including this one, have declined to allow sophisticated repeat players like the Noteholders to avoid the effects of the broad language of an adequately noticed proposed order.  See, e.g., In re Johns-Manville Corp., 340 B.R. 49, 68 (S.D.N.Y. 2006), aff'd, 476 F.3d 118 (2d Cir. 2007) ("The broad language regarding the proposed Insurance Settlement Order in the nationwide August 2, 1984 Notice of Hearing to Consider Approval of Compromise and Settlement of Insurance Litigation should have put Chubb-a sophisticated insurer with asbestos-related insurance policies-on notice with regards to whatever asbestos-related claims it may have against Travelers and the other settling insurers.") (Koeltl, J., affirming a Judge Lifland ruling in relevant part).  The Noteholders had 18 months of chances to state their claims below and they failed to do so.  This Court should not reward them for sleeping on their rights and failing to read the pleadings.

---

[131]  Objection, Exh. A ¶¶ 1-3.  A blackline of the Order against the Proposed Order is included in the Record Appendix at Tab 29.

[132]  M&T Brief at 17 (emphasis added).

[133]  See Skulnik v. Skulnik (In re United Steel Enters., Inc.), No. 05-5783, 2006 WL 3544583, at *6 (D.N.J. Dec. 8, 2006) ("Appellant received all the vital documents that were needed to understand how her rights were at stake and to respond appropriately. Failing to read the documents because they were large and complex is not a due process violation.").  Cf. Spencer Cent. Developers, LLC v. Sterling Rubber Prods. Co. (In re Sterling Rubber Prods. Co.), No. 04-8090, 2006 WL 348143, at *6 (6th Cir. Feb. 15, 2006) ("[F]ailing to read a notice setting a deadline is not non-culpable conduct justifying relief from a party's failure to comply with the deadline.") (unreported opinion).

**B.     The Noteholders Cannot Use Their Own Failure to
Raise Additional Claims at Oral Argument to Argue the
Bankruptcy Court Improperly Failed to Consider Them**

The Noteholders also argue that, by entering the Order, the Bankruptcy Court improperly adjudicated issues not before it because (i) the Debtors did not object in more detail to "any unliquidated claims other than the Conversion Right Claims"; and (ii) the oral argument and oral ruling "dealt exclusively" with the Conversion Right Claims.[134]  But the Noteholders overlook the fact that, having put the Noteholders on notice of the scope of the Objection and having objected in detail to all the claims the Debtors *were* aware of, the Debtors were not required to object in detail to claims they *were not* aware of.[135]  Indeed, the burden is on a claimant to state its claim—not on the objector to intuit it.  When the Debtors objected to the Noteholders' claims beyond Principal and Interest, the Debtors put the Noteholders on notice that the Debtors were seeking to disallow ***any*** claims beyond Principal and Interest.  The fact that the Noteholders never stated any such claims (beyond making a throwaway reference to potential—and, in any event, untimely—make-whole claims)[136] and elected not to raise or even mention them at oral argument does not constitute grounds

---

[134]  6% Brief at 48-49.

[135]  The Noteholders seem to believe that claimants have no obligation to state their claims with specificity but debtors are somehow required to object in exquisite detail to catchall reservations of rights.  In any event, as M&T acknowledges, the cases it cites involve prejudice to *defendants* resulting from *plaintiffs*' failure to articulate the scope of their *claims*.  M&T Brief at 15-16.  Those cases are inapposite here, where the Noteholders are the plaintiffs/claimants and the Debtors are the defendants/objectors.

[136]  Contrary to the Noteholders' assertion, the Debtors' objection to makewhole claims brought by certain holders of the Debtors' unsecured nonconvertible notes did not preserve the Noteholders' option to later assert makewhole claims. Indeed, the unsecured makewhole objection merely clarified—in the section describing the Debtors' unsecured debt—that it was not the Debtors' sole objection claims related to the Debtors' unsecured debt and that the Debtors intended to preserve their rights to object to the Convertible Noteholders' claims at a later time.

for indefinitely preserving them.[137]  It goes without saying that a party that fails to put an issue before a court cannot credibly argue that the court improperly failed to consider it.

The Noteholders also overlook the fact that the Bankruptcy Court was the party most familiar with the contours of its ruling and, upon submission of competing orders together with the parties' articulations of their respective rationales,[138] determined in its discretion—to which the utmost deference is owed[139]—the Order was consistent with its decision.  Accordingly, the Debtors could not possibly have, as M&T argues, "failed to comply with the Bankruptcy Court's direction."[140]

In any event, even now, the Noteholders are not *actually* seeking to assert other claims—just an order from this Court that effectively exempts them from the Bar Date.  Aside from the fact that such an order would eviscerate the Bar Date, it would also prejudice the other claimants who chose not to opt out of compliance with the Bar Date.  Moreover, the Debtors specifically objected to the Noteholders' attempts to use their Original Claims to continue asserting claims through (or possibly after) confirmation.[141]  The Bankruptcy Court was well within its jurisdiction (and its discretion) to enforce the Bar Date.  Entry of the Order did not constitute error.

---

[137]  It appears the Noteholders believe they are entitled to assert additional claims *ad infinitum*.  See, e.g., HSBC Brief at 14 ("The Convertible Noteholders *may well* assert unliquidated claims for breach of contract or expectation damages."); id. at 15 ("Here, the 4.75% and 6.00% Noteholders *may* have a claim for damages on account of the Debtors' early repayment of the debt.") (emphases added).  Moreover, although HSBC argues the Stipulation "provided for the express preservation" of claims for unliquidated amounts, HSBC Brief at 13, HSBC is wrong.  The Stipulation merely provided the claims would be addressed pursuant to the Plan or during the claims reconciliation process.  HSBC Stipulation ¶ 9.  That time is now.

[138]  See Letter regarding Proposed Order from Edward O. Sassower to Judge Lifland's chambers, dated as of August 10, 2007 (App. Tab 30); Letter regarding Proposed Order from Matthew S. Barr to Judge Lifland's chambers, dated as of August 10, 2007 (App. Tab 31).

[139]  See In re Casse, 198 F.3d 327, 334 (2d Cir. 1999).

[140]  M&T Brief at 20.

[141]  See Debtors' Reply at 7-8.

Dated: September 24, 2007
      New York, New York

KIRKLAND & ELLIS LLP

/s/ Richard M. Cieri
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)
Stephen E. Hessler
M. Catherine Peshkin (MP 5400)
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

KIRKLAND & ELLIS LLP
Marc Kieselstein, P.C.
Aon Building
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

KIRKLAND & ELLIS LLP
Jeffrey S. Powell
655 15th Street, N.W.
Washington, D.C. 20005-5793
Telephone:  (202) 879-5000
Facsimile:   (202) 879-5200

*Counsel for the Debtors-Appellees*