**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re:                              :

                                      :   Chapter 11

CALPINE CORPORATION, et al.,     :

                                        :   Case No. 05-60200 (BRL)

                Debtors.       :

---------------------------------------------------------- x

ARISTEIA CAPITAL, L.L.C., AURELIUS   :
CAPITAL MANAGEMENT, L.P.,         :   Civil Case No. 07-CV-7830 (JGK)
BRENCOURT CREDIT OPPORTUNITIES  :   (Consolidated with Civil Case Nos. 07-
MASTER, LTD., BRENCOURT MULTI-    :   CV-7831, 07-CV-7832 and 07-CV-7867)
STRATEGY ENHANCED DEDICATED FUND, :
LP, DILLON READ U.S. FINANCE L.P.,    :
DILLON READ FINANCIAL PRODUCTS    :
TRADING LTD., DRAWBRIDGE SPECIAL  :
OPPORTUNITIES ADVISORS LLC, LINDEN :
CAPITAL L.P., NISSWA MASTER FUND    :
LTD., ORE HILL HUB FUND LTD., PINES  :
EDGE VALUE INVESTORS LTD., PINES    :
EDGE VALUE INVESTORS L.P., SILVER   :
SANDS FUND LLC, STARK MASTER FUND  :
LTD., 3V CAPITAL MANAGEMENT, LLC,   :
HSBC BANK USA, N.A., AS INDENTURE   :
TRUSTEE FOR THE 6% CONVERTIBLE    :
NOTES DUE 2014 AND THE 4.75%        :
CONVERTIBLE NOTES DUE 2023, AND    :
MANUFACTURERS & TRADERS TRUST    :
COMPANY, AS INDENTURE TRUSTEE FOR :
THE 7.75% CONVERTIBLE NOTES,       :

                Appellants,     :

                                          :

         -against-             :

CALPINE CORPORATION AND ITS       :   **ORAL ARGUMENT REQUESTED**
AFFILIATED DEBTORS AND DEBTORS IN  :
POSSESSION, OFFICIAL COMMITTEE OF  :
UNSECURED CREDITORS OF CALPINE    :
CORPORATION, OFFICIAL COMMITTEE OF :
EQUITY SECURITY HOLDERS,        :

                                          :

                Appellees.     :

---------------------------------------------------------- x

**REPLY BRIEF OF APPELLANT HOLDERS
OF THE 7.75% CONVERTIBLE NOTES**

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen (KH-4679)
Erez E. Gilad (EG-7601)
180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for Appellants Brencourt Credit
Opportunities Master, Ltd., Brencourt Multi-
Strategy Enhanced Dedicated Fund, LP,
Dillon Read U.S. Finance L.P., Dillon Read
Financial Products Trading Ltd., Linden
Capital L.P., and Ore Hill Hub Fund, Ltd.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

INTRODUCTION ......................................................................................................1

PRELIMINARY STATEMENT .....................................................................................1

ARGUMENT ............................................................................................................2

I.    THE CONVERTIBLE NOTEHOLDERS POSSESS A RIPE CLAIM
      FOR BREACH OF THE CONVERSION RIGHT CONTAINED IN
      THE INDENTURE ..............................................................................................2

      A.    The Appellees Persist in their Incorrect Reading of the
            Indenture, Which Clearly Provides for the Continuing Right to
            Convert During A Bankruptcy                                              3

      B.    Damages For Breach of the Conversion Right Are Due Despite
            The Automatic Acceleration Of The Debt As a Result of the
            Bankruptcy Filing                                                       7

II.   DISALLOWANCE OF THE CONVERSION RIGHT CLAIM
      AS CONTINGENT OR UNMATURED CONTRAVENES
      THE BANKRUPTCY CODE ..................................................................................9

III.  THE APPELLEES, AND THE BANKRUPTCY COURT, FAIL
      TO APPRECIATE THE UNIQUE NATURE OF THE
      7.75% CONVERTIBLE NOTES ...........................................................................12

IV.   THE BANKRUPTCY COURT OFFERED NO MEANINGFUL
      EXPLANATION FOR CONCLUDING THAT THE CONVERSION
      RIGHTS CLAIMS ARE SUSCEPTIBLE TO STATUTORY
      SUBORDINATION, AND FAILED TO SPECIFY THE LEVEL
      OF PRIORITY THAT WOULD BE AFFORDED TO THE
      CONVERSION RIGHT CLAIMS UPON SUBORDINATION
      UNDER SECTION 510(b) OF THE BANKRUPTCY CODE ........................................13

V.    THE RECORD IS DEVOID OF ANY FINDINGS OF FACT
      OR CONCLUSIONS OF LAW TO SUPPORT ENTRY OF
      THE ORDER DENYING MAKEWHOLE OR BREACH
      OF "NO-CALL" CLAIMS ..................................................................................16

VI.   THE ORIGINAL PROOF OF CLAIM PROVIDED THE
      DEBTORS WITH SUFFICIENT NOTICE OF THE
      CONVERSION RIGHT CLAIM ...........................................................................18

i

VII.    THE BANKRUPTCY COURT COMMITTED LEGAL ERROR
        IN DETERMINING THAT THE SUPPLEMENT DID NOT
        RELATE BACK TO THE ORIGINAL PROOF OF CLAIM
        AND ABUSED ITS DISCRETION IN EXPUNGING THE
        CLAIMS ON EQUITABLE GROUNDS ..........................................................................19

        A.    The Supplement Relates Back To The Original Proof Of Claim
              Because It Did Nothing More Than Describe The Original
              Claim With More Particularity Or Plead A New Theory Of
              Recovery                                                                              19

        B.    The Bankruptcy Court's Finding Of Prejudice Was Based On
              Hyperbole And Unwarranted Assumptions Of Fact                                        22

CONCLUSION ......................................................................................................................26

# TABLE OF AUTHORITIES

## CASES

In re 433 South Beverly Drive,
117 B.R. 563 (Bankr. C.D. Cal. 1990).............................................................................7

Alexandra Global Master Fund, Ltd.,
No. 06 Civ. 5383, 2007 WL 2077153 (S.D.N.Y. July 20, 2007) .....................................15

In re America West Airlines, Inc.,
179 B.R. 893 (Bankr. D. Ariz. 1995)..............................................................................14

Ameritrust Co. v. Integrated Resources,
157 B.R. 66 (S.D.N.Y. 1993)........................................................................................22

In re Asia Global Crossing, Ltd.,
324 B.R. 503 (Bankr. S.D.N.Y. 2005)............................................................................21

In re The Bennett Funding Group, Inc.,
146 F.3d 136 (2d Cir. 1998)...........................................................................................5

In re Bagnato,
80 B.R. 655 (S.D.N.Y. 1987).........................................................................................17

In re Calpine Corp.,
365 B.R. 392 (Bankr. S.D.N.Y. 2007).........................................................................8, 12

In re Campbell,
336 B.R. 430 (B.A.P. 9th Cir. 2005)...............................................................................17

In re Carmelo Bambace, Inc.,
134 B.R. 125 (Bankr. S.D.N.Y. 1991)............................................................................21

In re Chateaugay Corp.,
961 F.2d 378 (2d Cir. 1992).........................................................................................12

Chock Full O'Nuts Corp. v. United States,
453 F.2d 300 (2d Cir. 1971).........................................................................................13

In re Einstein/Noah Bagel Corp.,
257 B.R. 499 (Bankr. D. Ariz. 2000)..............................................................................11

Finanz AG Zurich v. Banco Economico S.A.,
192 F.3d 240 (2d Cir. 1999).........................................................................................12

In re First American Health Care of Georgia, Inc.,
    Nos. 96-20188, 96-20190, 96-20218, 1997 WL 33477665 (Bankr. S.D.Ga. April
    28, 1997) ............................................................................................................12

Gens v. Resolution Trust Corp.,
    112 F.3d 569 (1st Cir. 1997)...............................................................................20

Harff v. Kerkorian,
    324 A.2d 215 (Del. Ch. 1974), rev'd in part on other grounds, 347 A.2d 133 (Del.
    1974) ....................................................................................................................14

Hilton Hotels Corp. v. Dunnet,
    275 F. Supp. 2d 954 (W.D. Tenn. 2003)..............................................................11

In re Imperial Coronado Partners, Ltd.,
    96 B.R. 997 (B.A.P. 9th Cir. 1989)........................................................................7

Integrated Resources v. Ameritrust Co. Nat'l. Ass'n (In re Integrated Resources, Inc.),
    157 B.R. 66 (S.D.N.Y. 1993)...............................................................................24

In re King,
    305 B.R. 152 (Bankr. S.D.N.Y. 2004).................................................................17

Lancaster Factoring Co. Ltd. v. Mangone,
    90 F.3d 38 (2d Cir. 1996) ....................................................................................24

In re LHD Realty Corp.,
    726 F.2d 327 (7th Cir. 1984) .................................................................................7

Lillis v. AT&T Corp.,
    No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007).........................11

Liona Corp., Inc. v. PCH Associates (In re PCH Associates),
    949 F.2d 585 (2d Cir. 1992)...................................................................................9

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),
    419 F.3d 115 (2d Cir. 2005)...........................................................................21, 22

In re Migel's Will,
    336 N.Y.S.2d 376 (N.Y. Sur. 1972)....................................................................14

Northwest Bank Worthington v. Ahlers,
    485 U.S. 197 (1988)............................................................................................11

R.A. Mackie & Co. v. Wien Securities Corp.,
    329 F. Supp. 2d 477 (S.D.N.Y. 2004)..................................................................11

Racusin v. American Wagering, Inc. (In re American Wagering, Inc.),
     No. 05-15969, 2007 WL 1839681 (9th Cir. June 28, 2007)........................................14, 16

Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,
     691 F.2d 1039 (2d Cir. 1982)........................................................................................5, 7

In re Skyler Ridge,
     80 B.R. 500 (Bankr. C.D. Cal. 1987)........................................................................7, 8, 12

In re Stone & Webster, Inc.,
     270 B.R. 1 (Bankr. D. Del. 2001) ..................................................................................10

In re U.S. Lines, Inc.,
     No. 04 Civ. 6614, 2006 WL 1559237 (S.D.N.Y. July 7, 2006) ....................................18

Wabash Valley Power Association v. United States (In re Wabash Valley Power
     Association),
     72 F.3d 1305 (7th Cir. 1995) ........................................................................................11

**STATUTES**

11 U.S.C. § 502(a) ............................................................................................................10

11 U.S.C. § 502(b)(1) ....................................................................................................9, 10

11 U.S.C. § 510(b) ............................................................................................................15

# INTRODUCTION

Appellants, the holders and/or investment advisors to certain holders of the 7.75%

Contingent Convertible Notes due 2015 (the "7.75% Convertible Notes" or the "7.75%

Convertible Noteholders")[1] issued by Calpine Corporation, by and through their undersigned

counsel, hereby submit this reply to the (1) Brief of Debtors-Appellees ("Debtors' Brief"),

(2) Brief of Appellee Official Committee of Unsecured Creditors of Calpine Corporation, *et al.*

("C.C. Brief")and (3) Opposition Brief of Appellees The Official Committee of Equity Security

Holders ("E.C. Brief"), and in support hereof, respectfully state as follows:[2]

# PRELIMINARY STATEMENT

The Appellees, like the Bankruptcy Court below, disregard critical facts of the

case, misconstrue the plain language of the Indentures and misapply several provisions of the

Bankruptcy Code.  In fact, the Bankruptcy Court went so far as to fail to consistently apply its

own CalGen Decision, rendered earlier in the same bankruptcy case, which awarded similarly

situated lenders an unsecured claim for damages arising under the breach of their loan

agreement, *despite* the automatic acceleration of the debt as a result of the bankruptcy filing, and

*despite* the absence of any language in the acceleration provisions in the loan agreement

specifically referring to such damage claims.  Ultimately, the Appellees (and the Bankruptcy

Court) fail to appreciate that the unique nature of the contingent convertible bonds which, unlike

---

[1]     The Appellant 7.75% Convertible Noteholders include: Brencourt Credit Opportunities Master, Ltd., Brencourt Multi-Strategy Enhanced Dedicated Fund, LP, Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., Linden Capital L.P. and Ore Hill Hub Fund, Ltd., as holders and/or investment advisors to certain holders of certain of the 7.75% Convertibles Notes.  The term "Appellees" as used herein shall refer, individually or  collectively, depending on the context, to the above-captioned debtors and debtors-in-possession (the "Debtors"), the Official Committee of Unsecured Creditors of Calpine Corporation *et. al.* (the "Creditors' Committee") and the Official Committee of Equity Security Holders (the "Equity Committee").

[2]     Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Opening Brief of Appellant Holders of the 7.75% Convertible Notes dated September 7, 2007 ("Opening Brief").

traditional convertible bonds, contemplate the payment of stock as well as cash upon conversion, and as such, the Conversion Right represents a distinct and valuable right that the noteholders bargained for, and which retains incremental value regardless of the trading price of the underlying stock as of the petition date.

In addition, the Appellees fail to cite to any specific finding of fact or conclusion of law contained in the Bankruptcy Court's Opinion to justify that Court's entry of a sweeping order that expunged claims that were neither briefed nor disputed as part of the Debtors' Limited Objection. The record is similarly insufficient to support the Bankruptcy Court's determination that the Conversion Right Claims should be time-barred. Rather than acknowledge the clear fact that the original Proof of Claim stated broad claims that were further defined in the Supplement, the Bankruptcy Court adopted the parade of horribles portrayed by the Debtors and expunged the Conversion Right Claim in a clear abuse of discretion, which, at the very least was reversible error to be corrected only through an evidentiary hearing before the Bankruptcy Court to be armed with the facts necessary to make such findings.

Based on the foregoing, the 7.75% Convertible Noteholders respectfully submit that the Bankruptcy Court's Order sustaining the Debtors' Limited Objection should be reversed and this matter should be remanded to the Bankruptcy Court for further proceedings.

## ARGUMENT

### I.
### THE CONVERTIBLE NOTEHOLDERS POSSESS A RIPE CLAIM FOR BREACH OF THE CONVERSION RIGHT CONTAINED IN THE INDENTURE

The lynchpin to the Appellees' position is based on two theories: (i) the acceleration clause in the Indenture that accelerates the maturity date of the principal and interest upon a bankruptcy filing, and (ii) an obscure sentence in the form of note attached to the

Indenture, which provides that the "conversion right shall commence on the initial issuance date of the Notes and expire at the close of business on the Business Day immediately preceding the date of Maturity. . . ."  Supplemental Indenture at A-5.  Reading these provisions together, the Appellees assert that the Conversion Right was erased by the bankruptcy filing because the maturity date was advanced to the petition date and the Conversion Right only exists until the maturity date.   This approach rewrites the Indenture and ignores applicable law.

A.    **The Appellees Persist in their Incorrect Reading of the Indenture, Which Clearly Provides for the Continuing Right to Convert During A Bankruptcy**

The Appellees' reading of the Indenture is incorrect and directly contravenes the express terms of Section 10.15(d) of the Indenture, which provides for the continuation of the right to convert post-bankruptcy.  Section 10.15(d) states as follows:

> If an Event of Default as set forth in Section 5.1(e) or (f) of the Original Indenture [*i.e.*, a bankruptcy filing] has occurred *and is continuing*, the Company <u>may</u> *not* pay cash *upon conversion* of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock, provided that Holders shall receive an amount in cash in lieu of any fractional shares.

Supplemental Indenture § 10.15(d) (emphasis added).

This language makes it crystal clear that the Conversion Right survived the Debtors' bankruptcy filing and obliterates the Appellees' main argument.  To read language in the Note in conjunction with the acceleration provision to disregard the terms of Section 10.15(d) is contrary to basic principles of contract interpretation as it would render a clear and express provision completely meaningless.  Importantly, the Appellees have no real response to the effect of Section 10.15(d) other than to say that it only applies to require the form of consideration payable to converting holders post-petition if they convert pre-petition.  Obviously,

this construction strains Section 10.15(d) beyond its plain meaning, which clearly permits conversion after a bankruptcy filing. Thus, the acceleration argument and the Bankruptcy Court's ruling thereon were incorrect and completely ignored Section 10.15(d).[3]

Indeed, despite compelling evidence contained in the Indenture, the Bankruptcy Court's Opinion makes *no reference at all to* Section 10.15(d) of the Indenture, nor does it discuss the impact of the continuing right to convert even after a bankruptcy filing upon the Court's acceleration analysis (described in more detail below), despite the Bankruptcy Court being made aware of the specific provision at the Hearing and in the papers below. Instead, the Bankruptcy Court chose to ignore the provision completely and read its pre-written Opinion into the record at the Hearing. The Court's failure to address this critical aspect of the Indenture — that ends the Appellees arguments in toto — was reversible error.

While it is not necessary to discuss the issue of the word "Maturity" given the clear language of Section 10.15(d), the Appellees make much of the point. The capitalized term "Maturity" is not defined, prompting the Appellees to argue, in a leap of logic, that "Maturity" means a date on which the 7.75% Convertible Notes become due and payable (Debtors' Brief at

---

[3] The Debtors' interpretation of this Section has vacillated throughout these proceedings from rejecting the notion that Section 10.15 permitted post-bankruptcy conversion at all (see generally Limited Objection) to stating that Section 10.15(d) could conceivably contemplate for conversion post-bankruptcy albeit under strangely limited circumstances (see Hr'g. Tr. at 58:17-21) or that the provision speaks to nothing more than the form of consideration that one may receive if a holder converted pre-bankruptcy. See Hr'g. Tr. at 58:21-25; see also Debtors' Brief at 32-33; E.C. Brief at 25; C.C. Brief at 27-28. But Section 10.15(d) clearly provides that Calpine "may" chose to deliver stock, rather than the cash component, to converting Noteholders, but there is no affirmative requirement that they do so.

In a feeble attempt to get around Section 10.15(d), the Equity Committee argues that the operative provision this Court should look to in order to determine whether the conversion right survives bankruptcy is Section 10.01(a) of the Supplemental Indenture, titled "Conversion Privilege." E.C. Brief at 25-26. That provision states: "*Subject to the provisions of this Article 10*, a Holder of a Note may convert such Note into cash and Common Stock equal to the Conversion Value in accordance with Section 10.15," if any of the conditions specified in Section 10.01 are met. Supplemental Indenture §10.01(a) (emphasis added). Thus, the Indenture makes clear on its face that the ability to convert is subject to other provisions within Article 10, which naturally includes Section 10.15(d), such that the 7.75% Convertible Noteholders can convert any time the conditions are met, notwithstanding the occurrence or continuation of a bankruptcy default.

30), as opposed to the objective meaning that reasonable investors would apply to the term, *i.e.*, the scheduled maturity date or the "Stated Maturity," which has the same meaning in the Indenture. Indeed, what likely happened is that the word "Stated" was inadvertently left out of the sentence.

The Appellees resort to their interpretation by reference to "financial parlance" (see Debtors' Brief at 30) without first attempting to reconcile this sentence with the remaining provisions and purpose of the Indenture, in contravention of traditional canons of contract interpretation under New York law. See Sharon Steel Corp. v. Chase Manhattan Bank, 691 F.2d 1039, 1051 (2d Cir. 1982) (stating that a contract must be enforced so as to give effect to its general purpose, without regard to specific words or phrases that might defeat the general purpose of the contract); In re The Bennett Funding Group, Inc., 220 B.R. 743, 759-60 (Bankr. N.D.N.Y. 1997) (same).

A review of the remaining provisions and overall purpose of the Indenture makes clear that the term "Maturity" refers to the scheduled maturity date. The mere fact that the Indenture expressly provides that the Conversion Right terminates *one day before* the "Maturity" date is sufficient to rebut the Appellees' interpretation. The Appellees would have this Court believe that the 7.75% Convertible Noteholders agreed to the unilateral abrogation of their Conversion Right, without any notice, one day before the Debtors' voluntarily breach of the Indenture. See e.g., E.C. Brief at 25-26 ("[B]ecause the conditions precedent to conversion had not been met on the day prior to the Petition Date, the Conversion Rights were not ripe."). This interpretation is simply wrong and does not reflect a reasonable commercial understanding of the Indenture. The Debtors' suggestion, in a footnote, that the choice of an ethereal date is "more

easily administrable" (see Debtors' Brief at 34, n. 91), simply makes no sense.  If anything, the opposite is true.[4]

In addition, Section 10.01(a)(2) provides that the 7.75% Convertible Notes may be converted at any time following May 31, 2014.  Id.  This right is not qualified in any respect. If the drafters of the Indenture had intended to prohibit conversion prior to the occurrence or during the continuance of a bankruptcy event of default, they would have said so, as they did in other instances throughout the Indenture.[5]  The Appellees' understanding of the word "Maturity" also conflicts with the Indenture's unfettered right to convert any time after May 31, 2014, and the Appellees' notion that "Appellants understood the risk at the time of contracting that the Conversion Rights "may never ripen" is inaccurate.  E.C. Brief at 28.

Contrary to the assertions made by the Appellees, the drafters of the Indenture *did* provide for protection against the Debtors' unilateral abrogation of the Conversion Right as a result of its own voluntary breach of the Indenture.  As noted above, the Indenture provides for the continuing right to convert even after a bankruptcy filing.  Moreover, the 7.75% Convertible Notes are non-callable for all purposes relevant to these proceedings — *a fact that none of the*

---

[4]    The Debtors argue that "it does not make sense for the conversion right to last past any maturity, stated or otherwise, considering that once the Notes have been repaid, there is nothing to convert."  Debtors' Brief at 31. This reasoning works backwards from the Debtors' result-driven conclusion that the Debtors could repay the 7.75% Convertible Notes without compensating the noteholders for loss of the conversion right, or that the Conversion Right involves a double-recovery, which it does not.  In a similar vein, the Equity Committee argues that the Appellants' interpretation of the word "maturity" would allow the noteholders to "call" the principal and interest under the Indenture while retaining the Conversion Rights separately.  See E.C. Brief at 23.  This mischaracterizes the nature of the Conversion Right Claim.  The Appellants are not demanding specific performance of their conversion right, but rather are seeking monetary compensation for the loss of the right to convert through the scheduled maturity date.

[5]    Only the Creditors' Committee meaningfully *attempts* to rebut this point by arguing that the exercise of the Conversion Right might be implicated by the automatic stay or otherwise impaired due to the Bankruptcy Code. See C.C. Brief at 28-29.  The Creditors' Committee fails to address the main point at issue, namely whether a cognizable claim for breach of the contract would occur, and whether the 7.75% Convertible Noteholders should be compensated for loss of the Conversion Right.

*Appellees dispute*.  See Base Indenture § 9.1; Supplemental Indenture § 3.02.  Thus,

notwithstanding the Appellees' assertions to the contrary, the 7.75% Convertible Noteholders

reasonably expected to retain their Conversion Right through the scheduled maturity date (or be

compensated for the premature loss of that right).

**B.    Damages For Breach of the Conversion Right Are Due Despite
       The Automatic Acceleration Of The Debt As a Result of the
       Bankruptcy Filing**

Another central premise behind the Bankruptcy Code's decision and the

Appellees' arguments is the notion that, upon the automatic acceleration of the debt as a result of

the bankruptcy filing, damages for breach of the Conversion Right are not recoverable since the

acceleration clause of the Indenture did not include any specific reference to such damages.  The

Appellees and the Bankruptcy Court disregard the plethora of analogous case law that has

awarded damages beyond principal and interest, despite the automatic acceleration of the debt

upon a bankruptcy filing.[6]

The case of In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Calif. 1987) is

instructive.  In that case, the bankruptcy court held that the "automatic acceleration of a debt

upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a

prepayment premium."  Id. at 507.  The court reasoned that acceleration is subject to deceleration

---

[6]    See In re Skyler Ridge, 80 B.R. 500 (Bankr. C.D. Cal. 1987) (rejecting debtor's argument that automatic
acceleration eliminated any prepayment right);  see also In re Imperial Coronado Partners, Ltd., 96 B.R. 997
(B.A.P. 9th Cir. 1989) (reasoning that since the debtor "had the right" to reinstate the loan, regardless of
whether it could practically do so, the lender was still entitled to prepayment even though the lender had itself
accelerated the debt prior to the bankruptcy);  In re 433 South Beverly Drive, 117 B.R. 563 (Bankr. C.D. Cal.
1990) (same); Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1053 (2d Cir. 1982) (holding
that there is "no bar…to the Indenture Trustee seeking specific performance of the redemption provisions where
the debtor cause[d] the debentures to become due and payable by its voluntary actions"); Cf. In re LHD Realty
Corp., 726 F.2d 327, 331 (7th Cir. 1984) (holding that the elimination of the prepayment penalty resulted only
from the creditor's voluntary acceleration of the debt following the creditors' filing of a motion for relief from
stay to foreclose, and not from the automatic acceleration resulting from the bankruptcy filing).

in a chapter 11 plan. Id. If this were not the case, a prepayment clause could never be enforced in

a bankruptcy case, and "[a] debtor, under such a rule, could always avoid the effect of a

prepayment premium clause by filing a bankruptcy case. Neither the Bankruptcy Code nor case

law compels so drastic a result." Id.

Moreover, in a complete reversal, the Bankruptcy Court failed to reconcile its

ruling on the Conversion Right Claim with its earlier CalGen Decision, in which the Bankruptcy

Court rejected the Debtors' similarly "preclusive argument for a total foreclosure of any damage

recovery" and held that, upon repayment during a no-call period, the CalGen lenders'

"expectation of an uninterrupted payment stream has been dashed giving rise to damages"

*notwithstanding the automatic acceleration of the debt and the fact that the acceleration*

*provisions in the CalGen loan documents did not reference such amounts.* In re Calpine Corp.,

365 B.R. 392, 399 (Bankr. S.D.N.Y. 2007) ("Accordingly, while the agreements do not provide a

premium or liquidated damages for repayment during the period the Debtors propose, the

CalGen Secured Lenders still have an unsecured claim for damages for the Debtors' breach of

the agreements.") (emphasis added).  Like the CalGen Lenders, the 7.75% Convertible

Noteholders are entitled to damages for breach of the Indenture despite the absence of any

reference in the acceleration provision in the Indenture to the payment of a premium or

liquidated damages.[7]

Inexplicably, the Bankruptcy Court makes no reference at all to its earlier CalGen

Decision, and does not provide any basis for distinction.  Under the law of this case and

---

[7]    The Debtors assert that Judge Lifland best understood his own CalGen Decision, and that his "interpretation of
the CalGen Refinancing Opinion is entitled to the *utmost deference*."  Debtors' Brief at 37.  The problem is,
Judge Lifland did not even cite to the CalGen Decision in his Opinion or offer any basis to distinguish the
present facts from the CalGen fact pattern.  In any event, the Debtors misstate the appropriate standard of
review.

principles of *stare decisis*, the Bankruptcy Court was bound to apply similar principles of law consistently among similarly situated creditors, but failed to do so. The CalGen Decision is the law of this case and mandates a similar outcome here, notwithstanding the Appellees' attempts to preclude its application. See Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 592 (2d Cir. 1992) ("[u]nder the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."). There is no logical distinction between the nature of the Conversion Right Claim at issue here and the unsecured claim awarded to the CalGen lenders, and there is no basis to refuse to extend the doctrine to the present facts. At its core, the CalGen Decision squarely held that that lenders are entitled to the economic benefit of their bargain (without finding that CalGen was solvent). If anything, the Convertible Noteholders present a stronger case for allowance since the Indenture expressly provides for the post-bankruptcy survival of the Conversion Right.

## II.
### DISALLOWANCE OF THE CONVERSION RIGHT CLAIM AS CONTINGENT OR UNMATURED CONTRAVENES THE BANKRUPTCY CODE

The Bankruptcy Court also found that the Conversion Right Claim was not allowable pursuant to section 502(b) of the Bankruptcy Code because the "conversion rights were not exercisable as of the petition date when the notes were accelerated and matured." Hr'g Tr. Aug. 8, 2007 at 101:25-102:9. This ruling contravenes the clear mandate of section 502(b)(1) that a claim may not be disallowed simply because it is contingent or unmatured.[8]

---

[8]    Specifically, section 502(b)(1) of the Bankruptcy Code, in relevant part, provides that if an objection to a claim is made, the Bankruptcy Court shall determine the amount of the claim "as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law *for a reason other than because such claim is contingent or unmatured*[.]" 11 U.S.C. § 501(b)(1) (emphasis added).

9

The decision in In re Stone & Webster, Inc., 270 B.R. 1 (Bankr. Del. 2001) is particularly instructive on this point.  In that case, Maine Yankee filed proofs of claim against the debtors for breach of their agreement to decommission a power plant with a performance due date of April 30, 2004.  The debtors argued that Maine Yankee's claims for damages under the contract were not ripe because Maine Yankee had not satisfied the agreement's conditions precedent to the award of damages. Id. at 11.  In response, Main Yankee argued that its claim was ripe and the potential uncertainty in calculating its damages does not make its damages unripe.  Id.  In addition, Maine Yankee argued that the definition of "claim" under section 101(5)(A) of the Bankruptcy Code does not require claims to be fixed and mature, but rather, section 502(b)(1) of the Bankruptcy Code permits courts to allow "contingent or unmatured" claims. Id.  The court sided with Maine Yankee, and specifically held that contingent claims may be allowed in even if they remain contingent:

> Put differently, even if this court were to find that Article 11.4 contained an unfulfilled condition precedent that Maine Yankee complete the decommissioning project and that therefore Maine Yankee's cause of action for breach of the Agreement had not yet accrued, the pendency of the unfulfilled condition would not prevent the court from allowing Maine Yankee's bankruptcy claim. . . . Thus, the quantity of Maine Yankee's damages, if proven, remains an issue for the court's consideration and possible estimation pursuant to 11 U.S.C. § 502(c).

Id. at 12-13 (emphasis added).

Much like the debtors in In re Stone & Webster, the Appellees conflate the notions of liability and damages, and assert that no breach has occurred because the conversion right is valueless.  Here too, the 7.75% Convertible Noteholders have asserted a valid breach of contract claim.  However, simply put, a claim cannot be disallowed because one party asserts, without evidence, that the claim is valueless.  The value of the Conversion Right should properly

10

be measured at an estimation hearing before the Bankruptcy Court, but no such proceedings have taken place. Suffice it to say that the Conversion Right does indeed possess significant independent value, even if Calpine shares traded at a price lower than the conversion price, based on the wealth of authority cited in the Opening Brief, but which the Appellees attempt to sweep under the rug. See Wabash Valley Power Ass'n v. United States (In re Wabash Valley Power Ass'n), 72 F.3d 1305, 1318 (7th Cir. 1995) (citing Northwest Bank Worthington v. Ahlers, 485 U.S. 197, 208 (1988)). "[B]ecause the value of a call option is derivative of the value of the underlying stock, the value of a call option on the stock of an insolvent corporation is not worthless as a matter of law." Id.

Contrary to the assertions made by the Appellees, the cases cited by the 7.75% Convertible Noteholders clearly establish that significant monetary damages would occur should a court find that a breach of the indenture occurred. See R.A. Mackie & Co. v. Wien Securities Corp., 329 F. Supp. 2d 477, 512-14 (S.D.N.Y. 2004); Lillis v. AT&T Corp., No. 717-N, 2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007) (awarding damages to employees who sought damages for premature termination of their out-of-the-money options based on expert testimony using the Black-Scholes model); Hilton Hotels Corp. v. Dunnet, 275 F. Supp. 2d 954, 963 n.4 (W.D. Tenn. 2003) ("[U]nder water options have measurable value based on the likelihood that they may move into the money at some point prior to their expiration. . . . [T]he under water options themselves had inherent value because they could be exercised in the future.").[9]

---

[9]   None of the cases cited by the Appellants in support of the notion that stock options, put rights and warrants represent controlling authority or involves a similar fact pattern, i.e., a convertible noteholder asserting a claim for incremental compensation as a result of abrogation of the conversion right. See Debtors' Brief at 38, n.104; C.C. Brief at 29-30; E.C. at 27-28. The case of In re Einstein/Noah Bagel Corp., 257 B.R. 499 (Bankr. D. Ariz. 2000), addressed the terms of a "put right" under a partnership agreement that, the court held, was illusory since the agreement absolved the partnership from liability in the event it was unable to satisfy the put obligations. Id. at 504-06. In any event, the language cited by the Debtors is dicta (see id. at 509), and the ENBC court

*(cont.)*

Thus, contrary to the Appellees' assertions, to the extent this Court finds that the Bankruptcy Court erred as a matter of law in determining that the Conversion Right mysteriously evaporated on the Petition Date, then, necessarily, the Conversion Right Claim cannot be disallowed simply because the pre-conditions to conversion had not yet been met, and the matter must be remanded to the Bankruptcy Court for estimation.[10]

### III.
### THE APPELLEES, AND THE BANKRUPTCY COURT, FAIL TO APPRECIATE THE UNIQUE NATURE OF THE 7.75% CONVERTIBLE NOTES

The Appellees' characterization of the Conversion Right Claim as a "double recovery" similarly misses the mark. Like the Appellees, the Bankruptcy Court mischaracterized the 7.75% Convertible Notes as providing for two mutually exclusive modes of satisfaction, and by repaying the principal and interest in full, the Debtors are rendering "alternative performance as provided in the indenture" (see Hr'g Tr. Aug. 8, 2007 at 101:3-25) and permeates throughout

---

ultimately refused to value the put interests. Id. at 510. The other cases cited by the Appellees involve warrants or stock options, which the applicable court viewed as an equity security under section 101(16)(C) of the Bankruptcy Code, which excludes a right to convert. Also, the court in Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 250 (2d Cir. 1999) expressly noted that the issue of conversion of foreign currency into U.S. dollars pursuant to section 502(b) of the Bankruptcy Code was not before it. The case of In re First American Health Care of Georgia, Inc., Nos. 96-20188, 1997 WL 33477665 at * 6 (Bankr. S.D.Ga. Apr. 28, 1997) has no bearing at all on the present dispute, since, in that case, the court sustained an objection to proof of interest filed by stock option holder, finding that holder forfeited all contractual rights to purchase stock options after he voluntarily resigned.

[10]    The Debtors make the new and unsupported argument that the lower coupon rate on account of the conversion feature is equivalent to original issue discount, and should therefore be treated as unmatured interest that is not allowable under section 502(b)(2). See Debtors' Brief at 38-39. There is no basis in law for this remarkable proposition. As explained by the Second Circuit in In re Chateaugay Corp., 961 F.2d 378 (2d Cir. 1992), original issue discount results when a bond is issued for less than its face value. The Appellees fail to demonstrate that the 7.75% Convertible Notes were issues at less than face value. Separately, the Equity Committee argues that the Conversion Right Claim is disallowable under section 502(b)(2) simply because the damages are unascertainable until a future date (see E.C. Brief at 33). This argument similarly misses the point with respect to the treatment of contingent claims under the Bankruptcy Code, and each of these assertions run counter to the Bankruptcy Court's CalGen Decision, which found that the unsecured "expectation damages" claim would not represent a claim for unmatured interest. See In re Calpine Corp., 365 B.R. at 399; see also In re Skyler Ridge, 80 B.R. 500, 508 (Bankr. C.D. Calif. 1987) (finding liquidated damages, including prepayment premiums, fully mature at the time of breach, and do not represent unmatured interest under section 502(b)(2) of the Bankruptcy Code).

the Appellees' papers.  However, this approach fails to take into account the fact that the 7.75%

Convertible Noteholders seek to recover nothing more than what they negotiated for with the

Debtors.  As evidenced by the plain language of the Indenture, the 7.75% Convertible

Noteholders received two separate and distinct forms of consideration that are *not* mutually

exclusive:  (i) the right to receive a fixed stream of income, in the form of interest and principal,

through the scheduled maturity date of June 1, 2015, *and* (ii) the right to convert the notes *and*

*receive stock in addition to cash* for the principal amount tendered upon conversion.[11]  The

Debtors are correct in the sense that, if you compared two bonds, the contingent convertible

bonds and a garden-variety convertible bond, they could both yield the same conversion claim

amount.  Where the Debtors miss the mark is that they yield different forms of recovery.  The

contingent convertible bonds yield both cash *and* stock, whereas the traditional convertible bond

yields only stock.  In the final analysis, the separation of the consideration is what gives rise to

separable claims for the 7.75% Convertible Noteholders for "par plus accrued" in addition to

damages arising from the loss of the Conversion Right (instead of just one or the other).

## IV.
### THE BANKRUPTCY COURT OFFERED NO MEANINGFUL EXPLANATION FOR CONCLUDING THAT THE CONVERSION RIGHTS CLAIMS ARE SUSCEPTIBLE TO STATUTORY SUBORDINATION, AND FAILED TO SPECIFY THE LEVEL OF PRIORITY THAT WOULD BE AFFORDED TO THE CONVERSION RIGHT CLAIMS UPON SUBORDINATION UNDER SECTION 510(b) OF THE BANKRUPTCY CODE

The Bankruptcy Court decreed that "even if the new claimants were cognizable

they would be *susceptib*le to subordination pursuant to Section 510(b) of the Bankruptcy Code as

---

[11]    In support of their contentions, Appellees (and the Bankruptcy Court) rely extensively upon <u>Chock Full O' Nuts Corp. v. U.S.</u>, 453 F.2d 300, 305 (2d Cir. 1971), a tax case from over 30 years ago, that is inapposite and bears no resemblance to the present facts.  The court relied upon the specific terms of the debenture in reaching its conclusion.  That case did not involve a contingent convertible bond.  Here, by contrast, the Indenture clearly provides for separate and distinct consideration in respect of the Conversion Right.

claims arising from the purchase or sale of a security." Hr'g Tr. Aug. 8, 2007 at 102: 10-24 (emphasis added). Though the Bankruptcy Court cites several cases, no meaningful explanation or analysis as to the application of the statute to the facts at hand is provided.

In generic fashion, the Appellees assert that section 510(b) is broadly applied, and cite to a litany of section 510(b) cases (see Debtors' Brief at 39-43; E.C. Brief at 33-36; C.C. Brief at 35-36), but fail to cite any authority related to contingent, convertible bonds or to meaningfully rebut the notion that the 7.75% Convertible Noteholders, by virtue of the hybrid nature of the contingent convertible notes, *did not assume the downside risks associated with the underlying common stock*, thereby distinguishing the present case from the cases cited by the Appellees.[12] As described above, in the event the trading price of Calpine's stock price dropped, the Noteholders still retained the right to enforce Calpine's absolute obligation to pay interest and repay principal. The 7.75% Convertible Noteholders are not required to actually convert in order to assert a debt claim for the breach of their Indenture.

Moreover, the Conversion Right Claim emanates from a breach of the Indenture, and therefore there is no transactional nexus between the 7.75% Convertible Noteholders' damages claim for breach of the Indenture with a purchase or sale of stock. See e.g., Racusin v. American Wagering, Inc. (In re American Wagering, Inc.), No. 05-15969, 2007 WL 1839681 (9th Cir. June 28, 2007) (finding that damages arising from breach of an agreement did not fall

---

[12]    Courts have clearly distinguished between a conversion right and the right to purchase typically associated with stock options. See In re America West Airlines, Inc., 179 B.R. 893 (Bankr. D. Ariz. 1995) ("The legislative history reveals that only a right to convert is not included in the definition of 'equity security'…[a] right to purchase however, is within the definition provided in the Bankruptcy Code."). As the Court stated in In re Migel's Will, 336 N.Y.S.2d 376, 379 (N.Y. Sur. 1972), "case law indicates that a convertible debenture is a bond and not an equity security until conversion occurs." Id. at 374; see also Harff v. Kerkorian, 324 A.2d 215 (Del. Ch. 1974), rev'd in part on other grounds, 347 A.2d 133 (Del. 1974) (same). Thus, the cases cited by the Debtors, which involve stock options, are distinguishable from the instant dispute, which involves claims arising under convertible bonds.

within the purview of Section 510(b) of the Bankruptcy Code because the contract "only gave

him the monetary value of the shares of stock, not the stock itself.  [The debtor] never upheld its

end of the contract, resulting in a lawsuit for breach seeking damages based on the value of the

stock.").  Here too, the Conversion Right Claim arises from the breach of a commercial loan

agreement; the holders have *not* affirmatively tendered their notes for conversion.  The

Appellees' strained distinction of the Racusin case rings hollow.

      Speaking of novel and extraordinary theories, the Appellees interpret the

Bankruptcy Court's Opinion as mandating that any damage award must be subordinated *beneath*

common stock.[13]  E.C. Brief at 3; Debtors' Brief at 44.  This assertion is nonsensical, and runs

counter to the statute itself, which provides that to the extent "*such security* is common stock,

such claim has the same priority as common stock."  11 U.S.C. § 510(b) (emphasis added).

      Though this point made by the Appellees is specious at best, it nevertheless

highlights the fact that the Bankruptcy Court did not specifically enunciate whether the

Conversion Right Claim would actually be subordinated, if allowed, or what priority would be

afforded to the claim.  See E.C. Brief at 3.  The statute, on its face, only requires that the 7.75%

Convertible Noteholders' claims arising from the loss of the Conversion Right be subordinated

(if at all) to the class of the 7.75% Convertible Notes (and certainly does not mandate that the

claim be subordinated "beneath" common equity).  Indeed, under the Debtors' current Plan, the

Conversion Right Claim, to the extent allowed but subject to subordination under section 510(b)

---

[13]  The case cited by the Equity Committee, Alexandra Global Master Fund, Ltd., No. 06 Civ. 5383, 2007 WL 2077153 at * 5 (S.D.N.Y. July 20, 2007) (J. Koeltl), has nothing at all to do with section 510(b) subordination, but relates to a motion to dismiss a 10b-5 securities fraud and common law fraud case involving convertible bonds.  In fact, that case *supports* the Appellants' view that the Conversion Right Claim represents a valid *debt* claim.  In Alexandra, this Court adopted the generally accepted rule that "a convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties."

of the Bankruptcy Code, would fall within the "Subordinated Debt Securities Claim," which represents a mezzanine class that is senior to equity.[14]

Ultimately, the statutory subordination of the Conversion Right Claim is inconsistent with the Bankruptcy Code's general policy that creditors are entitled to be paid before equity holders, and would subvert the policy considerations underlying the enactment of Section 510(b) of the Bankruptcy Code, which serves to shift the risk of loss from creditors to shareholders, and "to prevent disappointed shareholders, sometimes the victims of corporate fraud, from recouping their investment in parity with unsecured creditors." In re American Wagering, Inc., 2007 WL 1839681, at *3. Here, the 7.75% Convertible Noteholders have not sued the Debtors as equity investors, but rather have asserted a claim for breach of their debt instrument, which would be subordinate to debt claims, but senior to equity claims.

## V.
## THE RECORD IS DEVOID OF ANY FINDINGS OF FACT OR CONCLUSIONS OF LAW TO SUPPORT ENTRY OF THE ORDER DENYING MAKEWHOLE OR BREACH OF "NO-CALL" CLAIMS

The Appellees proffer several rationalizations to support the form of Order entered by the Bankruptcy Court, each of which misses the mark. No Appellee has come forward with *any* finding of fact or conclusion of law that justifies the Bankruptcy Court's disallowance of any claims other than the Conversion Right Claims.

Throughout its Opinion, the Bankruptcy Court refers exclusively to the convertible noteholders' "new claims," which the Bankruptcy Court expressly defined as the

---

[14]   Incidentally, the Plan's classification scheme buttresses the notion that prejudice would not befall stakeholders if the Supplement were allowed, particularly if the Conversion Right Claim were found to be subject to statutory subordination, with no harm done to the Plan structure or the Plan process.

Conversion Right Claims only.  (Hr'g Tr. Aug. 8, 2007 at 101: 25; 102: 1-5).[15]  No mention of

any other claims is made in the Opinion.  The Creditors' Committee cites a number of passages

from the transcript of the Hearing, which are taken out of context and fall well short of

demonstrating that the Bankruptcy Court considered anything other than the Conversion Right

Claims when it issued its decision.  See C.C. Brief at 39.

      The Appellees argue that the Limited Objection and proposed form of Order was

sufficient to place the 7.75% Convertible Noteholders on notice as to the broad relief requested,

and that the Debtors need not have specifically detailed each claim alleged by the Appellants.

See Debtors' Brief at 48, n.135;  E.C. Brief at 36-37.  Yet, the Appellees cannot point to any

basis in the record that satisfies Debtors' burden to come forward with sufficient evidence to

rebut the prima facie validity of alternate claims when all they briefed and addressed were the

Conversion Right Claims.[16]

      The Debtors' true intent is evidenced by their own Disclosure Statement wherein

the Debtors describe the nature of the Limited Objection as limited to the Conversion Right

Claims.  Specifically, the Disclosure Statement states as follows:

---

[15]    Specifically, the Bankruptcy Court found that "on March, April and May of 2007 the indenture[] trustees for the convertible notes filed 'supplemental' proofs of claims seeking in addition to repayment of outstanding principal and accrued interest, damages for 'any breach' of the conversion rights, collectively the *New Claims*." (Hr'g Tr. Aug. 8, 2007 at 96: 4-9) (emphasis added); see also Hr'g Tr. Aug. 8, 2007 at 97:18 ("The debtors object to the *new claims*")"; id. at 97:21; id. at 98:5 ("[T]he *new claims* are not amendments"); id. at 101:2-3 ("[T]he *new claims* are without merit") (emphasis added).

[16]    A claim objection must actually contest the debtor's liability or the amount of the debt.  In re Campbell, 336 B.R. 430 (B.A.P. 9th Cir. 2005).  Vague assertions and legal conclusions do not actually contest liability or the amount of the claims.  Id. at 435.  It is insufficient for the Debtors to simply assert, without more, that there is no liability, and need to satisfy their burden of proof, which the Debtors failed to do here.  The cases cited by the Debtors support the notion that the objector must come forward and produce sufficient evidence to rebut the claimant's prima facie claim.  See In re Bagnato, 80 B.R. 655, 658 (S.D.N.Y. 1987); In re King, 305 B.R. 152, 164-65 (Bankr. S.D.N.Y. 2004) (stating that a properly filed proof of claim is deemed allowed unless a party in interest objects such allowance compels the objecting party to go forward and produce sufficient evidence to rebut the claimant's prima facie case").  An oblique reference in the "Relief Requested" section of the Limited Objection, without more, is insufficient to strip the noteholders' prima facie claim.

On July 6, 2007, the Debtors filed an objection *to these additional conversion rights [sic] Claim*s on the basis that such Claims were late-filed, that any conversion rights terminated upon the filing of the Chapter 11 Cases, and that the Holders of the Convertible Notes were not entitled to damages because the Convertible Notes did not entitle them to both repayment of principal and interest and conversion. Further, the Debtors asserted that any Claims arising out of the alleged conversion rights, if Allowed, should be subordinated to the level of common stock.

Disclosure Statement at III.D.10.c.

Much like a picture that is worth a thousand words, this excerpt plainly establishes that the Limited Objection was directed *only* at the "additional conversion rights Claims."

## VI.
## THE ORIGINAL PROOF OF CLAIM PROVIDED THE DEBTORS WITH SUFFICIENT NOTICE OF THE CONVERSION RIGHT CLAIM

The Debtors negotiated the Indenture approximately two years ago, as part of one of the last financings Calpine was able to consummate before the Petition Date. The terms for the 7.75% Convertible Notes were highly negotiated and structured. Thus, the Debtors cannot hide and say that they could not reasonably expect a noteholder to come forward with a claim based on the cancellation of the Conversion Right. The Debtors certainly cannot claim that the Conversion Right Claim represents a novel theory, since the 7.75% Convertible Noteholders have asserted nothing more than a claim based on the Indenture the Debtors signed and which contains the express right to convert post-petition — indeed, how can the Debtors and the Bankruptcy Court ignore the fact that a unique provision exists in the Indenture that the Debtors negotiated only two years ago? It is therefore logical for the Debtors to expect that the holders would seek to be compensated for the unilateral elimination of that right. At best, Calpine's arguments should fail as a matter of law. At worst this Court should remand the issue to the

Bankruptcy Court for an evidentiary hearing to determine why the Debtors negotiated the 7.75% Convertible Notes the way that they did and whether they could have conceived of the Conversion Right Claim.

In any event, the original Proof of Claim asserted a claim for principal and accrued but unpaid interest as well as "other unliquidated amounts" including "[a]ll other interest, charges, penalties, premiums, and advances which may be due or become due under the [7.75% Convertible] Notes and the Indenture. . . ." Addendum to Proof of Claim at 2. In addition, under the heading "Supporting Documents," the Proof of Claim stated: "[t]he claims hereby made are all founded on the terms of the [7.75% Convertible] Notes (the originals of which are in the possession of the [7.75% Convertible Noteholders] and the terms of the Indenture." Id. at 3. A true and correct copy of the Indenture was attached. Thus, despite the Appellees' arguments to the contrary, the Proof of Claim was clearly sufficient to place the Debtors on notice of a cause of action arising from the breach of the Conversion Right contained in the Indenture.

## VII.
## THE BANKRUPTCY COURT COMMITTED LEGAL ERROR IN DETERMINING THAT THE SUPPLEMENT DID NOT RELATE BACK TO THE ORIGINAL PROOF OF CLAIM AND ABUSED ITS DISCRETION IN EXPUNGING THE CLAIMS ON EQUITABLE GROUNDS

The record is practically devoid of any meaningful basis for the Bankruptcy Court's determination that the Supplement did not relate back to the initial Proof of Claim or that the Supplement should be expunged on equitable grounds.

**A.    The Supplement Relates Back To The Original Proof Of Claim Because It Did Nothing More Than Describe The Original Claim With More Particularity Or Plead A New Theory Of Recovery**

All parties seem to agree that if an amendment describes an original claim with more particularity, or pleads a new theory of recovery on the facts set forth in the original claim, then the amendment should be deemed to relate back to the original claim.  See E.C. Brief at 12; C.C. Brief at 14; Debtors' Brief at 18-19.  Though the Appellees recite the standard, they pay little homage to it, and neither the Appellees, nor the Bankruptcy Court, adequately articulate how the Supplement fails the relation-back standard other than to note that "the initial claims did not make any meaningful reference to the conversion claims." Hr'g Tr. Aug. 8, 2007 at 99:14-15. Judge Lifland had no evidence before him to sustain his conclusion other than the proofs of claim themselves, and his actions in eliminating the Conversion Right Claims for the sake of judicial efficiency was an abuse of discretion.

The Appellees contort the applicable "relation-back" standard to suit their means by simply asserting, in conclusory fashion, that the Supplement asserted new grounds of liability (see C.C. Brief at 14) and by arguing that "the facts needed to support a claim for Conversion Damages were not alleged in the Original Claims."  E.C. Brief at 12-13.  What additional *facts* might those be?  The Conversion Right Claim relates to the *same* issuance of the Convertible Notes, the *same* Indenture, and involves the *same* parties.  The Supplement included the Indenture.  See Gens. v. Resolution Trust Corp., 112 F.3d 569, 575 (1st Cir. 1997).  The Equity Committee even reaches the metaphysical plane and argues that the Conversion Right Claim represents a "completely different kind of breach" than that asserted in the original claim and presents a wholly new theory of liability.  E.C. Brief at 12-13; see also C.C. Brief at 14.  This argument falls from its own weight:  the Supplement does no more than specify in more detail the nature of the breach.  There is no statute or applicable judicial authority that requires a creditor to spell out its theories of liability in a proof of claim and flag for the Debtors the

20

specific provisions of the relevant document that are being breached.  Indeed, the creditor may

not know the specific nature of the breach until after the case progresses, which is consistent

with the filing of a broad proof of claim at the outset of the case; the "catch-all" language in the

initial Proof of Claim should not be used to penalize the noteholders.  See Debtors' Brief at 19.

Contrary to the Debtors' assertions, the Debtors had every reason to expect that convertible

noteholders might assert a claim in respect of the conversion right contained in their indenture.

Ultimately, the Supplement did not change the parties or assert a new claim

against a separate debtor-entity.  Cf. Midland Cogeneration Venture Ltd. P'ship v. Enron Corp.,

419 F.3d 115 (2d Cir. 2005) (court rejected late-filed claim to add Enron under the guaranty six

months after the court-determined bar date).[17]  Here, there simply can be no other interpretation

of the Supplement other than that it described the previously stated unliquidated claims with

greater particularity.  While true that the Supplement was filed after the CalGen Decision, it is

categorically untrue that the Supplement details new claims based purely on the CalGen

Decision.  The 7.75% Convertible Notes are just that, convertible instruments that entitle the

holders thereof to convert all or a portion of their claim into stock.  The original Proof of Claim

stated that it was based upon the Indenture for the 7.75% Convertible Notes and asserted claims

for all amounts due thereunder.  To describe what "all amounts thereunder" means with greater

particularity is the literal definition of the relation-back standard.  Indeed, even if the Bankruptcy

Court was correct in holding that the Supplement set forth a new theory of recovery, it is

---

[17]     The cases cited by the Appellees are inapposite.  The case of In re Carmelo Bambace, Inc., 134 B.R. 125, 130
(Bankr. S.D.N.Y. 1991) involved a pension fund's assertion of separate and distinct claims: an initial claim
based upon delinquent pre-petition payments versus the amended claim for post-petition withdrawal liability.
The case of In re Asia Global Crossing, Ltd., 324 B.R. 503, 508 (Bankr. S.D.N.Y. 2005), involved late assertion
of avoidance actions that arose out of a different set of facts and transfers.

undeniable that it was based on the same document, facts and circumstances set forth in the original Proof of Claim.

Ultimately, the Appellees go well beyond applicable law in setting an insurmountable standard for the acceptance of amendments to proofs of claim. The Appellees' line of reasoning was expressly rejected by this Court in <u>Ameritrust Co. v. Integrated Resources</u>, 157 B.R. 66, 72 (S.D.N.Y. 1993), which applied Rule 15 of the Federal Rules of Civil Procedure in determining whether to deem a counterclaim a permissible amendment to an original proof of claim, and found that "[t]he appellant's contention that the amendment is permissible only if the 'underlying causes of action were asserted' in the original proof of claim is contrary to prevailing legal theory." <u>Id</u>. (citations omitted). Under Appellees' categorical view, no amendment would ever be allowed unless the original proof of claim already stated what was in the amendment, thereby vitiating a developed line of case law that holds that amendments are "freely allowed" where the purpose is to describe the original claim with greater particularity. <u>Midland Cogeneration Venture Ltd. P'ship v. Enron Corp.</u>, 419 F.3d 115, 134 (2d. Cir. 2005).

**B.    The Bankruptcy Court's Finding Of Prejudice Was Based On Hyperbole And Unwarranted Assumptions Of Fact**

The Appellees paint a skewed and distorted picture, which was adopted across-the-board by the Bankruptcy Court without scrutiny or evidentiary support, of the alleged prejudice that would befall the Debtors' estates if the Supplement were allowed.

The notion that the Debtors had no advance knowledge of the Conversion Right Claims before March 2007 (see C.C. Brief at 18) is simply disingenuous. The Appellees would have this Court ignore entirely the Debtors' commercial sophistication and pretend as if Calpine

saw the Indenture for the first time as part of the conversion right litigation or, worse yet, that Calpine did not even know the bonds were convertible.

The Appellees assert that the magnitude of the Conversion Right Claim, assumed by the Appellees to be in the hundreds of millions, would "significantly change the planned distributions" under the Plan. E.C. Brief at 18; see also C.C. Brief at 20; Debtors' Brief at 21. As described in the Disclosure Statement, the 7.75% Convertible Noteholders estimate their Conversion Right Claim, based on available information and the Plan's estimated distributions to holders of pre-petition equity interests, to range from approximately $140.2 million to $578.4 million.[18] These claims, although significant, fall well short of materially affecting a $24.6 billion unsecured claims pool.[19] The Enron case, as cited by the Debtors, which involved a liquidating plan, is a red herring because of Calpine's waterfall plan structure. The fact that pre-petition equity holders may be further out of the money as a result of the allowance of the Conversion Right Claim is a risk that equity holders assume due to their decision to invest in the lowest rung of Calpine's capital structure. However, the effect on equity holders is insufficient to displace the 7.75% Convertible Noteholders from their position as legitimate creditors of Calpine entitled to higher priority in the capital structure.

---

[18]    The foregoing estimate by the 7.75% Convertible Noteholders involves several judgments and assumptions regarding various, changeable factors, such as, stock price, the treasury rate and volatility. Specifically, the estimate reflects, among other things, the use of a significant rate of volatility, the high end estimate of New Calpine Total Enterprise Value as set forth by Miller Buckfire, and the low end of the Debtors' claims estimates. Notwithstanding anything contained herein, this estimate and the judgments and assumptions used by 7.75% Convertible Noteholders to arrive at such estimates shall not in any way be binding upon the 7.75% Convertible Noteholders or any of their representatives, consultants, or experts, nor be deemed to be a waiver or estoppel of any of the rights of the 7.75% Convertible Noteholders or their professionals, consultants or experts to assert or testify to a greater claim amount.

[19]    As of August 15, 2007, the Debtors reported approximately $9.9 billion in total *secured* claims and $24.6 billion in total *unsecured* claims remaining on the "Claims Register," and estimated that Allowed Unsecured Claims will range from approximately $8.1 billion to $9.3 billion at the conclusion of the claim reconciliation process. See Disclosure Statement, Art I.E.

Furthermore, the Debtors' proposed form of restructuring is not in danger in any way, even if this Court allows the Supplement. The Debtors' suggestion that they would have to go "back to the drawing board" is blatant hyperbole. Allowance of the claim would simply affect the redistribution of value among stakeholders, but would not jeopardize the plan's waterfall structure or have an impact on the plan process. The Appellees certainly fail to come forward with any evidence to support these assertions.

Moreover, the establishment of reserves in respect of the Conversion Right Claim similarly would not result in prejudice sufficient to justify the disallowance of the Conversion Right Claim based on equitable grounds because once liability on a claim is established, the time necessary for an evidentiary hearing on the measure of damages is certain to be very short and the parties likely would settle on a damages number fairly quickly. This is yet one more area where the Bankruptcy Court ruled without any evidence to support its findings. As noted above, much of the Bankruptcy Court's decisions are based on facts that it simply did not have before it, thus giving this Court little choice but to remand the case back to the Bankruptcy Court for further findings.[20]

In addition, it is hard to imagine that the allowance of the Supplement would disrupt the administration of the Debtors' chapter 11 cases or distract the Debtors and their professional advisors from the plan confirmation process, as the Appellees allege in generic fashion (see Debtors' Brief at 21-25; E.C. Brief at 16-17; C.C. Brief at 20) and which the Bankruptcy Court accepted without question. Again, as noted above, the plan sought to be

---

[20]    As disclosed at the Hearing to consider the Limited Objection, the parties agreed to go forward without the submission of evidence and address the legal nature of the Conversion Right Claim, though the 7.75% Convertible Noteholders never intended to waive presentation of evidence on all of the subjective factors upon which the Bankruptcy Court ruled.

confirmed is a waterfall plan that simply distributes value until it runs out.  It is impossible to see how seeking confirmation of such a plan would be any more cumbersome if the claims pool was larger.  The Debtors likely would not amend the plan, the equity committee would not mount any more of a valuation challenge than they otherwise would have, and the Court would not be any more burdened with a confirmation hearing than it otherwise would.

Another exaggerated concern raised by the Appellees is that allowance of the Supplement would open the proverbial flood gates and inspire other stakeholders to come forward with novel claims asserting "expectation damages" which could allegedly threaten the Debtors' ability to timely emerge from chapter 11.  See C.C. Brief at 20-21; E.C. Brief at 17.  In fact, if the Appellees are consistent in their arguments, then the CalGen decision would have opened all of the floodgates that needed to be opened but there has been no rush at the door.  In addition, the docket for this case at the Bankruptcy Court demonstrates that the Debtors have actively objected to all "novel" claims, like the makewhole or "breach of contract" claims of nearly all holders of Calpine's funded debt, so the risk of a slippery slope is practically non-existent.[21]

The Appellees further argue that if the Supplement were allowed, the purpose of bar dates would be vitiated, but provide no basis for this leap of logic.  The 7.75% Convertible

---

[21] Notably, the Appellees have settled virtually all such claims.  Specifically, on June 8, 2007, the Debtors filed their motion [Docket 4880] (the "Makewhole Objection") seeking the entry of an order allowing the Debtors' limited objection to certain claims relating to Calpine's second lien debt and certain of Calpine's unsecured bonds, and determining the value of such claims pursuant to Bankruptcy Rule 3012.  In footnote 3 to the Makewhole Objection, the Debtors expressly stated that the proofs of claim filed in connection with the different series of convertible notes issued by Calpine were not the subject of the Makewhole Objection, though the Debtors reserved their rights to object to such claims at a later date. See id. at 5, n.3.  Approximately one month later, on July 6, 2007, the Debtors' filed their Limited Objection.  The Debtors have since settled, or are on the cusp of settling, all the makewhole objections, except with respect to the convertible noteholders.  See generally Debtors' Motion For Approval of Stipulation with Calpine Unsecured Noteholders and HSBC Bank USA, N.A., as Indenture Trustee dated September 19, 2007 [Docket 6201].

Noteholders acknowledge the critical role played by bar dates in bankruptcy, but nowhere in their papers do Appellees support their suggestions that allowance of the Supplement would cause creditors to amend their claim "at any time in a bankruptcy case without bankruptcy court approval."  E.C. Brief at 20; C.C. Brief at 12.  Far from a disguised attempt to assert a late claim, the Supplement does nothing more than amplify the specific nature of the unliquidated amounts that were previously asserted in the Original Proof of Claim.  In the parlance of the Creditors' Committee, the Supplement does nothing more than assert "plain vanilla" grounds of liability — breach of contract — arising from the same four corners of the Indenture.

## CONCLUSION

Accordingly, the 7.75% Convertible Noteholders respectfully request that this Court reverse the Bankruptcy Court's Order and remand these proceedings to the Bankruptcy Court in accordance with the foregoing.

Dated: New York, New York
        October 1, 2007

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By: /s/ Kristopher M. Hansen
        Kristopher M. Hansen (KH-4679)
        Erez E. Gilad (EG-7601)

180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for Appellant Holders of the 7.75%*
*Convertible Notes*

26