UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

In re:

CALPINE CORPORATION, et al.,                Chapter 11
                                            Case No. 05-60200(BRL)

                Debtors.
────────────────────────────────

ARISTEIA CAPITAL, L.L.C., AURELIUS
CAPITAL MANAGEMENT, LP, DRAWBRIDGE
SPECIAL OPPORTUNITIES ADVISORS LLC, ORE
HILL HUB FUND LTD., NISSWA MASTER FUND
LTD., PINES EDGE VALUE INVESTORS L.P.,      07 Civ. 8493 (JGK)
SILVER SANDS FUND LLC, STARK MASTERFUND
LTD. AND 3V CAPITAL MANAGEMENT, LLC         OPINION AND ORDER

                Plaintiffs,

            - against -

CALPINE CORPORATION AND ITS AFFILIATED
DEBTORS AND DEBTORS IN POSSESSION,

                Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

        This is an appeal from the Order Granting Debtors' Limited

Objection to Convertible Noteholder Claims Nos. 2404, 2821,

2823, 6247, 6249, 6280, 6299 and 6300 (the "Order") entered by

the United States Bankruptcy Court for this district (the

"Bankruptcy Court") on August 10, 2007.  (Docket No. 5595).  The

appeal is brought by certain holders of convertible notes and

their respective successor indenture trustees (the

"Appellants").  The convertible notes were issued by Calpine

Corporation ("Calpine," and together with its affiliated debtors

and debtors-in-possession, the "Debtors").  There is

jurisdiction to hear the appeal pursuant to 28 U.S.C.
§ 158(a)(1).

The central issue on this appeal is whether the Bankruptcy
Court erred in finding that the appellant indenture trustees and
noteholders were not entitled to compensation for the alleged
loss of the conversion rights of their convertible debentures.
The Bankruptcy Court found that the claims for the alleged loss
of such rights were untimely and in any event without merit in
view of the fact that all of the notes were accelerated and the
debtors were entitled to principal and interest but not, in
addition, to compensation for the alleged loss of the conversion
rights.

The Court has reviewed the Bankruptcy Court's thorough
decision granting the Debtors' limited objection (the "Limited
Objection") and the arguments of the parties to this appeal.
The Order is **affirmed in part** and **vacated and remanded** in part.
The Appellants' motion to withdraw the reference is **denied
without prejudice**.

I.

The following facts are undisputed unless otherwise noted.
Between 2000 and 2005, Calpine issued four series of unsecured
convertible notes (the "Convertible Notes" or "Notes").  Calpine
issued the 6.00% Convertible Senior Notes Due 2014 (the "6%

Notes") and the 7.75% Contingent Convertible Senior Notes Due

2015 (the "7.75% Notes) pursuant to an indenture, dated as of

August 10, 2000, (the "Original Indenture" and, as supplemented

by the First Supplemental Indenture, dated as of September 28,

2000, the Second Supplemental Indenture, dated as of September

30, 2004, and the Third Supplemental Indenture, dated as of June

23, 2005, the "Indenture"). (See R. App. for Br. of Debtors-

Appellees Exs. 2-4.) Calpine issued the 4.75% Contingent

Convertible Senior Notes Due 2023 (the "4.75% Notes") pursuant

to a separate indenture, dated as of November 14, 2003, which

was superseded by the Amended and Restated Indenture dated as of

March 12, 2004 (the "4.75% Indenture and, together with the

Indenture, the "Indentures"). (Id. Ex. 5.)[1]  New York Law

governs the Indentures. (See Original Indenture § 10.11; Second

Supplemental Indenture § 12.07; Third Supplemental Indenture §

12.07; 4.75% Indenture § 12.08.)  On December 20, 2005 (the

"Petition Date"), the Debtors filed petitions under Chapter 11

of the Bankruptcy Code.  As of the Petition Date, approximately

$1.8 billion in principal was outstanding under the Convertible

Notes.

On April 26, 2006, the Bankruptcy Court issued an order

establishing August 1, 2006 as the Bar Date for filing proofs of

---

[1] Calpine issued the 4% Convertible Notes Due December 26, 2006 (the "4%
Notes"), but claims by those noteholders are not part of this appeal.  See
infra n.3.

claim.[2]  (See App. for Opening Br. of 7.75% Noteholders Ex. 10.)

On July 19, 2006, Wilmington Trust Company, as indenture trustee

for the 7.75% Notes, filed a Proof of Claim asserting claims for

(a) principal and interest and (b) other unliquidated charges

under the Indenture. (Claim 2404, R. App. for Br. of Debtors-

Appellees Ex. 6.)  The other unliquidated charges were defined

as "[a]ll other interest, charges, penalties, premiums, and

advances which may be due or become due under the Notes and the

Indenture...."  (Id. at 2.)  On July 26, 2006, HSBC Bank

("HSBC"), as successor indenture trustee for the 4.75% and 6%

notes, filed two Proofs of Claim asserting similar claims for,

in addition to principal, interest, and trustee fees, "any and

all other amounts due or to become due under the Indenture and

the Notes, whether now due or hereafter arising, which amounts

may, presently, be unliquidated or contingent, but may become

fixed and liquidated in the future, including . . .

compensatory, secondary and/or punitive damages...."  (Claim

2821 § 2(f) and Claim 2823 § 2(d), R. App. for Br. of Debtors-

Appellees Exs. 7-8.)  The relevant Indenture was attached to the

Proofs of Claim.  On January 30, 2007, the Bankruptcy Court

approved a stipulation and order entered into by the Debtors and

HSBC allowing claim amounts for the principal and prepetition

---

[2] The 6% Noteholders assert, and the Debtors do not dispute, that the Debtors
granted the 6% Noteholders a 30-day extension of the bar date to August 31,
2006.

accrued interest due on the 4.75% Notes and 6% Notes.  The
stipulation reserved any "unliquidated claims" asserted in the
Proofs of Claim for the plan of reorganization process or claims
reconciliation process.  (R. App. for Br. of Debtors-Appellees,
Ex. 13 at 8.)

In March, April, and May of 2007, HSBC and Manufacturers
and Traders Trust Company (collectively, the "Successor
Indenture Trustees"), filed supplemental Proofs of Claim.  (See
R. App. for Br. of Debtors-Appellees Exs. 15-19.)  In addition
to principal and interest on the Convertible Notes, the
supplemental Proofs of Claim state claims for (i) the conversion
rights and (ii) damages for breach of the Indentures including
the conversion rights (the "Conversion Right Claims" or "New
Claims").  (Claim 6280 ¶ 4, Claim 6299 ¶ 4, and Claim 6300 ¶ 4.)[3]
The Debtors filed their initial joint plan of reorganization and
disclosure statement on June 20, 2007 (the "Initial Plan," and,
as amended on August 27, 2007 and September 18, 2007, the
"Plan").

On July 6, 2007, the Debtors filed a limited objection to
the Appellants' Proofs of Claim (the "Limited Objection").
(Docket No. 5206, R. App. for Br. of Debtors-Appellees Ex. 27.)
The Limited Objection sought disallowance of the "New Claims,"

---

[3] The supplemental Proofs of Claim filed by HSBC also asserted Conversion
Right Claims with respect to the 4.00% Notes.  The Debtors successfully
objected to these claims and this aspect of the Bankruptcy Court's ruling has
not been appealed.

defined as "damages for any 'breach' of the Conversion Rights."
(Id. at 12-13.)  On August 8, 2007, the Bankruptcy Judge issued
a ruling from the bench on the Limited Objection (the
"Opinion"), holding: (1) the timely-filed Proofs of Claim did
not encompass the Conversion Right Claims; (2) the Conversion
Right Claims did not "relate back" to the Original Claims and
therefore were new claims rather than amendments; (3) equitable
factors weighed against considering the Conversion Right Claims,
whether as new claims or as amendments to the timely-filed
Proofs of Claim; (4) the Conversion Right Claims had no merit;
and (5) to the extent the Conversion Right Claims were allowable
they were subject to subordination to the level of common stock
under Section 510(b) of the Bankruptcy Code.  (Tr. 97-101, Aug.
8, 2007, R. App. for Br. of Debtors-Appellees Ex. 1.)  On August
10, 2007, the Bankruptcy Court entered the Order, which
disallows not only the Conversion Right Claims but also any
claims under the Indentures beyond principal, accrued interest
and "reasonable prepetition indenture trustee fees," including
"any actual or potential claims, premiums or penalties related
to any contract defaults or damages."  (Order ¶ 3.)

## II.

The Court reviews the Bankruptcy Court's conclusions of law
de novo and its findings of fact for clear error.  Citibank,

N.A. v. Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Johns-Manville Corp., 340 B.R. 49, 58 (S.D.N.Y. 2006); see also Fed. R. Bankr. P. 8013.  A bankruptcy court's denial of leave to amend a timely-filed Proof of Claim or a request to file a late claim is reviewed for abuse of discretion.  Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 124 (2d Cir. 2005); Integrated Resources, Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Resources, Inc.), 157 B.R. 66, 70, 72 (S.D.N.Y. 1993).  The bankruptcy court abuses its discretion when "no reasonable man could agree with the bankruptcy judge's decision."  In re Integrated Resources, Inc., 157 B.R. at 72.  The parties have agreed that the language of the Indentures is unambiguous, and therefore the Bankruptcy Court's interpretation of the Indentures is subject to de novo review.  Network Publishing Corp. v. Shapiro, 895 F.2d 97, 99 (2d Cir. 1990).

III.

The Appellants argue that the timely-filed Proofs of Claim (the "Original Claims") encompassed a claim for breach of the conversion rights based on the broad language of the Original Claims and the attached Indentures.  In the alternative, the Appellants contend that the Bankruptcy Court abused its discretion when it found that the Conversion Right Claims did

not "relate back" to the Original Claims and therefore were late-filed new claims rather than amendments, and in any event the Bankruptcy Court should have considered the New Claims on equitable grounds.

The Appellants argue that the Original Claims encompassed the Conversion Right Claims.[4]  Under the Federal Rules of Bankruptcy Procedure, a "proof of claim is a written statement setting forth a creditor's claim."  Fed. R. Bankr. P. 3001.  The purpose of the claim filing requirement of the Bankruptcy Code is "to ensure that all those involved in the proceeding will be made aware of the claims against the debtor's estate and will have the opportunity to contest those claims."  Aetna Cas. & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 777 (2d Cir. 1996) (quoting Liona Corp. v. PCH Assocs., (In re PCH Assocs.), 949 F.2d 585, 605 (2d Cir. 1991)).  The Appellants argue that the catch-all language in the Original Claims and the attached Indentures put the Debtors on notice of the Conversion Right Claims.  However, the Original Claims did not mention the Noteholders' conversion rights or any alleged breach of those rights.  Moreover, the Appellants concede that they are not aware of any bankruptcy case where convertible

---

[4] It is not clear what standard of review applies to a bankruptcy court's determination as to what claims were asserted in a Proof of Claim.  Cf. In re Duplan Corp., 212 F.3d 144, 151 (2d Cir. 2000) ("The Bankruptcy Court's interpretation of the text of the Plan, the Confirmation Order, and the Final Decree are conclusions of law reviewed de novo.").  Therefore, this Court will review this aspect of the appeal de novo.

noteholders were allowed claims for damages for the loss of their conversion rights. (<u>See</u> Hr'g Tr. 9:3-22, 58:12-24, Oct. 15, 2007.)  Given the novel nature of the Conversion Right Claims, the catch-all provision would not have provided the Debtors reasonable notice that the Noteholders were asserting claims for breach of those rights.

The cases cited by the Appellants are distinguishable.  In these cases, the contested claims were not based on a novel theory of recovery and the Proof of Claims used sufficiently specific language to put a reasonable person on notice of the contested claims.  <u>See, e.g.</u>, <u>id.</u> at 776-77 (reasonable person put on notice of Department of Labor's right to offset black lung liability against tax refund where the claim filed by the Department of Labor stated that it was "subject to the United States's right to withhold subject to offset amounts due from another Federal entity...."); <u>In re Bloomingdale Partners</u>, 160 B.R. 101, 108 (Bankr. N.D. Ill. 1993) (finding sufficient notice of claim for common law nuisance where it was "clear from the face of the proof of claim that the [creditors were] seeking money damages from the Debtor on account of the Debtor's emanation of excessive noise from its building").  While a Proof of Claim does not necessarily require absolute precision, it still must provide sufficient notice to the parties.  The language of the Original Claims and the attached Indentures did

not provide sufficient notice to the Debtors of the Conversion Right Claims.

The Bankruptcy Court did not abuse its discretion in finding that the newly asserted Conversion Right Claims were time-barred and refusing to allow them as amendments or new claims. The Appellants argue that the New Claims "relate back" to the Original Claims and therefore the Bankruptcy Court erred in ruling that the Conversion Right Claims were untimely new claims rather than amendments to the Original Claims. Under the bankruptcy rules, courts may permit post-bar date amendments to timely filed proofs of claim. See Fed. R. Bankr. P. 7015 (Rule 15 of the Federal Rules of Civil Procedure governing amendment of pleadings applies in adversary proceedings); In re Enron Corp., 419 F.3d at 133. In determining whether a proposed amendment relates back to a timely-filed claim, courts first examine "whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." In re Integrated Resources, 157 B.R. at 70 (quoting In re Black & Geddes, Inc., 58 B.R. 547, 553 (Bankr. S.D.N.Y. 1983)). A claim relates back to a timely filed claim if it "(1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original

claim." In re Enron Corp., 419 F.3d at 133 (quoting In re
McLean Indus., Inc., 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)).

If the "relation back" threshold is satisfied, courts then
examine whether, under the facts of the case, it would be
equitable to allow the amendment. Id. (citing In re Integrated
Resources, 157 B.R. at 70). Courts consider the following five
equitable factors in determining whether to allow an amendment:

> (1) undue prejudice to the opposing party; (2) bad faith or
> dilatory behavior on the part of the claimant; (3) whether
> other creditors would receive a windfall were the amendment
> not allowed; (4) whether other claimants might be harmed or
> prejudiced; and (5) the justification for the inability to
> file the amended claim at the time the original claim was
> filed.

In re Integrated Resources, 157 B.R. at 70 (internal citation
omitted).

Rule 9006 of the Federal Rules of Bankruptcy Procedure
governs the admission of late-filed new claims, as opposed to
amendments. Rule 9006 provides in relevant part that "when an
act is required or allowed to be done at or within a specified
period . . . by order of court, the court for cause shown may at
any time in its discretion . . . permit the act to be done where
the failure to act was the result of excusable neglect." Fed.
R. Bankr. P. 9006(b)(1). The "excusable neglect" standard was
analyzed by the Supreme Court in Pioneer Inv. Servs. Co. v.
Brunswick Assocs. L.P., 507 U.S. 380, 395 (1993), and involves
consideration of similar equitable factors as the second-prong

11

of the test governing amendments, including: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." <u>Id.</u> The justification for the delay is weighed most heavily in the "excusable neglect" analysis.  <u>In re Enron</u>, 419 F.3d 122-23 (citing <u>Silivanch v. Celebrity Cruises, Inc.</u>, 333 F.3d 355, 368 (2d Cir. 2003).

The Bankruptcy Court first found that the Appellants failed to establish "relation back" because the Conversion Right Claims were separate and distinct from the Original Claims.  This was not an abuse of discretion, given the novelty of the Conversion Right Claims and the fact that the original Proofs of Claim did not mention any alleged breach of the conversion rights.  The bar date "serves the important purpose of enabling the parties in interest to ascertain with reasonable promptness the identity of those making claims against the estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization."  <u>In re Best Prods. Co., Inc.</u>, 140 B.R. 353, 357 (Bankr. S.D.N.Y. 1992) (citing <u>First Fid. Bank, N.A. v. Hooker Invs., Inc.</u> (<u>In re Hooker Invs., Inc.</u>), 937 F.2d 833, 840 (2d Cir. 1991)); <u>see also</u> <u>In re Asia Global Crossing Ltd.</u>, 324 B.R. 503, 508 (Bankr. S.D.N.Y. 2005).  Bar dates would

be rendered meaningless if creditors were granted leave to amend to assert new novel claims based on broad language in a timely-filed Proof of Claim and an attached Indenture.  See In re Stavriotis, 977 F.2d 1202, 1206 (7th Cir. 1992).  Instead, "court[s] must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment."  In re Enron Corp., 419 F.3d at 133 (quoting In re Integrated Resources, 157 B.R. at 70).

The Bankruptcy Court reached the reasonable conclusion that the Conversion Right Claims were "entirely new" claims that lacked a sufficient nexus to the Original Claims to justify leave to amend nearly seven and in some cases almost ten months after the Bar Date.  The fact that the New Claims arise out of the same Indentures is not sufficient to establish relation back because the Original Claims did not provide the Debtors with reasonable notice of the proposed amendment.  See generally In re Miss Glamour Coat Co., No. 79 Civ. 2605, 1980 WL 1668, at *3 (S.D.N.Y. Oct. 8, 1980).  The Original Claims did not mention the conversion rights and the Conversion Right Claims are both novel and substantively dissimilar to the specific claims made in the Original Claims.  Therefore, it was not an abuse of discretion for the Bankruptcy Court to find that the Conversion Right Claims did not relate back to the Original Claims.

The Bankruptcy Court then analyzed whether equitable principles warrant consideration of the New Claims. The Bankruptcy Court's balance of the equities was not clearly erroneous either with respect to consideration of the New Claims as amendments or under the "excusable neglect" analysis for late-filed claims. With respect to prejudice to the debtor or other parties in interest, courts consider: (1) the size of the claim in relation to the estate, (2) whether the plan has been filed with knowledge of the existence of the claim, and (3) the disruptive effect allowance of the claim would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated. In re Enron Creditors Recovery Corp., 370 B.R. 90, 101 (Bankr. S.D.N.Y. 2007); see In re Keene Corp., 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995).

The size of the New Claims supports a finding of prejudice in this case. It has been observed that prejudice means more than "a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims." In re R.H. Macy & Co., Inc., 166 B.R. 799, 802 (S.D.N.Y. 1994). However, "the size of the claim cannot be irrelevant to the analysis," and courts have found prejudice in situations where the size of the claims threatens the plan of reorganization. In re Enron Corp., 419 F.3d at 130; cf. In re AM Intern, Inc., 67 B.R. 79, 82 (N.D. Ill. 1986) ("Ordinarily, to be within the scope of a permissible

amendment, the second claim should not only be of the same nature as the first but also reasonably within the amount to which the first claim provided notice."). The New Claims are not of the same nature as the Original Claims, and the Appellants concede that "[u]sing the Debtors' current estimate . . . the Appellant Holders estimate that the conversion right claims for all three issues combined would approximate $258 million." (6% Noteholders Reply Br. 7.) At the hearing on the Limited Objection, the 6% Convertible Noteholders stated that their portion of the Conversion Right Claims could potentially reach $500 million. (Tr. 49-50.) Much smaller claims have been found to be prejudicial in other bankruptcies. See, e.g., In re Enron, 419 F.3d at 131 (bankruptcy court did not abuse its discretion when it found that the late assertion of a claim of $12.5 million was prejudicial in $900 billion bankruptcy).

The timing of the filing of the New Claims, well into the negotiations between the Debtors and the creditors and more than six months after the Bar Date further supports a finding of prejudice. The fact that the claims were submitted prior to the filing of the Initial Plan does not preclude a finding of prejudice. See id. at 129 (although the late claim was filed before the draft plan of reorganization and disclosure statement, "negotiations were at a sufficiently advanced stage

that the belated introduction of a multimillion dollar claim would have a disruptive effect.")

The Appellants argue in the alternative that subordination of the New Claims would eliminate any prejudice because allowance of the New Claims would not reduce the distribution to the other creditors.  The argument would be difficult to rely upon in view of the Appellants' vigorous argument that the New Claims should not be subordinated as a matter of law.  In any event, the argument is unpersuasive because the disruption in the judicial administration of the estate can constitute prejudice, apart from any decreased distribution.  Id. at 128. The Bankruptcy Court articulated the potential negative impact that allowance of the New Claims would have on consensual negotiations between the parties, confirmation of the plan of reorganization, and distributions to stakeholders.  Courts have taken into account whether allowance of a late claim would jeopardize the success of the reorganization or affect the distribution to creditors and equity holders.  In re Enron Corp., 419 F.3d at 130 (citing In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 128 (3d Cir. 1999)).

With respect to the remaining equitable factors, while other creditors may receive a larger distribution if the amendment is disallowed, this would not constitute a windfall. See In re Enron Recovery Creditors Corp., 370 B.R. at 99.

16

Furthermore, and most importantly for the purposes of the "excusable neglect" analysis, the Appellants have failed to offer a sufficient justification for the delay in asserting the New Claims.  Id. at 99, 103.  The Appellants had the ability to include the New Claims in their Original Claims and indeed to file supplemental Proofs of Claim at any time and have not offered any explanation as to why no such supplements were filed until such a late date.  Pioneer, 507 U.S. at 395.

The Appellants contend that there is no causal link between the delay and any potential prejudice because there is no evidence that the Debtors, had they known about the New Claims earlier, would have resolved them outside the plan process. However, the Debtors are not required to show that in the absence of the delay the New Claims would have been resolved in advance of the confirmation of the plan of reorganization. Rather, a finding of prejudice can be based on the size of the contested claims and the disruptive effect that allowance of the contested claims would have on the current administration of the estate.  See In re Enron Creditors Recovery Corp., 370 B.R. at 101.

Despite the length of the delay, there is no evidence of bad faith by the Appellants, so this final equitable factor weighs slightly in favor of the Appellants.  However, the other factors weigh decidedly against the Appellants under both the

amendment analysis and the "excusable neglect" analysis governing late-filed claims. Therefore, the Bankruptcy Court's balance of the equities and consequent refusal to allow the New Claims as amendments or as late-filed new claims was not an abuse of discretion.

IV.

The Appellants also appeal the Bankruptcy Court's disallowance of the Conversion Right Claims on the merits and its ruling that even if cognizable the Conversion Right Claims would be susceptible to subordination pursuant to Section 510(b) of the Bankruptcy Code. Upon a plenary review of the Indentures, the Court finds that the Conversion Right Claims are without merit. Under the Indentures, the conversion rights expired as a result of the filing of the bankruptcy petition and therefore the Noteholders have no valid claim for breach of their conversion rights under Section 502 of the Bankruptcy Code. The Court also finds that if the Conversion Right Claims were valid claims they would be subordinated to the level of equity under Section 510(b).

A.

Under New York law, "the essence of contract interpretation . . . is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances

18

existing at the time of the formation of the contract." VTech Holdings Ltd. v. Lucent Techs. Inc., 172 F. Supp. 2d 435, 441 (S.D.N.Y.2001) (internal citation omitted). "[T]he tests to be applied [to determine intent] ... are common speech ... and the reasonable expectation and purpose of the ordinary business[person] in the factual context in which terms of art and understanding are used, often also keyed to the level of business sophistication and acumen of the particular parties." Uribe v. Merchants Bank of New York, 693 N.E.2d 740, 743 (N.Y. 1998) (internal citation omitted). New York law requires a contract to be enforced according to the plain meaning of its clear and unambiguous terms so as to give effect to the intent of the parties. Wallace v. 600 Partners Co., 658 N.E.2d 715, 717(N.Y. 1995); see W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990).

A court should avoid construing a contractual provision in a manner that renders contractual language meaningless or superfluous. Two Guys from Harrison-N.Y., Inc. v. S .F.R. Realty Assocs., 472 N.E.2d 315, 318 (N.Y. 1984) ("In construing a contract one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."); Loctite VSI Inc. v. Chemfab New York Inc., 701 N.Y.S.2d 723, 725 (App. Div. 2000) ("courts should adopt an interpretation of a contract

which gives meaning to every provision of the contract, with no provision left without force and effect.").

B.

The Indentures allow holders to convert their Notes upon the occurrence of one of a number of conditions precedent. (Second Supplemental Indenture § 10.01(a); Third Supplemental Indenture § 10.01(a); 4.75% Indenture § 10.01(a).) Upon conversion, converting Noteholders are entitled to receive (a) repayment of principal, in cash and (b) payment of the difference between the conversion price and Calpine's stock price at the time of the conversion in shares of Calpine common stock. (Second Supplemental Indenture § 10.15(a), (b); Third Supplemental Indenture § 10.15(a), (b); 4.75% Indenture § 10.14(a), (b).) If an Event of Default has occurred and is continuing, the conversion value is to be paid exclusively in shares of common stock. (Second Supplemental Indenture § 10.15(d); Third Supplemental Indenture § 10.15(d); 4.75% Indenture § 10.14(d).)

Under the Indentures, the commencement of a Chapter 11 case constitutes an Event of Default. (Original Indenture § 5.1(e); 4.75% Indenture § 6.01(8).) In the event of a bankruptcy Event of Default, "the principal of and interest on [the Notes] shall ipso facto become and be immediately due and payable" without

20

any further action or notice by the trustee or Noteholders.
(Original Indenture § 5.2; see 4.75% Indenture § 6.02(a).)  None
of the conversion conditions were satisfied on the Petition Date
and therefore the conversion rights were not exercisable on the
Petition Date.  Under the Notes attached as Exhibits to the
Indentures, the conversion rights expire "at the close of
business on the Business Day immediately preceding the date of
Maturity...." (Second Supplemental Indenture A-5; Third
Supplemental Indenture A-5; 4.75% Indenture A-4.).  While the
definition of "Maturity" is therefore of particular importance
in determining whether the conversion rights existed as of the
Petition Date, the term "Maturity" is not defined in the
Indentures.

C.

The Debtors argue that "Maturity" refers generally to the
time when the Notes become due and payable, and therefore
occurred upon the automatic acceleration of the Notes when the
Debtors filed the Petitions.  This is consistent with the
general understanding that acceleration of debt makes the debt
immediately due and payable and therefore mature.  See, e.g., In
re LHD Realty Corp., 726 F.2d 327, 330-31 (7th Cir. 1984)
("acceleration, by definition, advances the maturity date of the
debt so that payment thereafter is not prepayment but instead is

payment made after maturity."); <u>In re Solutia Inc.</u>, No. 03-17949, 2007 WL 3376900, at *8 (Bankr. S.D.N.Y. Nov. 9, 2007) ("Acceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date."); <u>see also</u> <u>Black's Law Dictionary</u> 11 (7th Ed. 1999) (acceleration is "[t]he advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately.")  The Appellants contend that "Maturity" refers only to the stated term in the Notes, and therefore automatic acceleration did not result in "Maturity" and the conversion rights survived the filing of the bankruptcy petition.

A fair reading of the Indentures, which the parties ask the Court to interpret as unambiguous, indicates that "Maturity," consistent with general understanding, occurred when the Notes became "due and payable" by virtue of automatic acceleration upon the Debtors' bankruptcy filing.  (Original Indenture § 5.2; 4.75% Indenture § 6.02(a).)  At the time of the filing of the petition, the conversion rights were not exercisable because none of the conditions precedent for the exercise of the conversion rights had been satisfied.  Upon the commencement of the Chapter 11 case the Notes were automatically accelerated and matured.  By the terms of the Indentures, the conversion rights expired as a result of the Notes reaching "Maturity."

Therefore, as of the Petition Date, the Noteholders no longer held the conversion rights and cannot assert a claim for a breach of the conversion rights cognizable under Section 502 of the Bankruptcy Code.  See 11 U.S.C. § 502(b) (claim is estimated as of the date of the filing of the petition).

The interpretation that "Maturity" occurs upon automatic acceleration and that the conversion rights expired as a result of the Debtors' bankruptcy filing when they were not yet exercisable follows from the language and structure of the Indentures.  The Appellants' argue that Maturity refers solely to the maturity that occurs upon expiration of the stated term in the Notes.  However, that maturity is defined in the Indentures as "Stated Maturity." (Original Indenture § 1.1; 4.75% Indenture § 1.01.)  There is no language in the Indentures explicitly preserving the conversion rights in the event of a bankruptcy, nor do the Indentures indicate that filing a bankruptcy petition constitutes a breach of the conversion rights.  There are several places in the Indentures where the Appellants specifically negotiated for clauses to protect the value of the conversion rights.[5]  However, none of these protections preserved the conversion rights in the event of a

---

[5]  These protections include adjustments to the conversion price in the event of certain dividends or distributions, and anti-dilution protections in the event of a reclassification, merger, or other specified corporate transactions.  (See Second Supplemental Indenture and Third Supplemental Indenture §§ 10.05, 10.06, 10.12; 4.75% Indenture §§ 10.05, § 10.11.)

bankruptcy or provided a remedy for the loss of those rights in the event of a bankruptcy.  Contrary to the Appellants' argument, the fact that they may have bargained for no-call protection does not impact the analysis with respect to whether the conversion rights themselves survived the filing of a bankruptcy petition under the Indentures.

The Appellants argue that several clauses of the Indentures are inconsistent with the Debtors' interpretation that acceleration results in "Maturity," but these arguments are not persuasive.  For example, the 6% Noteholders point to Section 6.01(4) of the Second Supplemental Indenture.[6]  The 6% Noteholders argue that because "acceleration" and "maturity" appear in the disjunctive, acceleration under the Indenture cannot be interpreted to result in maturity.  However, Section 6.01(4) is a cross-default provision addressing defaults under other debt instruments and therefore refers to the use of "acceleration" and "maturity" in other debt instruments.  The broad language of Section 6.01(4) and the appearance of "acceleration" and "maturity" in the disjunctive serve to protect the Noteholders from the possibility that such terms may

---

[6] Section 6.01(4) of the Second Supplemental Indenture states in relevant part that an Event of Default includes a "default by the Company in the payment of principal of any bond, debenture, note or other evidence of the Company's indebtedness . . . which default for payment of principal is individually or in an aggregate principal amount exceeding $50,000,000 . . . when such indebtedness becomes due and payable (whether at maturity, upon redemption or acceleration or otherwise). . . ."  (Second Supplemental Indenture § 6.01(4); see also Third Supplemental Indenture § 6.01(4); 4.75% Indenture § 6.01(7).)

be defined and used differently in agreements covering other indebtedness that could trigger the cross-default provision. Therefore, Section 6.01(4) does not impact on whether automatic acceleration results in "Maturity" under the Indentures.

The 6% Noteholders' also argue that the definition of "Principal Amount at Maturity," defined as "the principal amount at maturity set forth on the face of such Note," requires a finding that "Maturity" refers only to the date set forth on the face of the Notes.[7]  (Second Supplemental Indenture § 1.01(b)) However, the definition only refers to a particular maturity and does not preclude "Maturity" from occurring at an earlier time as a result of automatic acceleration.

The Appellants rely heavily on Section 10.15(d) of the Indenture to establish that the Indentures contemplate conversion during the continuance of an Event of Default and therefore the conversion rights cannot be deemed to expire as a result of the filing of a bankruptcy petition.[8]  Section 10.15(d) provides in substance that during an Event of Default, Calpine is required to pay the conversion value exclusively in Calpine common stock rather than in a combination of cash and stock. The Appellants argue that this section explicitly contemplates a situation where the conversion rights are exercised after a

---

[7] "Principal Amount at Maturity" is only defined in the Second Supplemental Indenture governing the 6.00% Notes.
[8] The analogous section in the 4.75% Indenture is Section 10.14(d).

bankruptcy Event of Default.  However, Section 10.15(d) only
addresses the liquidity problem that Calpine would face if it
were required to pay a part of the conversion value in cash
while an Event of Default was continuing.  For example, during
non-bankruptcy Events of Default, acceleration is permissive
rather than automatic and therefore the conversion rights would
survive if the Indenture Trustee declined to accelerate the
principal and interest.  (Original Indenture § 5.2.)  If the
conversion rights were exercisable, the Indenture Trustee could
elect to convert rather than accelerate and the conversion value
would be paid in Calpine stock pursuant to Section 10.15(d).
Section 10.15(d) would also apply in a situation where a
bankruptcy Event of Default occurred after the Noteholders
elected to convert but prior to payment of the conversion value
by Calpine.  Contrary to the Appellants' assertions, nothing in
Section 10.15(d) preserves conversion rights that were not
exercisable as of the Petition Date in the event of a
bankruptcy.  Furthermore, the Appellants are not seeking to
convert the Notes at this time and they are not asking to have
their conversion value paid entirely in Calpine stock as Section
10.15(d) would require.  Therefore, Section 10.15(d) does not
establish that the conversion rights survive automatic
acceleration or that the Appellants have a remedy for money

damages for an alleged breach of the conversion rights upon the filing of a bankruptcy petition.[9]

The Bankruptcy Judge's opinion in In re Calpine Corp., 365 B.R. 392, 399 (Bankr. S.D.N.Y. 2007) (the "CalGen decision"), does not require a different conclusion.  In CalGen, the Debtors sought Bankruptcy Court approval of a refinancing that included repayment of certain secured notes issued by one of the Debtors. Some of the holders of those notes objected, arguing that the "no-call" clauses barred repayment or, in the alternative, that the proposed repayment entitled them to claims for "make-whole" premiums resulting from early redemption of the notes.  The Bankruptcy Court ruled that while the noteholders were not entitled to secured damages claims for prepayment premiums, the noteholders were nevertheless entitled to an unsecured claim for damages because as a result of the Debtors' early repayment, the noteholders "expectation of an uninterrupted payment stream has been dashed."  In re Calpine Corp., 365 B.R. at 399.  It is clear that the CalGen decision is distinguishable from this appeal.  First, the contested claims in CalGen involved no-call provisions rather than conversion rights.  Furthermore, the

---

[9] The Noteholders also argue that because Section 10.01(a)(2) provides that the Notes are exercisable after a fixed date in the future, the conversion rights must survive through the maturity set forth on the face of the Notes. (Second Supplemental Indenture § 10.01(a)(2); Third Supplemental Indenture § 10.01(a)(2).)  However, this provision only provides the Noteholders with an opportunity to convert after a specified date in the future if the Notes remain outstanding, and does not preclude the Notes from reaching Maturity at an earlier date or provide for the survival of the conversion rights in the event that the Notes reach Maturity at an earlier date.

Bankruptcy Judge found that under the CalGen agreements the
noteholders had an expectation of an uninterrupted payment
stream and that early repayment constituted a breach for which
the noteholders were entitled to damages.  Under the Indentures
in this case, the conversion rights expired as a result of the
filing of the Petitions.  Therefore, unlike in CalGen, there was
no breach of the Indentures and the Noteholders suffered no
"dashed expectation" damages as a result of acceleration.
Nothing in CalGen conflicts with the Bankruptcy Court's ruling
on the merits of the Conversion Right Claims, nor does it have
any impact on this Court's independent determination that the
Noteholders had no expectation of exercising their conversion
rights as of the filing of the petition.

    The Appellants rely on Sharon Steel Corp. v. Chase
Manhattan Bank, 691 F.2d 1039 (2d Cir. 1982) for the proposition
that the automatic acceleration did not affect the Appellants'
ability to seek damages beyond principal and interest for the
loss of the conversion rights.  In Sharon Steel, the indenture
trustees alleged a default resulting from an attempted
assignment of debentures by the debtor corporation.  The
indenture trustees sought both acceleration of the debentures
and redemption premiums on account of the default.  The District
Court held that the redemption premium was not recoverable
because the agreement called for acceleration rather than a

redemption premium.  Id. at 1053.  The Court of Appeals for the
Second Circuit reversed and granted the redemption premium on
the grounds that the "acceleration provisions of the indentures
are explicitly permissive and not exclusive of other remedies,"
including redemption.  Id.  Here, however, the conversion rights
expired by their own terms upon automatic acceleration.
Therefore, while Sharon Steel indicates that acceleration need
not be an exclusive remedy, here there was no breach of the
conversion rights upon which to seek any additional remedy
beyond acceleration.  Because the conversion rights did not
survive the Debtors' bankruptcy, Sharon Steel does not require
allowance of the New Claims.

    The Appellants also cite to other cases granting damages
for breaches of "out of the money" option contracts.  See, e.g.,
R.A. Mackie & Co. v. PetroCorp, Inc., 329 F. Supp. 2d 477, 512
(S.D.N.Y. 2004) (assessing damages for breach of plaintiff's
continuing right to exercise their perpetual warrants); Lillis
v. AT&T Corp., No. 717-N, 2007 WL 2110587 (Del. Ch. July 20,
2007).  R.A. Mackie involved a merger agreement that purported
to terminate "perpetual warrants" that were explicitly preserved
in the event of a merger.  See R.A. Mackie, 329 F. Supp. 2d at
503-04; see also Lillis, 2007 WL 2110587, at *14-*18
(interpreting the agreement at issue, which explicitly protected
the "economic position" of the option holders in the event of

certain corporate transactions, to provide for the preservation of the full economic value of employee stock options).  Neither of these cases involved damages for alleged breaches of conversion rights in bankruptcy.  In this case, the conversion rights were not exercisable as of the petition date and the Indentures do not provide for the preservation of the conversion rights in the event of a bankruptcy filing.  Therefore, the cases cited by the Appellants are inapposite.

Because the conversion rights expired prior to the Petition Date, it is unnecessary to reach the question of whether the Noteholders' claim for damages for abrogation of the conversion rights in addition to principal and interest constitutes an impermissible double recovery by asserting claims for both repayment and conversion under the Convertible Notes.  Under the Indentures at issue in this case the parties did not provide for the Noteholders to have a right to damages for the conversion right after a bankruptcy Event of Default.  It is similarly unnecessary to determine whether a claim for a breach of a conversion right that is "out of the money" as of the petition date but survives the filing of a bankruptcy petition pursuant to the agreement between the parties qualifies as a claim under Section 502(b) of the Bankruptcy Code.

D.

Even if allowable, the Conversion Right Claims would be subordinated to the level of equity under Section 510(b) of the Bankruptcy Code.  Section 510(b) provides in relevant part:

> For the purpose of distribution under this title, a claim ... for damages arising from the purchase or sale of such a security ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).  As an initial matter, Section 510(b) is to be applied broadly.  In re Enron Corp., 341 B.R. 141, 162-63 (Bankr. S.D.N.Y. 2006).  The damages claimed by the Appellants arise from the alleged elimination of the right to purchase common stock of Calpine through conversion of the Convertible Notes.

Several courts have applied Section 510(b) to subordinate claims for damages based on a breach of a right to receive stock.  See, e.g., Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 259 (2d Cir. 2006); In re WorldCom, Inc., No. 02-13533, 2006 WL 3782712, at *5-*6 (Bankr. S.D.N.Y. Dec. 21, 2006).  The Appellants attempt to distinguish these cases and others on the grounds that the Noteholders did not take on the risk expectations of a shareholder, pointing to the binding nature of the agreements in the cited cases as compared to the permissive exercise of the conversion rights at issue here.

However, by their own admission, the Noteholders offered a lower interest rate and less restrictive covenants on the Notes in exchange for the right to convert the notes into cash plus stock ownership in the company.  See Opening Br. of 7.75% Noteholders 11-12.  In doing so, the Noteholders received a lower return on their debt in exchange for the opportunity to capture the benefits of increased share price in the future.  Therefore, the Noteholders did take on risk that the conversion right would never ripen in order to obtain the "the upside potential of shareholder status."  In re Med Diversified, Inc., 461 F.3d at 256; see also In re WorldCom, 2006 WL 3782712, at *6 ("So long as the claimant's interest enabled him to participate in the success of the enterprise and the distribution of profits, the claim will be subordinated pursuant to section 510(b).").  The value of the conversion rights vary with the value of the common stock of Calpine, and therefore resemble an equity interest to which Section 510(b) is applicable.  See In re Med Diversified, Inc., 461 F.3d at 257-58; In re Enron Corp., 341 B.R. at 167-68.

    The New Claims are for damages arising out of a breach of the Appellant's prospective right to purchase common stock through conversion.  Therefore "the [conversion] transaction is part of the causal link leading to the injury," and must be subordinated to all claims or interests senior or equal to the claim or interest represented by such security.  In re Med

Diversified, Inc., 461 F.3d at 254.  The claim or interest represented by the conversion right is the common stock of Calpine, not the underlying debt instrument, and therefore the Conversion Right Claims, to the extent allowable, are subordinated to the level of common stock under Section 510(b).

V.

The Bankruptcy Court directed the parties to "[s]ettle an order consistent with" the Opinion. (Tr. 102:8-9.)  The parties submitted competing forms of order.  The Appellants objected to the form of order proposed by the Debtors both at the hearing on the Limited Objection and by letter to the Bankruptcy Court. (Tr. at 93:10-15; Ltr. from M. Barr & K. Hansen to the Hon. Burton R. Lifland, Aug. 10, 2007).  On August 10, 2007, the Bankruptcy Court entered the Order in substantially the form proposed by the Debtors.  The Order limited the value of the Appellants' claims to "the outstanding principal, plus accrued interest . . . and reasonable prepetition indenture trustee fees as provided under the Indentures . . . ."  (Order ¶¶ 2-3.)

The Appellants assert that the Order is overbroad because it goes beyond the relief requested by the Debtors in the Limited Objection, the briefing and argumentation by the parties, and the Opinion sustaining the Limited Objection. Specifically, the Appellants argue that the "make-whole" claims

and claims for prepetition indenture trustee fees were not properly before the Bankruptcy Court and that the Bankruptcy Court made no findings or ruling with respect to those claims.[10]

The Court agrees that the Order is overbroad. The Limited Objection stated that the Debtors were objecting to the "New Claims" defined as "damages for any 'breach' of the Conversion Rights." (Limited Objection 12-13.) There was only one place in the body of the Limited Objection indicating that the Debtors were seeking to limit the Appellants' claims solely to principal and interest.[11] The submissions to the Bankruptcy Court did not contain a developed discussion of any claims other than the Conversion Right Claims and the legal arguments therein specifically addressed the Conversion Right Claims.[12] Disallowance or valuation of claims other than the Conversion Right Claims was not argued at the hearing on the Limited Objection and the Opinion defined the New Claims as "damages for 'any breach' of the conversion right." (Tr. at 96:4-9.) The

---

[10] "Make-whole" claims refer to claims for breach of contract or expectation damages arising from the prepayment of debt subject to no-call provisions. (Opening Br. of HSBC 14.)

[11] In the Limited Objection, the Debtors state that "[t]he Debtors object to the New Claims to the extent they seek payment beyond Principal and Interest. Accordingly, the Debtors respectfully request that the Court, pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3007, grant the [Limited] Objection and disallow the Convertible Noteholders' claims to the extent they seek amounts beyond Principal and Interest." (Limited Objection 13-14.)

[12] In the submissions to the Bankruptcy Court, the 6% Noteholders included one footnote and the 7.75% Noteholders included one sentence related to the no-call provisions. (See Resp. of 6% Noteholders to Debtors' Limited Objection, 22-23 n.10; Resp. of 7.75% Noteholders to Debtors' Limited Objection 18.) In their reply brief, the Debtors included a short paragraph directed at such claims. (See Reply Br. to Debtors' Limited Objection 8-9.)

Order itself indicates that the Limited Objection sought

disallowance of the "New Claims." (Order 1.) The Opinion does

not include discussion of whether any other claims, including

any "make whole" claims, should be disallowed based on the

applicable standards and focuses its analysis exclusively on the

Conversion Right Claims.[13]

Under the Bankruptcy Code, if a party objects to a claim,

"the court, after notice and a hearing, shall determine the

amount of such claim in lawful currency of the United States as

of the date of the filing of the petition...." 11 U.S.C. §

502(b). The "notice and a hearing" that is required is the

notice and hearing appropriate under the circumstances. 11

U.S.C. 102(1)(A). The Order disallows and otherwise limits

claims beyond the Conversion Right Claims without giving the

Appellants the appropriate notice and hearing under the

circumstances. Furthermore, the record does not contain

sufficient findings of fact or law in order for this Court to

review the Bankruptcy Court's disallowance of any claims other

than the Conversion Right Claims. See Mazzeo v. Lenhart (In re

Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999); Fed. R. Bankr. P

9014, 7052 (Rule 52 of the Federal Rules of Civil Procedure

applies in contested matters). Therefore, to the extent the

---

[13] On June 8, 2007, the Debtors made a separate limited objection directed at "make-whole" claims under many other indentures, but this limited objection expressly excluded the Indentures and Noteholders. (Record App. to Opening Br. of 6% Noteholders, Ex. 7 at 5 n.3.)

Order disallows claims other than for the conversion rights or any alleged breach thereof, it is **vacated and remanded.**

## VI.

The 6% Noteholders, joined by the remaining appellants, have filed a motion to withdraw the reference from the Bankruptcy Court.  At oral argument on this appeal, the Appellants clarified that the motion for withdrawal of the reference was directed solely at the Conversion Right Claims, and was therefore contingent upon the Court's reversal of the Bankruptcy Court's decision with respect to those claims.  The Appellants have not requested withdrawal of the reference with respect to the "make-whole" claims.  (Tr. 177:4-7.)  Because the Court affirms the Bankruptcy Court's ruling with respect to the Conversion Right Claims, the motion to withdraw the reference is **denied without prejudice** as moot.

## CONCLUSION

The Order entered by the Bankruptcy Court on August 10, 2007 is **affirmed in part** and **vacated and remanded** in part.  The

Appellants' motion to withdraw the reference is **denied without**
**prejudice.**

SO ORDERED.

Dated:     New York, New York
           November 21, 2007

                                          John G. Koeltl
                                   United States District Judge